**2014-1802**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

APPLE INC., a California corporation,

*Plaintiff-Appellant,*

*v.*

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation, SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, AND SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

*Defendants-Appellees.*

Appeal from the United States District Court for the Northern District of California in No. 5:12-cv-00630-LHK, Judge Lucy H. Koh.

## NON-CONFIDENTIAL BRIEF FOR PLAINTIFF-APPELLANT APPLE INC.

MARK D. SELWYN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
(650) 858-6000

RACHEL KREVANS
ERIK J. OLSON
NATHAN B. SABRI
CHRISTOPHER L. ROBINSON
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7000

WILLIAM F. LEE
RICHARD W. O'NEILL
MARK C. FLEMING
LAUREN B. FLETCHER
ANDREW J. DANFORD
SARAH R. FRAZIER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000

October 3, 2014

*Counsel for Plaintiff-Appellant Apple Inc.*

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Apple Inc. certifies the following:

1.      The full name of every party or *amicus* represented by us is:

Apple Inc.

2.      The names of the real party in interest represented by us is:

Not applicable

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

WILMER CUTLER PICKERING HALE AND DORR LLP:  Thomas E. Anderson, Rebecca Bact, Heath A. Brooks, Anna Bonny Chauvet, Andrew J. Danford, Ronald R. Demsher (former), Mark C. Fleming, Lauren B. Fletcher, Adele R. Frankel, Sarah R. Frazier, Liv L. Herriot, Peter J. Kolovos, Gregory H. Lantier, Anna Tin-Yee Lee (former), William F. Lee, Andrew L. Liao, Cosmin Maier, Joseph J. Mueller, Richard W. O'Neill, John P. Pettit, Kevin S. Prussia, James L. Quarles, III, Katie M. Saxton, Mark D. Selwyn, Peter J. Shen (former), Michael J. Silhasek, Victor F. Souto, Thomas G. Sprankling, Timothy D. Syrett, Nina S. Tallon, Timothy A. Tatarka, Olga L. Tobin, S. Calvin Walden, David C. Yang, Kathryn D. Zalewski

GIBSON, DUNN & CRUTCHER LLP:  Jordan H. Bekier, Brian M. Buroker, Frederick S. Chung, Emily L. Fedman (former), Megan K. Fluckiger, Joshua R. Furman (former), Holly A. Jones, Stephanie J. Kim, Steven S. Kim (former), Josh A. Krevitt, Jeffrey G. Lau, Jason C. Lo, Quincy Lu, H. Mark Lyon, Shannon E. Mader, Timothy W. Malone (former), Casey J. McCracken, Azar Mouzari, Mark Nolan Reiter, Jennifer J. Rho, Sarah J. Sladic, Rodney J. Stone, Daniel J. Thomasch, Paul E. Torchia, Michael A. Valek, Robert Vincent, Samuel K. Whitt, Minae Yu

MORRISON & FOERSTER LLP:    James P. Bennett, Ruth N. Borenstein, Brittany N. DePuy (former), Efrain Staino Flores, Richard S.J. Hung, Michael A. Jacobs, Esther Kim, Matthew I. Kreeger, Rachel Krevans, Kenneth A. Kuwayti, Scott F. Llewellyn, Jack W. Londen, Harold J. McElhinny, Erik J. Olson, Mary Prendergast, Christopher L. Robinson, Nathaniel B. Sabri, Nicole M. Smith, Christopher J. Wiener

COOLEY, GODWARD, KRONISH LLP:  Benjamin George Damstedt

SKIERMONT PUCKETT LLP:  Sarah Elizabeth Spires

Dated:  October 3, 2014

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ....................................................................vi

STATEMENT OF RELATED CASES ...................................................1

JURISDICTIONAL STATEMENT .......................................................1

INTRODUCTION ...................................................................................1

STATEMENT OF ISSUE.......................................................................4

STATEMENT OF FACTS ......................................................................4

    A.    Apple's Reputation For Innovation.......................................4

    B.    Apple's Infringed Patents.......................................................6

        1.    The '647 Patent ...........................................................6

        2.    The '721 Patent ...........................................................9

        3.    The '172 Patent .........................................................11

    C.    Samsung's "Fast Follower" Status.......................................12

    D.    Samsung's Infringement .....................................................14

    E.    Irreparable Harm To Apple .................................................14

        1.    Irreparable Harm to Apple's Reputation ...................15

        2.    Irreparable Harm To Apple's Market Share And Downstream Sales.................................................16

    F.    Samsung's Purported Design-Arounds ...............................19

    G.    Apple's Narrowly-Tailored Permanent Injunction .............20

H.  The District Court's Denial Of Apple's Proposed Injunction ............20

I.  Apple's Motion For An Ongoing Royalty ..........................................25

SUMMARY OF ARGUMENT ...............................................................26

STANDARD OF REVIEW ....................................................................29

ARGUMENT ........................................................................................29

I.  THE DISTRICT COURT ERRED BY FINDING NO IRREPARABLE HARM. .............31

A.  The District Court Erred By Requiring Proof That The Infringing Features Drive Demand For Samsung's Entire Products As A Prerequisite To An Injunction Limited To The Infringing Features Alone. ...............................................31

B.  The District Court Erred By Finding That Apple Did Not Suffer Irreparable Harm To Its Reputation As An Innovator. ............34

1.  Apple Proved Irreparable Harm To Its Reputation Under *Douglas Dynamics*. .........................................34

2.  The District Court Improperly Declined To Follow *Douglas Dynamics*. .................................................39

3.  The District Court Erred By Ignoring Relevant Record Evidence And Improperly Imposing A Heightened New Standard To Prove Irreparable Reputational Harm. ................................................40

C.  The District Court Erred In Finding That Apple Did Not Suffer Irreparable Sales-Based Losses Due To Samsung's Infringement. ........................................................50

1.  Apple Established A Causal Nexus For The '647 Patent. ......................................................52

2.  Apple Established A Causal Nexus For The '721 Patent. ......................................................53

3.      Apple Established A Causal Nexus For The '172 Patent...........................................................................55

4.      The District Court Erred By Failing To Consider The Collective Evidence Of A Causal Nexus...........................56

II.    THE DISTRICT COURT ERRED BY FINDING THAT MONEY DAMAGES CAN REMEDY THE HARM CAUSED BY SAMSUNG'S ONGOING INFRINGEMENT. ................................................................................60

III.   THE DISTRICT COURT CORRECTLY FOUND THAT THE BALANCE OF HARDSHIPS FAVORS GRANTING APPLE'S PROPOSED INJUNCTION. .................63

IV.    THE DISTRICT COURT CORRECTLY FOUND THAT THE PUBLIC INTEREST FAVORS GRANTING APPLE'S PROPOSED INJUNCTION. ....................65

CONCLUSION ......................................................................................66

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

### Statement Regarding Redaction Of Confidential Materials

The material omitted on page 5 of this non-confidential brief discusses the results of Apple's confidential market research.  The material omitted on pages 17 and 51 of this non-confidential brief are statements from Samsung's confidential business strategy documents.  The material omitted from pages A12, A16, A19, A33, and A34 of the non-confidential addendum concerns the confidential terms of Apple's licensing agreements and the results of Apple's confidential market research.  This material has been designated confidential pursuant to a protective order and/or filed under seal in the United States District Court for the Northern District of California.

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abbott Laboratories v. Sandoz, Inc.*,
  544 F.3d 1341 (Fed. Cir. 2008) ........................................................65

*Acumed LLC v. Stryker Corp.*,
  551 F.3d 1323 (Fed. Cir. 2008) ........................................................45

*Apple Inc. v. Samsung Electronics Co.*,
  678 F.3d 1314 (Fed. Cir. 2012) ......................................32, 33, 57, 59

*Apple Inc. v. Samsung Electronics Co.*,
  695 F.3d 1370 (Fed. Cir. 2012) ..................................................1, 32

*Apple Inc. v. Samsung Electronics Co.*,
  735 F.3d 1352 (Fed. Cir. 2013) ...............................................passim

*Atari Games Corp. v. Nintendo of America, Inc.*,
  897 F.2d 1572 (Fed. Cir. 1990) ........................................................57

*Broadcom Corp. v. Emulex Corp.*,
  732 F.3d 1325 (Fed. Cir. 2013) ..........................................30, 32, 64

*Broadcom Corp. v. Qualcomm Inc.*,
  543 F.3d 683 (Fed. Cir. 2008) ...........................................47, 63, 64

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
  269 F.3d 1149 (10th Cir. 2001) ........................................................42

*Douglas Dynamics, LLC v. Buyers Products Co*,
  717 F.3d 1336 (Fed. Cir. 2013) ...............................................passim

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)...................................................................passim

*Ecolab, Inc. v. FMC Corp.*,
  569 F.3d 1335 (Fed. Cir. 2009) ........................................................29

*Edwards Lifesciences AG v. CoreValve, Inc.*,
  699 F.3d 1305 (Fed. Cir. 2012) ........................................................30

*Facebook, Inc. v. Power Ventures, Inc.*,
  No. 08-cv-5780, 2013 WL 5372341 (N.D. Cal. Sept. 25, 2013) ......................42

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
  No. 07-cv-331, 2013 WL 3043668 (D. Nev. June 17, 2013) ......................41, 61

*i4i Ltd. Partnership v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) .........................................................63

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
  988 F.2d 1117 (Fed. Cir. 1993) ........................................................39

*MySpace, Inc. v. Wallace*,
  498 F. Supp. 2d 1293 (C.D. Cal. 2007) ................................................60

*Optinrealbig.com, LLC v. Ironport Systems, Inc.*,
  323 F. Supp. 2d 1037 (N.D. Cal. 2004) ................................................60

*Panduit Corp. v. All States Plastic Manufacturing Co.*,
  744 F.2d 1564 (Fed. Cir. 1984) ....................................................... 39

*Presidio Components, Inc. v. American Technical Ceramics Corp.*,
  702 F.3d 1351 (Fed. Cir. 2012) ...................................................passim

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991) .........................................................60

*Robert Bosch, LLC v. Pylon Manufacturing Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011) ....................................................29, 64

*Sanofi-Synthelabo v. Apotex*,
  470 F.3d 1368 (Fed. Cir. 2006) .......................................................29

*Southern Snow Manufacturing Co. v. SnoWizard Holdings, Inc.*,
  No. 06-9170, 2014 WL 1652436 (E.D. La. Apr. 24, 2014) ........................41, 61

*Trebro Manufacturing, Inc. v. Firefly Equipment, LLC*,
  748 F.3d 1159 (Fed. Cir. 2014) ................................................35, 47, 50

*Verizon Services Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007) .....................................................................51, 64

## STATUTES

28 U.S.C.
   § 1292.......................................................................................................................1
   § 1331.......................................................................................................................1
   § 1338.......................................................................................................................1

## OTHER AUTHORITIES

O'Malley, Hon. Kathleen M., *Interesting Times at the Federal Circuit*, 63
   Am. U. L. Rev. 949 (2014) .........................................................................32, 40

## STATEMENT OF RELATED CASES

This Court previously resolved an appeal in this case arising from the district court's grant of a preliminary injunction.  *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370 (Fed. Cir. 2012) (Prost, J., joined by Moore & Reyna, JJ.) ("*Apple II*"). Counsel for Apple are unaware of any other case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338.  This Court has jurisdiction over the denial of a permanent injunction under 28 U.S.C. § 1292(c)(1).

## INTRODUCTION

In this case, the jury found that Samsung infringed three Apple patents more than thirty-five million times.[1]  And during trial, Samsung repeatedly represented that Apple's patented features are "trivial" and could be removed from Samsung's products in under one month using already-existing design-arounds.  Yet, now many months after the jury's verdict, Samsung has continued to harm Apple irreparably through additional sales of products incorporating Apple's technology,

---

[1]    In the last three years, two juries and the ITC have collectively found that Samsung has infringed eleven of Apple's patents and willfully diluted two of Apple's trade dresses.

and has still made no promises to refrain from using its supposedly insignificant and easily-eliminated infringing features in future products.

To prevent further infringement, and to follow this Court's recent precedent concerning injunctive relief, Apple proposed a narrowly-tailored permanent injunction. Apple did not seek to enjoin *entire Samsung products*. Instead, Apple only proposed to enjoin Samsung from further use of its *infringing features*, and, taking Samsung at its word, included a one-month sunset period for Samsung to design those features out of its products. If Samsung was accurate and truthful, it can remove the infringing features from its products quickly and without any harm to itself or the public.

The district court agreed that Apple's proposed injunction is narrowly-tailored, and found that the balance of hardships and public interest both favor an injunction. Nevertheless, the district court denied Apple injunctive relief of any kind. In doing so, the district court erroneously declined to follow this Court's precedent governing reputational harm. It also misapplied this Court's precedent regarding *product-based* injunctive relief—by requiring Apple to prove that the infringing features drive demand for Samsung's entire products, even though Apple only seeks an injunction against the *infringing features alone*. This new categorical rule—that to obtain an injunction, a patentee must prove that the infringing features drive demand for entire products, regardless of the scope of

injunctive relief sought—will preclude injunctions in nearly every case involving multi-feature products.  It also is precisely the type of rigid approach that this Court has cautioned "could lead to perverse situations such as a patentee being unable to obtain an injunction against the infringement of multiple patents" simply because there is insufficient proof that any one of them on its own drives demand for the entire infringing product.  *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1365 (Fed. Cir. 2013) ("*Apple III*").

In effect, the district court imposed a compulsory license on Apple.  But to make matters worse, it recently declined to award Apple any supplemental damages at this time and awarded prejudgment interest at below-market rates.  Together, these rulings have allowed Samsung to finance its ongoing infringement by borrowing money from Apple at rates better than it could have secured in the commercial marketplace.  It is no wonder, then, that Samsung's lawyers have publicly declared a complete victory for Samsung in this case because "Apple hasn't collected a penny—or succeeded in taking any products off the market."

Neither Congress nor the courts have endorsed the district court's categorical denial of injunctive relief, particularly when coupled with an unfair, below-market compulsory license.  Our Constitution and legal system provide greater and more meaningful protection for those, like Apple, who truly innovate.

The district court's denial of Apple's request for injunctive relief should be reversed.

## STATEMENT OF ISSUE

Whether the district court erred in denying Apple's request for a narrowly-tailored injunction—limited solely to the features found to infringe, and including a sunset period to afford Samsung sufficient time to implement design-arounds—by misapplying this Court's precedent and ignoring undisputed record evidence inconsistent with its decision.

## STATEMENT OF FACTS

### A.    Apple's Reputation For Innovation

Apple has invested billions of dollars and years of research to create some of the most innovative, distinctive, and successful products in the world, including its revolutionary iPhone and iPad products.  (A10424-26; A10450-54; A10585-98; A24813.)  At trial, it was undisputed that this unwavering focus has earned Apple an unparalleled reputation for innovation.  (A12 ("Apple has demonstrated an undisputed 'reputation as an innovator.'"); A10361 (Samsung's counsel admitting in his opening statement that "Apple is an amazingly innovative company"); A10453 ("[I]t's really important to the very DNA of Apple that we're an innovator who creates unique differentiations in our products that customers value."); *see* A3306-07 ("[C]onsumers rate the Apple brand extremely high on being different,

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

innovative and meaningful."); A4136 (█████████████████████

██████████████████████████████████████████████████

███████████████████).)

Apple also demonstrated that its reputation as an innovator depends, in significant part, on its ability to differentiate itself from competitors by leveraging its products' unique features.  For example, the head of Apple's Worldwide Marketing Group, Phil Schiller, testified that Apple's advertising showcases Apple's products as the "hero" by emphasizing their unique features—a strategy that is much less effective when other companies offer the same features. (A10470-71; *see* A20 (finding when competitors use Apple's patented features, "it is unlikely that consumers will associate those features exclusively with Apple"); A12350, A12369-70 (Samsung's expert admitting products lose uniqueness when competitors use similar features).)

Mr. Schiller further explained that Apple seeks to safeguard its reputation as an innovator by obtaining patents covering inventions that help differentiate Apple's product features:

> [I]f they're unique and special, we want to use them in our products for ourselves, to differentiate ourselves from the rest of the market. And patents hopefully help to protect us so that we can do that and have our unique advantages.  They also help identify those things that we've created in our products that are unique to Apple that people will recognize and see as Apple inventing them, being the creative inventor company we like to be seen as.

(A10452-53.)  To preserve its ability to rely on unique innovations to differentiate its products, Apple seeks to maintain exclusive control over these patented features.  (A33-34 (discussing Apple's restrictive licensing practices); A12443 ("Apple is, in general, very reluctant to license [its] intellectual property."); A12506.)

## B.    Apple's Infringed Patents

Among the many patents that Apple has received in recognition of its groundbreaking work are the three patents at issue:  U.S. Patent Nos. 5,946,647 ("the '647 patent"), 8,046,721 ("the '721 patent"), and 8,074,172 ("the '172 patent").

### 1.    The '647 Patent

Asserted claim 9 of the '647 patent claims an innovative system that detects multiple types of "data structures" (e.g., telephone numbers, email addresses, street addresses, website addresses) within text (e.g., an email, text message, webpage), and generates links to specific actions that can be performed for each type of detected structure.  For example, as shown in Figure 7 of the '647 patent, a user selecting a phone number ("(415) 555-1234") detected in the body of an email is prompted with the option to dial the phone number ("Call #") or store it in a phonebook ("Put in electronic telephone book") automatically:



(A361; A365-68; A10832-34.)

Apple implements the '647 invention across nearly every Apple product, including in iPhones and iPads, through its "data detectors" software. (A10792-94.) At trial, Apple engineer Thomas Deniau described the operation of that software, including how it detects multiple data structures (e.g., the webpage address, street address, telephone number, and email address structures detected in the received email below, which Apple's software has underlined and highlighted in blue):



(A10794-97; A10804; A24897-98.)   Mr. Deniau further explained that, when a user selects a detected structure (e.g., the email address, "support@giftsy.com"), the device displays a pop-up menu with a list of linked actions that can be performed automatically using that detected structure (e.g., if the user selects the "New Message" option, the Mail application will launch and open a new email message addressed to that recipient):



(A10798-802; A10804; A24897-962.)

### 2.    The '721 Patent

The '721 patent claims a user-friendly solution to the problem of accidental activation that can occur with touchscreen devices.  (A388; A10601-02; A10629; A10638.)  Asserted claim 8 covers a touchscreen device that unlocks when the user makes contact with an "unlock image," and continuously moves that image to a second, predefined location.  (A397.)  The device "display[s] visual cues to communicate [the] direction of movement of the unlock image required to unlock the device."  (*Id.*)

At trial, Apple inventor, Greg Christie, and Apple's expert, Dr. Andrew Cockburn, explained how Apple practices the '721 patent through its iconic "slide-to-unlock" feature—which Mr. Christie invented during development of the original iPhone:



(A10602-03; A10636-37; A24892-96.)  As shown above, the device unlocks only when the gray arrow image reaches the right side of the slide bar through continuous movement, thereby reducing the possibility of unintentionally unlocking the device through incidental contact.  (A10632-34.)

These witnesses also explained that Apple still uses the '721 invention today, and that Apple's long-standing promotion of the slide-to-unlock feature has made it a unique element of an Apple user's experience.  (A10433-34 (explaining Apple's first iPhone ad "started with the slide to unlock feature" because Apple wanted to "start[] the ad with something you're going to be doing every day, many, many times a day … [a]nd that one starting point was a great beginning to your understanding of what an iPhone is and what this kind of device can do"); A10603 ("It was also the first thing they'd see when they bought it …. So this was – this

was the customer's first experience."); A10636-38 (describing Apple's practice of the '721 invention); A21014.)

### 3. The '172 Patent

The '172 patent claims a method for automatically correcting spelling errors on touchscreen devices, which helps users type more efficiently and accurately without a physical keyboard.  Under asserted claim 18, and as shown in Figure 4D, when a user types a word in a first display area 214 ("cae"), a second display area 216 shows the typed word ("cae") and a suggested replacement ("car"):



(A406; A419-20; A10693-94.)  If the user enters a punctuation mark or space, the suggested word automatically replaces the typed word.  (A10694.)  Alternatively, the user can keep the word as typed or insert the suggested replacement by selecting it from the second area.  (A10694-95.)  Although Apple's products use an autocorrect feature that displays a suggested replacement that is automatically substituted for the typed word when the user enters a punctuation or space, that feature does not practice asserted claim 18 (because the suggested replacement does not appear in a second display area).  (A2619-21; A10697; A10751-52.)  And given strict procedural limitations on the number of patent claims the parties could present (A2304), Apple did not attempt to prove at trial that its autocorrect feature practices unasserted claims of the '172 patent.

### C.    Samsung's "Fast Follower" Status

Apple and Samsung are "fierce competitors" in the smartphone and tablet markets.  (A12443; *see* A14; A21; A10472-73; A24769.)  But in contrast to Apple's undisputed reputation as an "amazingly innovative company" (A10361), Samsung's Chief Marketing Officer, Todd Pendleton, conceded at trial that Samsung has long been perceived as "not an innovator" and as "a fast follower … who lets someone else introduce the innovative product and then quickly follows with their own products."  (A11702-04; A11707-08 (acknowledging April 2014 *Wall Street Journal* article (A2647-48) criticizing Samsung for "spending more on

[marketing] than focusing on R&D and innovation"); A24774 (stating Samsung's February 2012 objective to "Overcome Fast Follower Status & Establish Samsung as Challenger Brand to Apple"); *see* A2639-46 (*New York Times* article noting Samsung's "lingering reputation as a fast follower" in December 2013).)

Consistent with its "fast follower" reputation, and seeking to capitalize on Apple's hard work and strong goodwill, Samsung adopted a strategy of competing with Apple through products that incorporate Apple's own patented inventions. For the '647 patent, internal documents show that Samsung engineers studied the linking functionality of Apple's data detectors software, including copying directly from a paper written by one of the '647 inventors about data detectors.  (A10881-84; A10886-87; A10891-94; A20003; A20063; A20584.)  And Google engineers[2] praised the linking functionality of the '647 patent as a "powerful feature[]." (A10884-86; A20183-86.)  Similarly, for the '721 patent, Samsung's documents reveal widespread copying of the slide-to-unlock feature, including through side-to-side comparisons with the iPhone.  (A10640-52; A20197; A20274; A20347; A20903-04; A21228.)  As the district court found, "[this] evidence indicates that Samsung paid close attention to, and tried to incorporate, certain iPhone features," which is "indicative of copying by Samsung."  (A27.)

---

[2]    Google developed the Android operating system that runs on Samsung smartphones, including the linking software code for the linking feature found to infringe the '647 patent.  (A10937-38; A11591-95.)

### D.    Samsung's Infringement

On summary judgment, the district court held that Samsung infringed claim 18 of the '172 patent.  (A2494-99.)  And after a thirteen-day trial in April and May 2014, a jury found that Samsung infringed claim 9 of the '647 patent (based on 9 smartphone models) and claim 8 of the '721 patent (based on 3 smartphone models).  (A2650; A2653.)  Having found that Samsung infringed at least one of Apple's '647, '721, and '172 patents *more than thirty-five million times*, the jury awarded Apple damages of $119,625,000.  (A2656; A20545.)[3]    The district court has since denied Samsung's JMOL motions seeking to overturn the jury's infringement and damages verdicts.  (A3923-75.)

### E.    Irreparable Harm To Apple

Due to Samsung's ongoing infringement, Apple continues to suffer two types of irreparable harm:  (1) damage to Apple's reputation as an innovator, which this Court has found sufficient to justify injunctive relief, *see Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336 (Fed. Cir. 2013); and (2) lost market share and downstream sales.

---

[3]    The jury found no infringement of two other Apple patents.  (A2651-52.)

### 1.   Irreparable Harm to Apple's Reputation

Before the district court, Apple argued that Samsung's massive infringement has substantially harmed Apple's reputation as an innovator in several key respects.

*First*, pointing to Mr. Schiller's testimony, Apple explained that Samsung's infringement harms Apple's reputation as an innovator by misleading others into believing that Samsung invented the features claimed in Apple's patents:

> [I]t confuses customers about the source of those things, whether Apple is being [an] innovator and doing these things or whether Samsung or someone else is innovating, and that confuses customers and to the extent that this happens a lot and it's happening on a very large scale, more and more it diminishes whether people even see Apple as the innovator we are in the things we're creating.

(A10471; A10474-75 (explaining Samsung's infringement "has caused people to question some of the innovations that we've created and Apple's role as the innovator").)

*Second*, Apple argued that Samsung's widespread infringement has undermined Apple's ability to preserve the uniqueness of its innovative product features, and to continue presenting them as the "hero" in advertising. Indeed, at trial, even Samsung's executives affirmed the importance of offering unique product features, and admitted that they would not willingly allow competitors to use Samsung's differentiating features to compete directly against Samsung. (A11714-15; *see* A11643 ("innovation should be the key success factor" for

Samsung); A11710 (discussing importance of "innovation leadership," and noting Samsung "tout[s] in [its] advertising … where [it] come[s] to market first with those leading edge innovations"); A12350, A12369-70 (conceding companies cannot leverage the uniqueness of their products when other companies offer the same features).)

**Third**, Apple explained that permitting Samsung to continue its infringement will cause others to believe that Apple cannot enforce its patent rights, even if Apple prevails in proving infringement—which may entice other competitors to also incorporate Apple's patented features into their products.  That risk is particularly acute here given Samsung's inflammatory post-trial statements to the media in which it declared a complete victory for Samsung—despite the jury's infringement verdict—because "Apple hasn't collected a penny—or succeeded in taking any products off the market."  (A2715-16; *see* A2708-10, A2713 (Samsung's lead counsel casting Apple as a patent "jihadist" and labelling Apple's efforts to enforce its patents against Samsung as "Apple's Vietnam" and an "embarrassment to Apple").)

### 2.    Irreparable Harm To Apple's Market Share And Downstream Sales

While developing the products at issue, Samsung had an explicit "survival strategy":  i.e., "convert Apple [] customers to Samsung customers."  (A11641; A21184 ("Beating Apple is no longer merely an objective, it is our survival

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

strategy."); A24769.)   As the district court found, that strategy has resulted in "fierce" head-to-head competition between Apple and Samsung for smartphone and tablet customers.  (A21 ("[I]t is undisputed that Apple and Samsung compete directly in the market for smartphones and tablets."); A10473 (describing "extremely competitive environment with Samsung"); A12443 ("Apple and Samsung are fierce competitors in this market."); A20818 (Samsung characterizing smartphone market as "a two horse race between Apple and Samsung"); A24769 (identifying Apple as Samsung's "largest [U.S.] smartphone competitor").)

Samsung's conscious decision to compete through infringement has caused Apple to suffer substantial sales-based losses, which independently confirm that Apple will suffer irreparable harm without an injunction.  Specifically, in the "ecosystem" of the smartphone and tablet markets, each Samsung sale represents a potential lost sale to Apple, along with incalculable future downstream sales of computers, accessories, software applications, and future smartphones and tablets. (A10449-50 (discussing "ecosystem" effects); A10559-60 ("If [Samsung] gets sales, [Apple] lose[s] sales."); A10566-67 (detailing significance of when Apple loses smartphone buyers to Samsung); A11217-18 (explaining impact of competition); A21027 (███████████████████████████████████ ████████████████████).)

At trial, Apple established a causal nexus between these sales-based losses and Samsung's infringement. For example, Apple relied on a conjoint study from Dr. John Hauser, one of the most respected survey experts in the world, who concluded that "[t]he features that were enabled by the patents at issue in this case have a measurable impact on consumer demand for Samsung telephones, smartphones, and tablets," and that consumers are more likely to buy, and willing to pay a price premium for, a product containing the patented features. (A11130; *see* A11079 (conjoint studies are "widely recognized as the most used method for quantifying consumer demand for product features"); A12125-26 (Samsung's expert admitting Dr. Hauser is "very well known in the field of conjoint studies"); A20490-539.)[4]

Apple also introduced evidence from Samsung and Apple confirming that the patented features are important to consumer demand. For the '647 and '721 patents, Apple relied on the copying evidence discussed above (p. 13)—which reinforces Samsung's view that the patented features help drive consumer demand.

---

[4]     At the preliminary injunction stage, Samsung criticized Apple *for not using* a conjoint study to measure consumer perceptions. (A2062.) Yet, at trial, Samsung criticized Dr. Hauser *for using* that same type of study, and had its own experts base their opinions on studies counting the number of sentences in product reviews containing feature mentions, and studies observing how participants moved their eyes across a computer screen. The district court concluded that both Samsung studies "had significant problems," "were not convincing," and used methodologies "no court in the United States has approved." (A24-25.)

It also noted that consumer demand is evident from Samsung's own product manuals, which specifically emphasize and instruct how to use the infringing linking and slide-to-unlock features. (A10658; A10839-41; A21867; A23696; A24603.) Likewise, for the '172 patent, carrier and consumer complaints directed to alternative, less successful word correction features confirm that customers view reliable word correction as an important smartphone feature, and that they prefer the interface claimed in the '172 patent and used in Samsung's products. (A10700-04; A10706; A20985; A20988; A21006; A21318.)

### F.    Samsung's Purported Design-Arounds

Samsung's own conduct also confirms that the infringing features generate consumer demand. Throughout trial, Samsung asserted that the inventions of the '647, '721, and '172 patents were trivial, and that Samsung could easily implement acceptable alternatives in less than one month (via a software update). (*E.g.*, A11593-94 ("Changes like these shouldn't take more than a day for an engineer."); A11805-06 (opining "it would take less than a day" to design-around the '647 patent); A13350-51 (arguing in closing statement that Samsung could make "these changes, if they had to do it, in one month"); *see* A36-37.)

Since the jury's infringement verdict, however, Samsung has continued to infringe the '647 patent and has refused to confirm that it will refrain from future

use of the features found to infringe any of the three patents at issue.[5]  Samsung's

unwillingness to fully abandon these infringing features only further reinforces

their importance to consumers.

### G.   Apple's Narrowly-Tailored Permanent Injunction

After trial, Apple proposed a permanent injunction enjoining Samsung from

further infringement of the '647, '721, and '172 patents.  But Apple did not seek to

enjoin any Samsung product in its entirety.  Instead, Apple merely sought to bar

Samsung from utilizing the specific features found to infringe (and those not more

than colorably different).  (A2696-98.)  Apple also included a sunset period staying

enforcement of the injunction for thirty days after its entry—the maximum period

Samsung said that it needed to implement its supposed design-arounds.  (A2698;

A13350-51.)

### H.   The District Court's Denial Of Apple's Proposed Injunction

***Irreparable harm to Apple's reputation:***   The district court found that:

(1) Apple "presented significant evidence about the strength of its reputation and

the intensity of the parties' competition" (A14); (2) "like the plaintiff in *Douglas*

*Dynamics*, Apple has demonstrated an undisputed 'reputation as an innovator'"

---

[5]   Samsung continues to sell products containing features found to infringe the '647 patent, including in more recent products.  Although Samsung sold products containing features that infringe the '721 and '172 patents long after Apple filed this lawsuit, Samsung has since stopped selling the products accused at trial for those two patents and has apparently removed the infringing features for those patents in new products and software updates.

(A12); and (3) "[i]n *Douglas Dynamics*, the Federal Circuit identified similar facts and concluded the patentee's reputation would suffer irreparable harm from the infringing behavior" (*id.*).

However, the district court declined to follow *Douglas Dynamics*—which had ***reversed*** the denial of an injunction under an abuse of discretion standard—by casting the factors found sufficient to demonstrate irreparable harm in that case as mere "context-specific examples." (A13.) According to the district court, "[a] number of factors not present in *Douglas Dynamics* weigh against finding Apple suffered irreparable harm to its reputation." (A15.)

***First***, the district court held that Apple could not prevail without showing "actual injury" to its reputation (*id.*)—even though *Douglas Dynamics* found irreparable harm based on the mere ***potential*** of ***future*** harm. 717 F.3d at 1345.

***Second***, the district court held that "Apple's demonstrably robust reputation makes it less likely to be irreparably harmed by the appearance of Apple's three patented features in Samsung's products" (A15)—even though *Douglas Dynamics* rejected the same argument about the patentee in that case. 717 F.3d at 1345 ("[T]his court again disagrees with the district court that Douglas should suffer some penalty for managing through great effort to maintain market share in the face of infringing competition.").

***Third***, the district court dismissed unrefuted evidence that Samsung is perceived as a "fast follower" and "not an innovator" by concluding that "this testimony concerned only Samsung's reputation in the past" (A14; A16)—based entirely on a post-verdict declaration from Samsung's damages expert, and even though Samsung's Chief Marketing Officer conceded at trial that Samsung had that same "fast follower" reputation throughout this litigation. (A11702-04; A11707-08; *see* A24774; A2639-48.)

***Fourth***, the district court held that "Apple's claim for irreparable harm to its reputation as an innovator would be undermined by the presence of the patented features in non-Apple products regardless of an injunction" due to four Apple agreements involving the patents-in-suit (A16-17)—even though each agreement imposed significant restrictions limiting the ability to compete with Apple using Apple's own unique features, and without citing ***any*** evidence that a single licensee had actually implemented any such feature in a competing product.

***Fifth***, the district court held that, even without an injunction, "there is little established risk that any customers or business partners will believe that Apple does not enforce its patent rights" (A19)—without citing any supporting evidence, and without addressing Samsung's efforts to create the public perception that Apple's patents are not worth respecting and are ripe for copying (by portraying Apple as a patent "jihadist," and branding this case as "Apple's Vietnam," an

"embarrassment to Apple," and a complete victory for Samsung).    (A2708-10;

A2713; A2715-16.)

*Finally*, the district court held that Apple "has not met its burden to establish

a causal nexus between the patents at issue and any alleged [reputational] harm"

(A17)—even though (1) Apple's proposed injunction solely sought to enjoin the

infringing features; (2) *Douglas Dynamics* did not require separate proof of causal

nexus for reputational harm, which naturally follows in a case like this where a

patentee known as an innovator is forced to compete directly with products of a

less prestigious competitor that include the patentee's own inventions, and the

patentee seeks to protect its right to exclude; and (3) as discussed above (p. 15),

Apple satisfied the district court's test in any event through Mr. Schiller's

testimony identifying the precise reputational harm that Apple has suffered as a

result of Samsung's infringement.

*Irreparable sales-based harms:*    The district court found that Apple had

undisputedly lost market share and downstream sales due to "fierce" competition

with Samsung products containing the infringing features, which the district court

found "weighs in favor of finding irreparable harm."    (A21.)    The district court

also credited evidence "indicative of copying by Samsung" (A27), found other

evidence "probative" as to whether Apple and Samsung valued Apple's patented

features (A27-28), and rejected studies offered by Samsung's experts (attempting

to show no causal nexus) as "[un]persuasive" (A25). Nevertheless, the district court found that Apple had failed to show a causal nexus between its sales-based losses and Samsung's infringement. (A22-31.)

*Adequacy of money damages:* The district court agreed that money "will not compensate Apple" for the market share and downstream sales it lost due to Samsung's sales of products containing infringing features. (A35; *see* A33 ("Apple has shown that its alleged lost sales harm would be difficult to calculate and remedy."); A35 ("The Court concludes that damages for Apple's alleged irreparable harm in connection with alleged lost sales are difficult to quantify.").) But the district court refused to rule for Apple on this factor, based solely on its finding that Apple failed to demonstrate a causal nexus. (A35.)

Without explanation, the district court concluded that any harm to Apple's reputation could be compensated by money, and attempted to distinguish *Douglas Dynamics* on the ground that, unlike the patentee in that case, Apple supposedly had "no evidence that its alleged reputational harm cannot be remedied." (A32.)

*Balance of hardships:* Given Samsung's repeated representations about its supposed ability to design around Apple's patents easily and quickly, combined with Apple's narrow proposed injunction and accompanying sunset provision, the district court found "that Samsung will not face any hardship from the injunction." (A36; *see* A37 ("Samsung fails to demonstrate that it will suffer any hardship.").)

By contrast, the district court found that Apple faces the "'substantial hardship'" of having to compete against products incorporating its own inventions.  (A39-40.) The district court thus concluded that "the balance of hardships favors Apple and the entry of an injunction."  (A36; A40.)

*Public interest:*    The district court recognized that the public interest "favor[s] the enforcement of patent rights to promote the 'encouragement of investment-based risk.'"  (A40.)  The district court rejected Samsung's argument that Apple's narrow proposed injunction would deprive the public of non-accused smartphone features, and instead found that the injunction might increase product diversity by prompting the "introduction of new alternatives to the patented features."  (A41.)  Therefore, the district court concluded that "the public interest factor favors Apple."  (A42.)

## I.    Apple's Motion For An Ongoing Royalty

No amount of money can fully compensate Apple for the irreparable harm it will continue to suffer without an injunction.  Nevertheless, after the denial of its request for a permanent injunction, Apple filed a motion seeking an ongoing royalty to preserve its right to some partial relief for Samsung's ongoing infringement.  (A3871-77.)  Samsung has opposed the motion, arguing that ***no*** compensation should be awarded for its continuing infringement.  (A3985-4010.) Apple's motion remains pending.

## SUMMARY OF ARGUMENT

In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), the Supreme Court denounced the use of categorical rules in assessing injunctive relief, and Chief Justice Roberts wrote separately to emphasize that, consistent with the "long tradition of equity practice," courts should continue to "grant[] injunctive relief upon a finding of infringement in the vast majority of patent cases." *Id.* at 395. This case does not present any reason to depart from that traditional outcome. On the contrary, the facts favoring injunctive relief here are ***extraordinary***—involving three patents collectively infringed more than thirty-five million times, admittedly "fierce" competition between the parties, a patentee with an unquestioned reputation for innovation that relies on patents to help maintain the uniqueness of its products, undeniable and incalculable harm to the patentee's market share and "ecosystem," and a proposed injunction limited solely to specific ***features*** found to infringe (i.e., not entire products) and that includes a sunset period to allow the infringer to implement supposed design-arounds.

In view of this compelling evidence, the district court agreed that Apple's proposed injunction was narrowly-tailored, and found that the balance of hardships and public interest both favor an injunction. Nevertheless, the district court refused to grant Apple any injunctive relief by ignoring record evidence and imposing a series of new categorical rules that, if upheld, will ***preclude*** injunctive

relief in the vast majority of patent cases; particularly where, like here, the infringement stems from a multi-feature product.

*First*, in prior appeals, this Court held that Apple could not enjoin Samsung from selling entire products without proof that the specific infringing features drove demand for those products—explaining that this demand for separate proof of a causal nexus prevents parties from obtaining ***product***-based injunctive relief extending beyond the right to exclude afforded by ***feature***-based patents.  In this case, the district court misapplied that precedent by requiring Apple to prove that Samsung's infringing features drive demand for Samsung's entire products—even though Apple only seeks an injunction directed to the infringing features alone.  In other words, the district court announced a categorical rule that essentially requires ***all*** patentees in ***all*** cases to prove that the infringing feature drives demand for the entire product in which it is contained, even where the patentee is not seeking injunctive relief based on the product.  That was an abuse of discretion.

*Second*, the facts of this case are nearly identical to those at issue in *Douglas Dynamics*—where this Court ***reversed*** a finding of no irreparable reputational harm as an abuse of discretion based on evidence that the parties were direct competitors, the patentee had a long-standing reputation as an "innovator" while the infringer did not, and the patentee sought to protect its strong reputation and the uniqueness of its patented technologies by declining to license them to others.  The

district court acknowledged that this litigation has "similar facts," but declined to follow *Douglas Dynamics* by characterizing this Court's case-dispositive factors as mere "context-specific examples." That too was legal error.

The district court also erred by concluding that Apple failed to prove a causal nexus between Samsung's infringement and the harm to Apple's reputation. The district court improperly dismissed unrefuted evidence showing that Samsung's decision to flood the market with millions of devices containing Apple's patented features has irreparably stripped Apple of its ability to preserve the uniqueness of those features in its current and future products, and to promote them as the "hero" in its advertising. The district court further erred by developing unjustified categorical rules providing that: (1) companies with the strongest reputations for innovation must meet an almost-impossible burden to show irreparable reputational harm; (2) evidence of actual and quantifiable consumer confusion must exist as a condition to prove irreparable reputational harm; and (3) proof of irreparable reputational harm requires patentees to maintain ***absolute*** exclusivity over their inventions.

***Finally***, despite finding that Apple has suffered significant and incalculable sales-based losses due to Samsung's millions of product sales containing the infringing features, the district court concluded that this harm was not irreparable. But that decision stemmed solely from the same erroneous belief that Apple must

separately show that Samsung's infringing features drive demand for Samsung's entire products, even for an injunction limited to the infringing features alone. And even under that inapplicable product-focused analysis, the district court erred by assessing each piece of evidence in isolation—evidence that, when viewed collectively, reveals that consumers, Apple, and Samsung all view the patented features as valuable drivers of demand.

## STANDARD OF REVIEW

This Court reviews the denial of a permanent injunction for abuse of discretion. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1147 (Fed. Cir. 2011). "A district court abuses its discretion when it acts 'based upon an error of law or clearly erroneous factual findings' or commits 'a clear error of judgment.'" *Id.* (quoting *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1352 (Fed. Cir. 2009)). "To the extent the court's decision is based upon an issue of law, [this Court] review[s] that issue de novo." *Sanofi-Synthelabo v. Apotex*, 470 F.3d 1368, 1374 (Fed. Cir. 2006).

## ARGUMENT

To obtain permanent injunctive relief, Apple must satisfy the traditional four-part equitable test by showing:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay*, 547 U.S. at 391. Historically, those equitable considerations have favored "grant[ing] injunctive relief upon a finding of infringement in the vast majority of patent cases." *Id.* at 395 (Roberts, C.J., concurring); *see Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013) ("The courts have a long history of remedying trespass on property rights—including patent rights—by removing the trespasser."); *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012) ("Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement.").

This case is no exception. Rather, it is exceptional only in how strongly the equities *favor* injunctive relief. On this record, it was an abuse of discretion for the district court to deny Apple an injunction directed to the infringing features alone, especially when coupled with a reasonable sunset provision. Indeed, if Apple cannot obtain this type of narrow relief against its chief competitor—which openly copied Apple's patented technologies and used them to compete directly against Apple, and which has now been found to infringe eleven Apple patents in United States courts, including three in this case—there is likely no case involving multi-featured products in which a patentee could *ever* obtain injunctive relief.

I.    **THE DISTRICT COURT ERRED BY FINDING NO IRREPARABLE HARM.**

Apple has suffered two types of irreparable harm as a result of Samsung's infringement:  (1) to its reputation as an innovator, including an eroded ability to preserve the uniqueness of its products and its carefully guarded right to exclude; and (2) to its market share and downstream sales.  Each is sufficient on its own to warrant a finding of injunctive relief, and together they overwhelmingly support a permanent injunction.

The district court dismissed both harms based on its mistaken belief that this Court's causal nexus analysis required Apple to prove that Samsung's infringing features drive demand for the entire product containing them—even for an injunction against the infringing features alone.  The district court further erred by finding that Apple did not meet this flawed new causal nexus requirement, despite unrefuted evidence demonstrating that Samsung's infringement has irreparably damaged Apple's reputation as an innovator, and that Apple, Samsung, and consumers all view Samsung's infringing features as helping to drive product demand.

A.    **The District Court Erred By Requiring Proof That The Infringing Features Drive Demand For Samsung's Entire Products As A Prerequisite To An Injunction Limited To The Infringing Features Alone.**

In *Apple III*, this Court reiterated that the purpose of a causal nexus analysis is to assess "'whether the patentee seeks to leverage its patent for competitive gain

beyond that which the inventive contribution and value of the patent warrant.'" *Apple III*, 735 F.3d at 1361 (quoting *Apple II*, 695 F.3d at 1375). Consistent with that principle, this Court has required separate proof that the infringing feature drives demand for a larger product only where the patentee sought to parlay a ***feature-based*** infringement verdict into a ***product-based*** injunction. *Compare Apple III*, 735 F.3d at 1352 (affirming denial of injunction enjoining products given insufficient proof that infringing features drove demand for the products); *Apple II*, 695 F.3d at 1375-76 (denying product-based injunction due to insufficient proof infringing features drove demand for products); *Apple Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("*Apple I*") (affirming denial of preliminary product injunction because "the patented feature does not drive demand for the product"), *with Emulex*, 732 F.3d at 1337-38 (affirming product-based injunction where "undisputed evidence at trial linked the claimed invention … to the success of the products incorporating it"); *see also* O'Malley, Hon. Kathleen M., *Interesting Times at the Federal Circuit*, 63 Am. U. L. Rev. 949, 956 (2014) ("[W]e have explained—and outlined the contours of the requirement—that there must be some causal nexus between an infringed feature in a product and the consumer demand for that product ***before a permanent injunction barring that product can issue***." (emphasis added)).

This case is critically different.  Apple did not request to enjoin the sale of entire Samsung smartphones and tablets; instead, it proposed an injunction limited to *the patented features alone*.  The purpose and substance of the causal nexus requirement are necessarily satisfied in this circumstance because there is no risk that Apple might be "leverag[ing] its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant."  *Apple III*, 735 F.3d at 1361 (internal quotation marks omitted).  Indeed, this Court noted that an injunction "more likely to prevent only infringing *features* rather than the sale of entire *products*" may be "more equitable," especially if coupled with a sunset period.  *Id.* at 1363.

The district court abused its discretion by requiring Apple to prove that Samsung's infringing features drive demand for Samsung's *entire products* as a prerequisite for securing an injunction directed only to the infringing features.  A causal nexus analysis must take into account the scope of the requested injunction, and the district court erred by failing to do so here.  *See Apple I*, 678 F.3d at 1328 (affirming causal nexus finding where infringed patent, which "claimed all views of the patented device," was coextensive with injunction enjoining that product).  The district court's requirement for proof that the patented features drive demand for an entire product, regardless of the scope of injunctive relief sought could "amount to a categorical rule barring injunctive relief in most cases involving

multi-function products, in contravention of *eBay*." *Apple III*, 735 F.3d at 1364. It also would unfairly penalize patentees by causing the availability of injunctive relief to turn on ***the infringer's decision*** whether to include the patented invention in products with numerous other features.

Had the district court correctly considered Apple's evidence of irreparable harm in the context of Apple's narrowly-tailored request for injunctive relief, it would have found a sufficient causal nexus for both Apple's reputation-based and sales-based harms. Both harms undisputedly arose from Samsung's sale of products containing the infringing features, and Apple's requested feature-based injunction is exactly commensurate with that infringement. There is necessarily a causal nexus to the infringing feature when an injunction only seeks to enjoin the infringing feature itself.

### B. The District Court Erred By Finding That Apple Did Not Suffer Irreparable Harm To Its Reputation As An Innovator.

#### 1. Apple Proved Irreparable Harm To Its Reputation Under *Douglas Dynamics*.

In *Douglas Dynamics*, this Court held that the patentee had demonstrated irreparable harm to its reputation based on five factors: (1) the existence of direct competition between the patentee and infringer; (2) the patentee's reputation as an innovator; (3) the infringer's "less prestigious and innovative" reputation; (4) the patentee's effort to maintain exclusive control over its patented features; and (5)

absent an injunction, that the patentee's customers might believe the patentee "did not enforce its intellectual property rights." 717 F.3d at 1344-45. Apple proved the same five factors here.

*First*, just like the parties in *Douglas Dynamics*, Apple and Samsung are direct competitors. (A10472-73; A11641; A12443; A20818; A21184; A24769.) In fact, the district court found "significant" and "undisputed" evidence showing that "the intensity of the parties' competition" was "fierce." (A14-15; A21.) This "strongly" supports a finding of irreparable harm. *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1171 (Fed. Cir. 2014) ("Trebro and Firefly are direct competitors selling competing products in this market. Thus, the record strongly shows a probability for irreparable harm."); *Presidio Components, Inc. v. American Technical Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) (direct competition "suggest[s] strongly the potential for irreparable harm"); *see Douglas Dynamics*, 717 F.3d at 1345 ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.").

*Second*, Apple demonstrated, Samsung admitted, and the district court found that Apple has an extremely strong reputation for developing innovative product features that differentiate its smartphones and tablets from those of its competitors.

(A12 ("[T]he Court finds that, like the plaintiff in *Douglas Dynamics*, Apple has demonstrated an undisputed 'reputation as an innovator.'"); A14-15 ("Apple has presented significant evidence about the strength of its reputation," which "tends to show that Apple is recognized for innovation."); A15 (noting Apple's "demonstrably robust reputation"); A3306-07; A10361.) *See Douglas Dynamics*, 717 F.3d at 1344-45 ("Douglas's reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' snowplows.").

Apple also established that its reputational harm resulting from Samsung's infringement is particularly severe because it involved distinctive features integral to Apple's unique user experience. Apple demonstrated that the '647 invention is so important to Apple's unique user experience that Apple has included its data detectors feature across nearly all of its products, including in iPhones and iPads. (A10794.) For the '721 patent, Apple purposefully promoted its slide-to-unlock feature in its first iPhone advertisement because it represents a "great beginning" that customers utilize "every day, many, many times a day." (A10433-34; A21014; *see* A10602-04.) Samsung's infringement has foreclosed Apple from differentiating its products from its chief competitor using its patented inventions and from having consumers associate those patented innovations *exclusively* with Apple. (A12350, A12369-70 (admitting companies cannot differentiate products

as unique based on features competitors have as well).)  *See Douglas Dynamics*,

717 F.3d at 1344-45.

    *Third*, at trial, Samsung's Chief Marketing Officer confirmed that Samsung

is perceived as "a fast follower" and "not an innovator":

> Q.    [Samsung has] been specifically called a fast follower in the smartphone world; correct?
>
> A.    Yes.
>
> Q.    And it's been specifically called a fast follower in the tablet world; correct?
>
> A.    I believe so, yes.
>
> Q.    And, in fact, Samsung, in its own documents, has reflected the public sentiment that it's a fast follower; correct?
>
> A.    Yes.
>
>              \* \* \*
>
> Q.    And, in fact, you know, do you not, that there was the perception in the smartphone and tablet world that Samsung was not an innovator; correct?
>
> A.    There was a perception, yes.

(A11702-04.)  *See Douglas Dynamics*, 717 F.3d at 1344-45 (finding irreparable

reputational harm, in part, because defendant was known as "less prestigious and

innovative").

    *Fourth*, Apple demonstrated that Samsung's ongoing infringement (and

imposition of a compulsory license) would conflict with Apple's efforts to

maintain exclusive control over its patented features. (A33-34 (discussing Apple's restrictive licensing practices); A12443 ("Apple is, in general, very reluctant to license [its] intellectual property."); A12506.) *See Douglas Dynamics*, 717 F.3d at 1345 ("Exclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation, and here, Douglas's exclusive right to make, use, and sell the patented inventions is under attack by Buyers's infringement."); *see also eBay*, 547 U.S. at 395 (Roberts, C.J., concurring) (explaining "long tradition of equity practice" of granting injunctions "upon a finding of infringement in the vast majority of patent cases" "is not surprising given the difficulty of protecting a right to *exclude* through monetary remedies that allow an infringer to *use* an invention against the patentee's wishes").

***Finally***, Apple established that others might believe it does not enforce its patents even when it prevails on its infringement claims—particularly given Samsung's inflammatory public statements calling Apple a patent "jihadist," labelling Apple's efforts to enforce its patents against Samsung as "Apple's Vietnam" and an "embarrassment to Apple," and declaring a complete victory for Samsung—despite a jury's infringement verdict—because "Apple hasn't collected a penny—or succeeded in taking any products off the market." (A2708-10; A2713; A2715-16.) At the very least, this perception might cause others to believe

that they too can copy Apple's patented features without risk of an injunction. *See Douglas Dynamics*, 717 F.3d at 1345 ("Douglas's reputation would be damaged if its dealers and distributors believed it did not enforce its intellectual property rights.").[6]

## 2.    The District Court Improperly Declined To Follow *Douglas Dynamics*.

In light of this compelling record evidence, the district court acknowledged that this case and *Douglas Dynamics* involve "similar facts." (A12 ("In *Douglas Dynamics*, the Federal Circuit identified similar facts and concluded the patentee's reputation would suffer irreparable harm from the infringing behavior.").) Yet, the district court declined to follow that binding precedent, casting this Court's case-dispositive factors as mere "context-specific examples." (A13.) That was error.

The district court had no authority to decline to follow *Douglas Dynamics* when the same factors that demonstrated irreparable reputational harm in that case are present here too. *See L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1127 (Fed. Cir. 1993) ("Principles of *stare decisis* require similar rulings on similar facts, and thus it was error to fail to follow *Avia Group*."); *Panduit Corp. v.*

---

[6]    The district court incorrectly stated that, according to Apple, "*Douglas Dynamics* implicitly abrogated the causal nexus requirement," and irreparable reputational harm always follows from "the mere fact of infringement." (A9-10.) Apple merely argued that a causal nexus analysis is necessarily met, and that irreparable reputational harm is established, when the five reputational-harm factors from *Douglas Dynamics* are present, as they are here.

*All States Plastic Mfg. Co.*, 744 F.2d 1564, 1573 (Fed. Cir. 1984) ("[A] district court exercising jurisdiction pursuant to 28 U.S.C. § 1338 is bound by the substantive patent law of this circuit."); *see also* O'Malley, *supra*, at 956 ("[W]e have made clear that it is error to fail to enter a permanent injunction where the circumstances warrant one." (citing *Douglas Dynamics*)).

### 3. The District Court Erred By Ignoring Relevant Record Evidence And Improperly Imposing A Heightened New Standard To Prove Irreparable Reputational Harm.

Seeking to justify its departure from *Douglas Dynamics*, the district court ruled that "[a] number of factors not present in *Douglas Dynamics* weigh against finding Apple suffered irreparable harm to its reputation stemming from the appearance of Apple's patented features in Samsung's products." (A15.) None of those "factors" properly distinguishes this case.

*First*, the district court held that Apple could not prevail without showing "actual injury" to its reputation and quantifying the amount of actual harm. (A15.) But this demand for evidence of actual, quantifiable injury is inconsistent with the very nature of *irreparable* harm—which cannot be quantified with any reasonable precision. Moreover, *Douglas Dynamics* found irreparable injury—without any evidence of actual harm—based on the *mere likelihood of future* reputational injury: "Douglas's reputation as an innovator *will* certainly be damaged *if*

*customers found* the same 'innovations' appearing in competitors' snowplows." 717 F.3d at 1344-45 (emphasis added).

The district court also faulted Apple for failing to prove that consumers "have difficulty differentiating Samsung and Apple products due to the infringing features." (A15.) But in *Douglas Dynamics*, the Court rejected the notion that proof of reputational harm requires consumer confusion: "Even absent consumer confusion, however, there can still be harm to a company's reputation." 717 F.3d at 1344.

**Second**, the district court criticized Apple for relying on Mr. Schiller's testimony. (A15.) But if anyone knows about the harm caused to Apple's reputation by a competitor, it is Mr. Schiller—Apple's top-ranking marketing executive. And courts applying *Douglas Dynamics* have accepted this type of executive testimony as sufficient evidence of irreparable reputational harm. *See*, *e.g.*, *Southern Snow Mfg. Co. v. SnoWizard Holdings, Inc.*, No. 06-9170, 2014 WL 1652436, at *7 (E.D. La. Apr. 24, 2014) (testimony from plaintiff's owner); *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, No. 07-cv-331, 2013 WL 3043668, at *3 (D. Nev. June 17, 2013) (relying on executive testimony that the "patented technology was very important to [the patentee's] business because the technology showed

customers that [the patentee] was a technology leader and allowed [it] to distinguish itself").[7]

The district court also dismissed Mr. Schiller's testimony as too general because he supposedly "did not link any harm to infringement of the three patented features in question."  (A15.)  But Mr. Schiller **specifically** explained how Apple makes "unique and special" products, markets them as the "hero," and uses its inventions "to differentiate [itself] from the rest of the market," and he further detailed that being "an innovator who creates unique differentiation in our products that customers value" is part of "the very DNA of Apple."  (A10452-53; A10466-67.)  Mr. Schiller also explained Apple's ability to preserve its unique features, and promote them as the "hero," is undercut **each time** Samsung competes with Apple using products that incorporate Apple's own patented features—because it "confuses customers about … whether Apple is being [an] innovator and doing these things or whether Samsung or someone else is innovating," and "diminishes whether people even see Apple as the innovator."  (A10470-71.)

---

[7]    Courts have accepted similar evidence of reputational harm outside the patent context.  *See*, *e.g.*, *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001) (finding irreparable reputational harm based on CEO testimony); *Facebook, Inc. v. Power Ventures, Inc.*, No. 08-cv-5780, 2013 WL 5372341, at *15 & n.17 (N.D. Cal. Sept. 25, 2013) (accepting employee testimony as sufficient evidence of irreparable reputational harm).

That precise testimony detailed how Samsung's infringement of the three patents at issue has attacked the very essence of Apple's unique corporate identity as an innovator. It was error for the district court to discard that unrebutted testimony simply because it covered identical harms caused by Samsung's infringement of other patents as well. Indeed, the district court's reasoning unfairly makes it more difficult for a patentee to show irreparable harm where, as here, the defendant's infringement has been so wide-ranging that it is not limited to the patents-in-suit. *Cf. Apple III*, 735 F.3d at 1365 ("To hold otherwise could lead to perverse situations such as the patentee being unable to obtain an injunction against the infringement of multiple patents covering different—but when combined, all—aspects of the same technology, even though the technology as a whole drives demand for the infringing product.").

*Third*, the district court held that "Apple's demonstrably robust reputation makes it less likely to be irreparably harmed by the appearance of Apple's three patented features in Samsung's products." (A15.) But this Court rejected that very argument in *Douglas Dynamics*: "[T]his court again disagrees with the district court that Douglas should suffer some penalty for managing through great effort to maintain market share in the face of infringing competition." 717 F.3d at 1345.[8]

---

[8]    *Douglas Dynamics* observed that "[m]ore relevant is the rise in Buyers's market share from zero to about 5% in three years while infringing Douglas's

The strength of Apple's reputation merely indicates that Apple has more to lose from Samsung's infringement; a fact that, if anything, supports a finding of irreparable harm. The district court's contrary reasoning—that the stronger a patentee's reputation, the more difficult irreparable harm is to prove—would mean that injunctions are only available to protect the weakest reputations, even though they are least worthy of protection.

*Fourth*, Samsung's Chief Marketing Officer conceded that Samsung is perceived as a "fast follower" and "not an innovator." (A11702-04.) Samsung did not contest that fast-follower status in its injunction briefing. But the district court dismissed this testimony as "concern[ing] only Samsung's reputation in the past," based entirely on a post-verdict declaration from Samsung's damages expert. (A16 (citing A3022-23).) That was clear error. Those admissions were based on a Samsung presentation from 2012, when Apple filed this litigation, and an article published just days before Mr. Pendleton testified. (A2647-48; A11702-04; A11707-08; A24774.)

Moreover, even if Samsung could show that its reputation recently improved, *Douglas Dynamics* did not *require* the infringer to have a poor reputation. Rather, it just noted that irreparable harm would be "particularly"

---

patents." 717 F.3d at 1345. Samsung's market share improved during the period when it was infringing Apple's patents. (A21438.)

strong in that circumstance.  717 F.3d at 1344-45 ("Douglas's reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' snowplows, ***particularly*** products considered less prestigious and innovative." (emphasis added)).  Moreover, any such improvement for Samsung could well be attributable to its prolonged use of ***Apple's*** patented inventions.  The more relevant period for assessing Samsung's reputation is before the infringement began, when even Samsung's expert concedes there was "a perception that Samsung was a fast follower and not an innovator."  (A3022-23.)

***Fifth***, the district court concluded that Apple's reputation could not be harmed by Samsung's infringement because Apple failed to maintain ***absolute*** exclusivity over its patents.  (A16-17.)  But that is precisely the type of categorical rule the Supreme Court and this Court have rejected as a predicate for injunctive relief.  *See eBay*, 547 U.S. at 393 (holding there is "no basis for categorically denying" injunctions to patentees that license their patents); *Apple III*, 735 F.3d at 1370 (rejecting "categorical rule that Apple's willingness to license its patents precludes the issuance of an injunction"); *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) ("A plaintiff's past willingness to license its patents is not sufficient per se to establish a lack of irreparable harm if a new infringer were licensed.").

Nor is there any record support for the district court's assertion that Apple's patented features are present in "non-Apple products regardless of an injunction" (A17)—a position even Samsung did not advocate. The district court's assumption that others must be practicing Apple's patents is inconsistent with the agreements themselves. One license is to IBM (A2271), which does not even make smartphones or tablets. Apple's license with Nokia is just a limited litigation standstill agreement, not an ongoing license to use Apple's inventions. (A2144-45; *see* A33.) And Apple's licenses with Microsoft and HTC each include anti-cloning provisions that bar the use of features in a way that diminishes Apple's distinctive user experience. (A2721-22; A2772; *see* A33.) These highly restrictive terms only reinforce Apple's substantial efforts to maintain exclusivity over its patented inventions.

In addition, the mere fact that Apple has executed agreements covering its patents does not mean that others actually practice them; particularly where, as here, the agreements are broad portfolio cross-licenses and litigation settlements encompassing hundreds of other patents. (A2135; A2137; A2140; A2143; A2156-269; A2272-73; A2719-23; A2742; A2744; A2749-50.) In fact, the record does not show that any licensee practices any of the three patents at issue, despite the district court's speculative assumption to the contrary.

**Sixth**, the district court concluded that Apple did not suffer any reputational harm for the '172 patent, in part, because it did not claim to practice asserted claim 18. (A18.)  That was legal error.  *See Trebro*, 748 F.3d at 1171 ("[T]he fact that Trebro does not presently practice the patent does not detract from its likely irreparable harm."); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703 (Fed. Cir. 2008) ("Broadcom provided evidence of irreparable harm, despite the fact that it does not currently practice the claimed inventions."); *see also eBay*, 547 U.S. at 393 (criticizing rigid rules that would foreclose injunctive relief on the basis of whether the patentee practices its invention).

In addition, undisputed evidence shows that Apple's products include an autocorrect feature that, at the very least, competes with the Samsung feature found to infringe claim 18 of the '172 patent.  (*E.g.*, A10697; A10751-52.)  This Court has held that whether the patentee sells a competing product that "embod[ies] similar technology" is relevant for assessing irreparable harm, and the district court legally erred by failing to consider that evidence here.  *See Presidio*, 702 F.3d at 1363 (holding "district court placed too much weight on Presidio's failure to practice the '356 patent" where Presidio's products "embod[ied] similar technology" and the parties were "close competitors").  The district court also failed to acknowledge uncontested evidence that Apple still considers its presently-

unused patented inventions "extremely" valuable because it often incorporates them into subsequent products.  (A10445-46.)

*Seventh*, the district court held that, even after denying Apple injunctive relief, "there is little established risk that any customers or business partners will believe that Apple does not enforce its patent rights."  (A19.)  No evidence supports that speculative conclusion, which is undermined by Samsung's public efforts to portray Apple as a patent "jihadist," and to brand this case as "Apple's Vietnam," an "embarrassment to Apple," and a complete victory for Samsung.  (A2708-10; A2713; A2715-16.)  This evidence (which the district court did not address) reflects a very real risk that, without entry of an injunction, Apple's customers and partners will begin to view Apple's patented innovations as unworthy of judicial protection and, accordingly, not innovative.  It also would encourage Apple's competitors to view the lack of an injunction in this case as an invitation for them to use Apple's patented inventions freely as well.

*Finally*, the district court held that Apple "has not met its burden to establish a causal nexus between the patents at issue and any alleged [reputational] harm." (A17.)  As noted above (pp. 31-34), however, that conclusion was legal error given the narrow ***feature***-based scope of Apple's proposed injunction.

Moreover, for the product-based injunction in *Douglas Dynamics*, this Court did not require patent-specific proof of a causal nexus between the defendant's

infringement and the patentee's reputational injury—even though the infringed patent "cover[ed] only some components of the accused snowplow assemblies." 717 F.3d at 1344. Rather, the Court treated proof of the injury as coextensive with proof of a causal nexus—because, just like here, the infringer with a "less prestigious" reputation was competing directly against a patentee (using the patentee's own inventions) that had a reputation as an innovator and sought to preserve exclusive control over its patented features. A patentee's reputation as an innovator "*will certainly be damaged*" under those extraordinary circumstances, all of which are present here. *Id.* at 1344-45 (emphasis added).[9]

As noted above (pp. 15, 41-43), this case also included Mr. Schiller's detailed testimony explaining the actual harm that Samsung's infringement has caused to Apple's reputation as an innovator. Therefore, this case involves far greater proof of actual irreparable harm than the Court had before it in *Douglas Dynamics*, and more than enough evidence to demonstrate a causal nexus under the flawed legal standard that the district court applied.

---

[9]     In *Apple III*, this Court distinguished *Douglas Dynamics* from the type of sales-based harms that Apple had asserted in that case because *Douglas Dynamics* involved "irreparable 'erosion in reputation and brand distinction' as a result of the defendants' infringement—a type of harm not asserted by Apple." 735 F.3d at 1362. This distinction would be meaningless unless that different type of harm affected the type of causal nexus proof required (i.e., if the causal nexus test applies in the same way to reputational and sales-based harms, this would not have been a way to distinguish *Apple III* from *Douglas Dynamics* at all).

In sum, the district court concluded that Apple has not suffered irreparable injury to its reputation as an innovator based on multiple legal errors, including by refusing to follow *Douglas Dynamics*, by dismissing unrefuted relevant evidence, and by imposing new requirements not warranted by law. Each was an abuse of discretion requiring reversal.

### C. The District Court Erred In Finding That Apple Did Not Suffer Irreparable Sales-Based Losses Due To Samsung's Infringement.

Samsung's infringement of the three patents at issue also caused Apple to suffer significant lost market share and incalculable downstream sales—irreparable harms that independently warrant injunctive relief.

*First*, as noted above (pp. 16-17, 35), it is undisputed that Apple and Samsung are "fierce" competitors in the smartphone and tablet markets, and this factor alone weighs "strongly" in favor of injunctive relief. *See Trebro*, 748 F.3d at 1171; *Douglas Dynamics*, 717 F.3d at 1345; *Presidio*, 702 F.3d at 1363.

*Second*, as the district court found, Samsung's infringing sales have caused Apple significant injury to its competitive standing—especially given the "ecosystem effects" of the smartphone and tablet markets, where each sale to Samsung represents a potential lost sale to Apple, along with incalculable future lost downstream sales. (A21 ("It is also undisputed that this competition affects downstream sales because of so-called 'ecosystem' effects, where one company's customers will continue to buy that company's products and recommend them to

others."); A10449-50 (when consumers purchase a smartphone, "they'll tend to buy … accessories and other products that they might want to use with it"); A10559-60 ("If [Samsung] gets sales, [Apple] lose[s] sales."); A10566-67 (explaining significance of when Apple loses a smartphone customer to Samsung); A11217-18 (explaining impact of competition); A21027 (███████████████ ██████████████████████████████).)

This evidence that Samsung's sales of products containing the infringing features has caused Apple to lose millions of smartphone and tablet sales, along with significant future downstream sales, "squarely supports a finding of irreparable harm." *Presidio*, 702 F.3d at 1363; *see Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007) (recognizing "lost opportunities to sell other services to the lost customers" as irreparable harm).

***Third***, as discussed above (pp. 31-34), there was no need for Apple to offer separate proof of a causal nexus to justify its proposed injunction, which is directed to the infringing features alone (not entire products). Nevertheless, Apple still "show[ed] some connection between the patented feature and demand for Samsung's products" for each infringed patent. *Apple III*, 735 F.3d at 1364 (explaining there are "a variety of ways to make this required showing," including "evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions," "that the inclusion of a patented feature makes a

product significantly more desirable," or "that the absence of a patented feature would make a product significantly less desirable").

### 1.    Apple Established A Causal Nexus For The '647 Patent.

For the '647 patent, Apple relied on the expert testimony of Dr. Hauser, whose conjoint study demonstrated that Samsung's infringing "linking" feature drives demand for Samsung's smartphones and tablets—as reflected by the significant number of survey respondents who indicated that they would not purchase a Samsung smartphone that lacked the inventive feature of the '647 patent, and who were willing to pay a significant price premium for devices including the same feature. (A11130 (opining Samsung's infringing linking feature had "a measureable impact on consumer demand for Samsung telephones, smartphones, and tablets"); A20491; A20495; A20539.)

Apple also relied on internal documents showing that: (1) Samsung studied and copied the data detectors technology covered by the '647 patent; (2) Google engineers viewed that technology as a "powerful feature[]"; (3) Samsung chose to implement its infringing "linking" function to "improve" its products; and (4) Samsung promoted the operation of its linking feature in its product manuals. (A10839-41; A10881-87; A10891-94; A20003; A20063; A20184; A20584; A21867; A23696.) Apple offered evidence showing that it too views the '647

invention as important to consumers—through its wide implementation of data detectors across most product lines.  (A10792-94.)

Additionally, Apple pointed to the fact that Samsung has yet to remove the infringing "linking" feature from its products—despite having notice of the '647 patent for more than four years (A20481; *see* A34), despite a jury's infringement verdict, and despite Samsung's representations that the invention of the '647 patent is "trivial" and can be designed around in "less than a day."  (A11593-94 ("Changes like these shouldn't take more than a day for an engineer."); A11805-06 (opining "it would take less than a day to make the change," which is "not a big deal").)  Samsung has refused to remove its infringing "linking" feature precisely because consumers value and demand it in their smartphones and tablets.

### 2.    Apple Established A Causal Nexus For The '721 Patent.

Apple also established a causal nexus for the '721 patent.  Apple relied on Dr. Hauser, who opined that, according to his conjoint study, the simple, yet important slide-to-unlock feature helps drive consumer demand for touchscreen devices—such that consumers are more willing to buy, and to pay a substantial price premium for, a device that includes the feature.  (A11130; A20497; A20539.)

Consistent with that conclusion, Apple demonstrated that it also views the slide-to-unlock feature of the '721 patent as a driver of consumer demand.  Apple witnesses explained the importance of the feature to consumers, as "the first thing

they'd see" when "deciding whether they want to buy it," and as something they

use "every day, many, many times a day"—reinforced by Apple's decision to

depict the feature prominently in its advertising and to include it in every version

of the iPhone.  (A10432-34; A10601-04; A10611-12; A10636-38; A21014.)

Apple also relied on evidence showing Samsung believes that its infringing

slide-to-unlock feature makes its products more desirable.  At trial, Apple's expert

discussed a "great many" documents cataloguing Samsung's widespread copying

of that feature.  (A10640-52; A20197; A20274; A20347; A20903-04; A21228; *see*

A27 (finding that evidence "indicative of copying by Samsung").)   Samsung

product manuals also highlight the infringing slide-to-unlock feature and its

operation.  (*E.g.*, A10658; A24603.)  And a Samsung designer testified that the

"first page screen" is important to Samsung as a "method to communicate with []

customers."  (A11735; A11753.)[10]

In light of Apple's long-standing use and prominent promotion of the '721

slide-to-unlock feature, Samsung's widespread and successful efforts to copy the

feature, and survey evidence showing consumer demand for the feature, the district

---

[10]    Conversely, Samsung's carrier customers view Samsung products **without**
the infringing slide-to-unlock feature as less desirable.  (A10688, A21019 (Verizon
expressing "a negative response" when Samsung implemented an alternative
unlock feature).)

court should have found a causal nexus between Samsung's infringing slide-to-unlock feature and demand for Samsung's products.

### 3. Apple Established A Causal Nexus For The '172 Patent.

Apple also established the importance of Samsung's infringing autocorrect feature to consumers. For example, Dr. Hauser's survey reinforces that consumers find products that use the '172 patent's autocorrect feature more desirable than products without the feature—even at a price premium. (A11130; A20493; A20498; A20539.) The record also includes a recommendation from T-Mobile for Samsung to adopt the autocorrect method of the '172 patent ("[s]hows word in suggestion bar but do not change in text field until user accepts or hits space"), and contains criticisms of alternative autocorrect methods as "leading to a somewhat jarring experience." (A10700-02; A20988.) Similarly, a Verizon customer survey identified "a usability issue" with an autocorrect method that kept the text as entered after the user entered a space or punctuation key, versus automatically replacing the text with the suggested correction as taught by the '172 patent. (A10703-04; A21006.)

These complaints from Samsung's customers, coupled with direct evidence of consumer willingness to pay more for the infringing autocorrect feature, confirm a causal nexus between Samsung's infringement of the '172 patent and demand for Samsung's products.

**4.      The District Court Erred By Failing To Consider The Collective Evidence Of A Causal Nexus.**

In light of this collective evidence—showing that consumers, Samsung, and Apple view the '647, '721, and '172 inventions as enabling valuable features that help drive product demand—the district court should have found that Apple demonstrated a sufficient causal nexus for each infringed patent.  The district court erred by ruling to the contrary.

*First*, the district court correctly found that the "sentence-counting" exercise and "eye-tracking" study submitted by Samsung's experts, neither of whom tested Dr. Hauser's conclusions with their own conjoint study, "had significant problems," were not persuasive, and used methodologies "no court in the United States has approved."  (A24-25.)  The district court also expressed "doubt" about the reliability of Dr. David Reibstein's attacks on Dr. Hauser's survey given Dr. Reibstein's failure to disclose statistical validity studies for his pretest, his inability to explain key portions of his results, and Samsung's prior criticisms of Apple for *not* using a conjoint study to measure consumer demand.  (A24.)

Nevertheless, the district court gave *no weight* to Dr. Hauser's conjoint study—even though Dr. Hauser is one of the most well-respected survey experts in the world and "very well known in the field of conjoint studies" (A12125-26), and even though conjoint studies are "widely recognized as the most used method for quantifying consumer demand for product features" (A11079).  In so doing, the

district court failed to articulate the specific reasons for discarding that evidence in its entirety, beyond summarizing the parties' competing arguments and stating that Apple failed to "rebut Samsung's critiques" (without indicating which "critiques" it had credited and why).  (A25.)  This was error.  *See Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1578 (Fed. Cir. 1990) (explaining "sufficient basis must be articulated by the court" when deciding whether to award an injunction).

Moreover, even without knowing which of Samsung's critiques the district court credited, Samsung's criticisms at most suggest that Dr. Hauser's survey did not perfectly measure demand for the infringing features.  They do not negate the fact that, at the very least, the survey shows "*some* connection between the [feature claimed by the '647 patent] and demand for Samsung's products," which is all the causal nexus requirement demands.  *Apple III*, 735 F.3d at 1364 (emphasis added).

**Second**, the district court acknowledged that Apple presented evidence "indicative of copying by Samsung" (A27)—which itself is evidence of a causal nexus.  *See Apple I*, 678 F.3d at 1327-28 ("[E]vidence that Samsung's employees believed it to be important to incorporate the patented feature into Samsung's products is certainly relevant to the issue of nexus between the patent and market harm.").  Nonetheless, the district court discounted that evidence because "[s]ome of the cited Samsung documents show that Samsung valued numerous other

noninfringing features." (A27.) But a causal nexus analysis does not require proof that the patented feature is the **sole** driver of demand. *See Apple III*, 735 F.3d at 1364. It was error to disregard copying evidence showing that the patented features drive demand just because the same evidence shows demand for other features too.

**Third**, the district court dismissed evidence that Samsung had refused to remove infringing features—even after the jury's verdict, and despite claims that design-arounds can be implemented quickly and easily—because "Samsung has maintained … it reasonably believed that it did not infringe" and because "Samsung's subjective beliefs are not dispositive of causal nexus." (A27.) But the jury found (and the district court has since agreed) that Samsung **did infringe**, Samsung has continued to infringe the '647 patent, and Samsung has given no assurances that it will refrain from all future infringement of any of the three patents at issue. In addition, Apple has never maintained that Samsung's conduct is the **only** evidence of demand, particularly in view of the significant other evidence of demand discussed above.

**Fourth**, the district court acknowledged "probative" evidence that Apple practices the '721 patent, but held that "as with Apple's other evidence, it does not demonstrate demand by consumers for Samsung's infringing products." (A28.) However, this Court has explained that subjective evidence that "employees

believed it to be important to incorporate the patented feature into [their] products is certainly relevant to the issue of nexus between the patent and market harm." *Apple I*, 678 F.3d at 1327-28.[11]

**Finally**, throughout its decision, the district court merely considered each item of Apple's causal nexus evidence in isolation. (*E.g.*, A25 ("Apple's conjoint study fails to demonstrate that the features claimed in the '647, '721, and '172 patents drive consumer demand for Samsung's infringing products."); A27 ("[T]his [copying] evidence alone does not establish that the infringing features drove customer demand for Samsung's smartphones and tablets."); A28 (dismissing evidence about importance of patented features to Apple because "it does not demonstrate demand by consumers for Samsung's infringing products").)

That is precisely the type of piecemeal analysis this Court has previously rejected. *See Apple III*, 735 F.3d at 1368 (instructing district court on remand to consider evidence dismissed as insufficient to show causal nexus on its own). Had the district court properly considered all of the relevant evidence ***in its totality***—

---

[11]    The district court did not address whether Apple practices the '647 patent, but noted that Apple engineer Thomas Deniau "was not presented as an expert witness and did not directly equate asserted claim 9 of the '647 patent with 'data detectors.'" (A27-28.) Mr. Deniau described in detail how Apple's data detectors software works (A10792-804), and Apple's technical expert described the invention of the '647 patent (A10832-34). That evidence collectively establishes that Apple's data detectors software practices claim 9 of the '647 patent, or at the very least, "embod[ies] similar technology" that competes with Samsung's infringing "linking" feature. *Presidio*, 702 F.3d at 1363.

rather than dismissing whole categories of evidence as insufficient in isolation—it would have found a causal nexus for each infringed patent for the reasons discussed above.

## II.    THE DISTRICT COURT ERRED BY FINDING THAT MONEY DAMAGES CAN REMEDY THE HARM CAUSED BY SAMSUNG'S ONGOING INFRINGEMENT.

Harm to reputation is a prototypical injury that cannot be fully compensated by money damages—because it is incredibly difficult, if not impossible, to value. *See Douglas Dynamics*, 717 F.3d at 1345 ("This court finds remedies at law inadequate to compensate Douglas for at least the reputation loss Douglas has suffered from Buyers's infringement."); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (affirming irreparable harm based upon "intangible injuries" that are difficult to quantify, such as damages to "goodwill"); *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007) ("Harm to business goodwill and reputation is unquantifiable …."); *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004) ("Damage to a business' goodwill is typically an irreparable injury because it is difficult to calculate.").

The district court attempted to distinguish this line of cases by suggesting that, in *Douglas Dynamics*, "the patentee provided evidence to support the court's conclusion" regarding the inadequacy of legal remedies.  (A32.)  But the patentee in *Douglas Dynamics* did not present ***any*** evidence of actual reputational injury, let

alone separate proof that the injury could not be remedied with money. Rather, the mere *possibility* of *future* harm was sufficient to show that no adequate monetary remedy was available. 717 F.3d at 1344-45.[12]

Application of the same standard here requires a finding that the irreparable harm caused to Apple's reputation as an innovator cannot be reasonably quantified or compensated with monetary damages. The district court erred by holding to the contrary.

The district court also erred in concluding that this prong favored Samsung with respect to Apple's sales-based losses. The district court correctly found that, in the smartphone and tablet "ecosystem," a consumer's initial choice of a device often dictates future purchases of related products—making it difficult or impossible to reasonably measure the sales-based harm caused by Samsung's millions of infringing sales. (A32-33; A35; A10449-50; A11313-15; A21080.)

---

[12]     The district court stated that *Southern Snow* and *Halo Electronics* involved specific "evidence" showing monetary damages were inadequate. But in both cases, the court relied solely on the nature of the patentee's reputational injury to establish the inadequacy of money damages. *See Southern Snow*, 2014 WL 1652436, at *7 (holding that because patentee suffered "analogous reputation loss" to *Douglas Dynamics*, "monetary damages would similarly be an inadequate remedy for damage to SnoWizard's 'reputation and brand distinction'"); *Halo Elecs.*, 2013 WL 3043668, at *7 (noting "Halo argues that damages are inadequate to compensate it for Pulse's infringement for essentially the same reasons that Halo is irreparably harmed" and concluding Halo's "loss of customer goodwill cannot be compensated by a reasonable royalty payment"). Here too, the nature of Apple's injury—reputational harm defying precise quantification—confirms the inadequacy of money damages.

The district court also correctly found that "Apple is reluctant to license its patents." (A34.) And based on those findings, the district court repeatedly found "that damages for Apple's alleged irreparable harm in connection with alleged lost sales are difficult to quantify." (A35; *see* A32 ("Apple has cited evidence tending to show that lost market share and downstream sales may be difficult to quantify."); A33 ("Apple has shown that its alleged lost sales harm would be difficult to calculate and remedy.").)

Nonetheless, the district court ruled against Apple on this prong based entirely on its erroneous conclusion that Apple failed to prove a causal nexus. (A35 ("[T]he Court will not issue a permanent injunction based on irreparable harm that Samsung's infringement did not cause, even if monetary remedies will not compensate Apple for that irreparable harm.").) As discussed above (pp. 31-34, 48-49, 51-60), that conclusion was wrong as a matter of law because Apple necessarily met the causal nexus requirement by proposing a feature-based injunction, and because Apple introduced evidence sufficient to meet the causal nexus requirement for a product-based injunction in any event.

Therefore, if the Court reverses the district court's erroneous conclusion that Apple failed to demonstrate irreparable harm (as it should), the inadequacy of monetary remedies factor also tips in Apple's favor. *See Apple III*, 735 F.3d at 1368 ("[T]he loss of customers and the loss of future downstream purchases are

difficult to quantify." (quoting *Apple I*, 678 F.3d at 1337 (O'Malley, J., concurring))); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010) (money cannot fully compensate "loss of market share," which "frequently def[ies] attempts at valuation"); *Qualcomm*, 543 F.3d at 703 ("[D]ifficulty in estimating monetary damages reinforces the inadequacy of a remedy at law.").[13]

## III. THE DISTRICT COURT CORRECTLY FOUND THAT THE BALANCE OF HARDSHIPS FAVORS GRANTING APPLE'S PROPOSED INJUNCTION.

Although Samsung's infringement has been widespread—and the resulting injuries to Apple's reputation and competitive standing severe—the relief that Apple seeks is narrow. Apple only seeks to enjoin Samsung's ongoing use of the infringing features—not a sales ban against any product in its entirety. (A36 ("Apple seeks a narrower injunction against only 'Infringing Features' … and not smartphone or tablet products in their entirety."); A2696-98.) And to eliminate any possible burden on Samsung, Apple included a sunset period during which Samsung can implement the supposed-design arounds that it told the district court and jury are available now and can be implemented in days. (A36 (finding "the injunction includes a 30-day 'sunset provision' to delay its effect" and "[a]t trial,

---

[13]    The inadequacy of money damages is further confirmed by the district court's decision to award pre-judgment interest at far below prevailing commercial rates and to postpone any award of supplemental damages until after an appeal on the merits. (A3894-902.) Samsung is guaranteed to profit by paying for its current infringement years later, with funds borrowed from Apple at near zero interest rates. Only an injunction can eliminate these perverse incentives that have fueled Samsung's widespread infringement.

Samsung's witnesses repeatedly told the jury that design-arounds would be simple or already exist"); A2698.)

Given the narrow relief that Apple sought, and Samsung's repeated claims to have easy-to-implement design-arounds ready to go, the district court found that "Samsung will not face any hardship from the injunction." (A36.) That determination was correct. *See Apple III*, 735 F.3d at 1363 (delay in enforcement "may make an injunction more equitable and, thus, more justifiable in any given case"); *Emulex*, 732 F.3d at 1338-39 (praising "well-crafted sunset period … [that] allowed for time to remove the infringing product from the market without causing significant downstream disturbance"); *Qualcomm*, 543 F.3d at 704 ("district court's carefully constructed sunset provisions" minimized any burden on defendant); *Verizon*, 503 F.3d at 1311 n.12 (recognizing whether infringer is given time "to implement a workaround" as "relevant to the balance of the hardships").

The district court also concluded that, because Apple faces the "'substantial hardship'" of being forced to compete against products incorporating its own inventions (A39-40), "the balance of hardships favors Apple and the entry of an injunction" (A36). This too was correct. *See Douglas Dynamics*, 717 F.3d at 1345 (noting if infringer says it has "a non-infringing alternative which it could easily deliver to the market, then the balance of hardships would suggest that [the infringer] should halt infringement"); *Bosch*, 659 F.3d at 1156 (affirming

injunction to avoid patentee having to endure the "substantial hardship" of "compet[ing] against its own patented invention").

## IV. THE DISTRICT COURT CORRECTLY FOUND THAT THE PUBLIC INTEREST FAVORS GRANTING APPLE'S PROPOSED INJUNCTION.

The district court also correctly found "that the public interest factor favors Apple." (A42.) The record shows that Apple invested substantial resources and took significant risks to develop the inventions that Samsung has incorporated into its products. (*E.g.*, A10424-26 (explaining Apple's development of the iPhone took years, involved "hundreds of people," and was "[i]ncredibly risky"); A10585-98 (describing process for developing the iPhone and '721 invention, which involved "an awful lot of people" and "a ton of work" that "was pretty much non-stop" over several years).) As the district court acknowledged, the public interest favors the enforcement of patent rights to encourage precisely that type of investment in innovation. (A40 ("[T]he public interest does favor the enforcement of patent rights to promote the 'encouragement of investment-based risk.'").) *See Douglas Dynamics*, 717 F.3d at 1346 (explaining "public's general interest in the judicial protection of property rights in inventive technology" favors injunctive relief); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1363 (Fed. Cir. 2008) (describing "right of exclusion for a limited period as an incentive to inventors to risk the often enormous costs in terms of time, research, and development").

Nor are there any countervailing considerations.  Apple's injunction targets only the specific patented features and allows Samsung the time it claims to need to implement its supposed design-arounds.  Therefore, it would not deprive the public of a single product or any non-infringing features.  (A41 ("[T]here is substantially less risk that the injunction will deprive the public of access to 'a large number of non-infringing features,' particularly given Samsung's representations about the ease and speed of designing around the patents at issue.").)

In fact, as the district court found, the public actually stands to benefit from the diversity of product offerings that would result from Samsung implementing its supposed design-arounds.  (A41 ("[A]n injunction may prompt introduction of new alternatives to the patented features.").)

## CONCLUSION

The district court's order denying a permanent injunction should be reversed or, in the alternative, vacated and remanded for further proceedings.

Respectfully submitted,

/s/ William F. Lee

MARK D. SELWYN                    WILLIAM F. LEE
WILMER CUTLER PICKERING           RICHARD W. O'NEILL
   HALE AND DORR LLP           MARK C. FLEMING
950 Page Mill Road                LAUREN B. FLETCHER
Palo Alto, CA  94304              ANDREW J. DANFORD
(650) 858-6000                    SARAH R. FRAZIER
                                  WILMER CUTLER PICKERING
RACHEL KREVANS                       HALE AND DORR LLP
ERIK J. OLSON                     60 State Street
NATHAN B. SABRI                   Boston, MA  02109
CHRISTOPHER L. ROBINSON           (617) 526-6000
MORRISON & FOERSTER LLP
425 Market Street                 THOMAS G. SPRANKLING
San Francisco, CA  94105-2482     WILMER CUTLER PICKERING
(415) 268-7000                       HALE AND DORR LLP
                                  1875 Pennsylvania Avenue, N.W.
                                  Washington, DC  20006
                                  (202) 663-6000

October 3, 2014                   *Counsel for Plaintiff-Appellant*
                                  *Apple Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that, on this 3rd day of October, 2014, I filed the foregoing Non-Confidential Brief for Plaintiff-Appellant Apple Inc. with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

*/s/ William F. Lee*
WILLIAM F. LEE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13,928 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

October 3, 2014

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Order Denying Apple's Motion for Permanent
    Injunction, Dkt. No. 1954 (Aug. 27, 2014)
    **[FILED UNDER SEAL]**.........................................................A1-42 (TAB 1)

U.S. Patent No. 5,946,647............................................................A354-369 (TAB 2)

U.S. Patent No. 8.046,721............................................................A370-397 (TAB 3)

U.S. Patent No. 8,074,172............................................................A398-421 (TAB 4)

# TAB 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE, INC., a California corporation, | Case No.: 12-CV-00630-LHK |
| Plaintiff, | ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD, A Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company | [UNDER SEAL] |
| Defendants. | |

19   Apple, Inc. ("Apple") owns U.S. Patent Nos. 5,946,647 (the "'647 patent"); 8,046,721 (the

20  "'721 patent"); and 8,074,172 (the "'172 patent"), which each cover features that Apple contends

21  are related to the ease of using smartphones. Apple asserted these three patents and two others

22  against Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung

23  Telecommunications America, LLC (collectively, "Samsung"). On summary judgment, the Court

24  found that Samsung infringed the '172 patent. A jury then found that Samsung also infringed the

25  '647 and '721 patents, and awarded damages for all infringed patents. Apple now moves, based

26  only on these three patents, to enjoin Samsung from making, selling, developing, or advertising

27  infringing features in its products. *See* ECF No. 1895-4 ("Proposed Order"). Apple's motion is

28  fully briefed, and the Court heard oral arguments on July 10, 2014. Having considered the parties'

1

**A1**

1  arguments, the briefing, the relevant law, and the record in this case, the Court concludes that

2  Apple has not established that it is entitled to the permanent injunction it seeks. Apple's Motion

3  for a Permanent Injunction is therefore DENIED.

## I.    TECHNOLOGICAL BACKGROUND

Because the particular features claimed by the patents-in-suit are relevant to the Court's

conclusions, the Court begins by briefly reviewing the claimed features.

The '647 patent, entitled "System and Method for Performing an Action on a Structure in

Computer-Generated Data" and colloquially called the "quick links" patent, discloses "a system

and a method [that] causes a computer to detect and perform actions on structures identified in

computer data." '647 patent Abstract. The application for the '647 patent was filed on February 1,

1996, and the patent issued on August 31, 1999. Asserted claim 9 depends from claim 1. Both

claims recite:

> 1.  A computer-based system for detecting structures in data and performing
>     actions on detected structures, comprising:
>     an input device for receiving data;
>     an output device for presenting the data;
>     a memory storing information including program routines including
>          an analyzer server for detecting structures in the data, and for linking actions
>          to the detected structures;
>          a user interface enabling the selection of a detected structure and a linked
>          action; and
>          an action processor for performing the selected action linked to the selected
>          structure; and
>     a processing unit coupled to the input device, the output device, and the
>          memory for controlling the execution of the program routines.
>
> 9.  The system recited in claim 1, wherein the user interface enables selection of an
>     action by causing the output device to display a pop-up menu of the linked
>     actions.

*Id.* cls.1, 9. The '647 patent discloses a system and method for recognizing when certain patterns

or "data structures" are present in a data set, and automatically providing optional actions for a user

to perform on the data structures. *See id.* col.2 ll.21-54. For example, the system may scan a

Microsoft Word document and recognize when phone numbers or email addresses appear in the

document. *See id.* col.1 ll.24-35; *see also id.* col.2 ll.42-53. Then, the system may link actions to

these structures and allow the user to select an action. *Id.* As an example, when an e-mail address

is detected in a document, the system may automatically give the user the options to send an e-mail

2

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

1   to the identified address or to store the e-mail address in an electronic address book. *Id.* at col.5

2   ll.5-18. As another example, when a phone number is detected in a document, the system may give

3   the user the option to place a call to that phone number or to place the number in an electronic

4   telephone book. *Id.*

5        For infringement of the '647 patent, Apple accused the Messenger (also referred to as

6   "Messaging" by the parties) and Browser applications in the Gingerbread, Ice Cream Sandwich,

7   and Jelly Bean versions of the Android operating system, as implemented on nine accused

8   Samsung products: the Admire, Galaxy Nexus, Galaxy Note, Galaxy Note II, Galaxy S II, Galaxy

9   S II Epic 4G Touch, Galaxy S II Skyrocket, Galaxy S III, and Stratosphere. *See* Tr. at 833:5-8,

10   839:1-6, 841:23-842:14. The jury found that all nine accused products infringe the '647 patent.

11   *See* ECF No. 1884 at 9.

12        The '721 patent, entitled "Unlocking a Device by Performing Gestures on an Unlock

13   Image" and nicknamed the "slide to unlock" patent, is generally directed to devices with touch-

14   sensitive displays that users can unlock by performing certain gestures. *See* '721 patent Abstract.

15   The '721 patent claims priority to an application filed on December 23, 2005, and issued on

16   October 25, 2011. Asserted claim 8 depends from claim 7. Both claims recite:

17       7.  A portable electronic device, comprising:
            a touch-sensitive display;
18            memory;
            one or more processors; and
19            one or more modules stored in the memory and configured for execution by the
               one or more processors, the one or more modules including instructions:
20            to detect a contact with the touch-sensitive display at a first predefined location
               corresponding to an unlock image;
21            to continuously move the unlock image on the touch-sensitive display in
22               accordance with movement of the detected contact while continuous contact
               with the touch-sensitive display is maintained, wherein the unlock image is
               a graphical, interactive user-interface object with which a user interacts in
23               order to unlock the device; and
24            to unlock the hand-held electronic device if the unlock image is moved from the
               first predefined location on the touch screen to a predefined unlock region
25               on the touch-sensitive display.

26       8.  The device of claim 7, further comprising instructions to display visual cues to
           communicate a direction of movement of the unlock image required to unlock
27           the device.

28

3

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

**A3**

*Id.* cls.7, 8. Thus, the patent generally discloses ways to unlock a smartphone by sliding a finger

(for example) across the screen to "continuously move" an image to an unlocking position.

For infringement of the '721 patent, Apple accused the touchscreen-based unlocking

mechanisms on six accused Samsung products: the Admire, Galaxy Nexus, Galaxy S II, Galaxy S

II Epic 4G Touch, Galaxy S II Skyrocket, and Stratosphere. *See* Tr. at 650:14-16, 658:17-659:4.

The jury found that the Admire, Galaxy Nexus, and Stratosphere infringe the '721 patent, but that

the Galaxy S II, Galaxy S II Epic 4G Touch, and Galaxy S II Skyrocket did not infringe. *See* ECF

No. 1884 at 9.

The '172 patent, entitled "Method, System, and Graphical User Interface for Providing

Word Recommendations" and colloquially called the "auto correct" patent, discusses systems for

suggesting replacements for text as a user types. *See* '721 patent Abstract. The application for the

'721 patent was filed on January 5, 2007, and the patent issued on December 6, 2011. Asserted

claim 18 recites:

> 18. A graphical user interface on a portable electronic device with a keyboard and a
> touch screen display, comprising:
> a first area of the touch screen display that displays a current character string
> being input by a user with the keyboard; and
> a second area of the touch screen display separate from the first area that
> displays the current character string or a portion thereof and a suggested
> replacement character string for the current character string;
> wherein;
> the current character string in the first area is replaced with the suggested
> replacement character string if the user activates a key on the keyboard
> associated with a delimiter;
> the current character string in the first area is replaced with the suggested
> replacement character string if the user performs a gesture on the suggested
> replacement character string in the second area; and
> the current character string in the first area is kept if the user performs a gesture
> in the second area on the current character string or the portion thereof
> displayed in the second area.

*Id.* cl.18. The '172 patent discloses a method, system, and interface for providing word

recommendations to users inputting text into a portable communication device and for allowing the

user to select the recommended words. *See generally id.* at Abstract.

For infringement of the '172 patent, Apple accused the word recommendation feature of the

Messenger application in Android as implemented on seven accused Samsung products: the

Admire, Galaxy Nexus, Galaxy Note, Galaxy S II, Galaxy S II Epic 4G Touch, Galaxy S II

4

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

**A4**

United States District Court
For the Northern District of California

1    Skyrocket, and Stratosphere. *See* ECF No. 1884 at 9; ECF No. 1151 at 9, 11 n.3. Before trial, the

2    Court granted summary judgment that the accused products infringe the '172 patent, ECF No. 1151

3    at 14, and the jury awarded damages for that infringement, *see* ECF No. 1884 at 9.

4    **II.    PROCEDURAL BACKGROUND**

5        Apple's current motion follows multiple rulings regarding preliminary and permanent

6    injunctions in the two patent lawsuits between Apple and Samsung in this Court, including three

7    opinions from the Federal Circuit. In its March 6, 2014 order denying Apple's request for a

8    permanent injunction in the first lawsuit, this Court summarized the relevant proceedings in both

9    litigations, the appeals to the Federal Circuit regarding injunctions, and the Federal Circuit's

10    guidance regarding the proper analysis for assessing injunctive relief in patent cases. *See* Order

11    Denying Apple's Renewed Mot. for Permanent Injunction at 5-14, *Apple, Inc. v. Samsung Elecs.*

12    *Co.*, No. 11-CV-01846-LHK (N.D. Cal. Mar. 6, 2014) (ECF No. 3015, "1846 Injunction Order").

13    Of particular relevance are the Federal Circuit's opinions in "*Apple I*" (678 F.3d 1314 (Fed. Cir.

14    2012)), "*Apple II*" (695 F.3d 1370 (Fed. Cir. 2012)), and "*Apple III*" (735 F.3d 1352 (Fed. Cir.

15    2013)).[1]

16        Apple filed the instant lawsuit on February 8, 2012, alleging that Samsung infringed several

17    Apple patents not asserted in the first lawsuit. On the same day, Apple moved for a preliminary

18    injunction, seeking to enjoin Samsung's accused Galaxy Nexus smartphone based on four asserted

19    patents. *See* ECF No. 10. This Court granted Apple's motion as to the so-called "unified search"

20    patent, No. 8,086,604 (the "'604 patent," which is no longer asserted), but denied Apple's motion

21    as to the other three patents, and entered a preliminary injunction. *See* ECF No. 221. Samsung

22    appealed this Court's ruling as to the '604 patent. On appeal, the Federal Circuit reversed the

23    Court's finding that Samsung's alleged infringement of the '604 patent caused Apple irreparable

24    harm and concluded that "the causal link between the alleged infringement and consumer demand

25    for the Galaxy Nexus is too tenuous to support a finding of irreparable harm." *See Apple II*, 695

26    F.3d at 1376. This Court subsequently dissolved the preliminary injunction. *See* ECF No. 1383.

---

[1]    In the 1846 Injunction Order, the Court referred to *Apple III* as "*Apple IV*." Because the parties now refer to this Federal Circuit decision as "*Apple III*," the Court follows suit.

5

**A5**

1    At the summary judgment stage, the Court held that Samsung infringed the '172 patent.

2    ECF No. 1151 at 14. This case then proceeded to trial. On May 5, 2014, a jury returned a verdict

3    that nine of ten accused Samsung products infringed one or both of Apple's '647 and '721 patents.

4    *See* ECF No. 1884 at 9. Apple sought approximately $2.1 billion in damages for infringement of

5    all five of its asserted patents, but the jury awarded Apple a total of $119,625,000.00 for

6    infringement of the three patents at issue. *Id.* at 8. Both parties filed motions for judgment as a

7    matter of law, challenging various portions of the jury's verdict.

8    In accordance with the Court's schedule for post-trial motions and briefing, Apple filed the

9    present motion on May 23, 2014. ECF No. 1895-3 ("Mot."). Samsung filed an Opposition on June

10   6, 2014. ECF No. 1907-3 ("Opp'n"). Apple filed a Reply on June 13, 2014. ECF No. 1918

11   ("Reply"). The Court held a hearing on July 10, 2014.

12   **III.   LEGAL STANDARD**

13   The Patent Act provides that in cases of patent infringement a court "may grant injunctions

14   in accordance with the principles of equity to prevent the violation of any right secured by patent,

15   on such terms as the court deems reasonable." 35 U.S.C. § 283. A patentee seeking a permanent

16   injunction must make a four-part showing:

17   > (1) that it has suffered an irreparable injury; (2) that remedies available at law, such
   > as monetary damages, are inadequate to compensate for that injury; (3) that,
18   > considering the balance of hardships between the plaintiff and defendant, a remedy
   > in equity is warranted; and (4) that the public interest would not be disserved by a
19   > permanent injunction.

20   *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Though injunctions were once

21   issued in patent cases as a matter of course, the U.S. Supreme Court ruled in 2006 that "broad

22   classifications" and "categorical rule[s]" were inappropriate in analyzing whether to grant a

23   permanent injunction. *Id.* at 393. "An injunction is a drastic and extraordinary remedy, which

24   should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S.

25   139, 165 (2010).

26   The Court evaluates each of the four *eBay* factors in light of the Federal Circuit's guidance

27   and determines whether, on balance, the principles of equity support issuance of a permanent

28   injunction in this case.

*Left margin:* United States District Court / For the Northern District of California

United States District Court
For the Northern District of California

## IV.    DISCUSSION

### A.    Irreparable Harm

"[T]o satisfy the irreparable harm factor in a patent infringement suit a patentee must establish both of the following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple II*, 695 F.3d at 1374. The Federal Circuit has explained that "the purpose of the causal nexus requirement is to show that the patentee is irreparably harmed *by the infringement*. Without such a showing, it is reasonable to conclude that a patentee will suffer the same harm with or without an injunction, thus undermining the need for injunctive relief in the first place." *Apple III*, 735 F.3d at 1363 (emphasis in original). This test "reflects general tort principles of causation and applies equally to the preliminary and permanent injunction contexts." *Id.* at 1361.

With respect to the first prong of the irreparable harm standard, Apple asserts two forms of irreparable harm. Apple argues that it will suffer irreparable damage to its reputation as an innovator, similar to the harm suffered by the patentee in *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1344-45 (Fed. Cir. 2013). Apple also contends that it will suffer irreparable harm from sales-based losses.

With respect to the second prong of the irreparable harm standard, Apple argues that trial evidence demonstrated a causal nexus between the alleged sales-based harm and Samsung's infringing behavior. Mot. at 12. Apple argues, however, that when reputational harm is alleged, the second prong of the irreparable harm test falls away and no separate proof of causal nexus is required. Reply at 2. Despite *Apple II*'s seemingly unambiguous language ("a patentee must establish both of the following requirements"), Apple argues that in *Douglas Dynamics*, the Federal Circuit "did not require separate proof of a causal nexus—because irreparable harm to the patentee's reputation *necessarily flows* from infringement[.]" *Id.* (emphasis in original).

### 1.    Causal Nexus and Reputational Harm

The Court first addresses Apple's assertions that, under *Douglas Dynamics*, reputational harm is not subject to the "causal nexus" requirement. As set forth below, the Court finds no

7

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1    reason to depart from the Federal Circuit's guidance that a patentee must demonstrate a causal

2    nexus between infringement and any alleged irreparable harm—including injury to reputation.

3        The Federal Circuit has repeatedly stated that the causal nexus inquiry is required to show

4    irreparable harm.  In *Apple II*, the Federal Circuit stated that "although the irreparable harm and the

5    causal nexus inquiries may be separated for the ease of analysis, they are *inextricably related*

6    *concepts*."  695 F.3d at 1374 (emphasis added).  In *Apple III*, the Federal Circuit further observed:

> Apple proposes that because no single equitable factor in the injunction analysis
> is dispositive, "[a] strong showing of irreparable harm should offset comparatively
> weak evidence of causal nexus, and vice-versa."  Apple Br. 60.  Like Apple's first
> argument, this argument seems to be premised on the mistaken notion that the
> causal nexus is a separate factor from irreparable harm.  As we have explained,
> however, *the causal nexus requirement is part of the irreparable harm factor.*
> *Without a showing of causal nexus, there is no relevant irreparable harm.*  In other
> words, *there cannot be one without the other.*

12    735 F.3d at 1363 (emphases added).  Furthermore, without the causal nexus requirement, a court

13    cannot distinguish "between irreparable harm caused by patent infringement and irreparable harm

14    caused by otherwise lawful competition."  *Id.* at 1361; *see also* Hon. Kathleen O'Malley,

15    *Interesting Times at the Federal Circuit*, 63 Am. U.L. Rev. 949, 956 (2014) ("[W]e have explained

16    – and outlined the contours of the requirement – that there must be some causal nexus between an

17    infringed feature in a product and the consumer demand for that product before a permanent

18    injunction barring that product can issue.").

19        There is no reason to forego this analysis in the context of reputational harm.  Even if harm

20    will be done to Apple's reputation, Apple is not entitled to an injunction if that harm originates

21    from some source *other than Samsung's infringing behavior.*  For example, it is possible that

22    Apple's reputation as an "innovator" could be harmed if Samsung's *noninfringing* features are

23    perceived as innovative, but that would not justify an injunction.

24        Apple argues that the Federal Circuit did not require proof of causal nexus in *Douglas*

25    *Dynamics*, "presumably because that type of reputational harm flows directly from the mere fact of

26    infringement."  Mot. at 5.  In *Douglas Dynamics*, however, the defendant did not challenge the

27    existence of a causal nexus between the infringing behavior and the alleged harm.  Indeed, the

28    Federal Circuit concluded that the patentee "has suffered irreparable injury *from [defendant's]*

8

**A8**

Case5:12-cv-00630-LHK   Document1954 *SEALED*   Filed08/27/14   Page9 of 42

United States District Court
For the Northern District of California

1  *infringement.*" 717 F.3d at 1345 (emphasis added).  Apple mistakenly asserts that the defendant

2  there "argued that the patentee could not prove irreparable harm because the patents 'cover only

3  some components of the accused snowplow assemblies.'" Reply at 3 (quoting *Douglas Dynamics*,

4  717 F.3d at 1343).  Apple relies on language from the *Douglas Dynamics* opinion that did not

5  concern causal nexus.  It appears that the "some components" argument to which the Federal

6  Circuit referred did not dispute the *cause* of the alleged harm to the patentee, but rather the *degree*

7  of that harm. *See Douglas Dynamics*, 2012 WL 2375012 at \*48 (Defendant Cross-Appellant's

8  Brief) ("[Patentee] cannot demonstrate that it is suffering significant—much less irreparable—

9  harm from sales of [infringer's] snowplows.").  Because the issue was not raised, the fact that the

10  Federal Circuit did not explicitly address causal nexus in *Douglas Dynamics* cannot be interpreted

11  as an abrogation of the causal nexus requirement in the context of alleged reputational harm.

12      Later, in *Apple III*, the Federal Circuit implicitly confirmed this interpretation of *Douglas*

13  *Dynamics*, observing that causal nexus was not raised in *Douglas Dynamics*.  In *Apple III*, Apple

14  argued that the causal nexus requirement should not be applied in the context of a permanent

15  injunction, citing a number of cases, including *Douglas Dynamics*. 735 F.3d at 1361-62.  The

16  Federal Circuit rejected Apple's argument, listing the cases cited by Apple and observing: "there is

17  no indication that any of the infringers in *those cases* challenged the existence of a causal nexus

18  between their infringement and the patentees' alleged harm."  *Id.* at 1362 (emphasis added).  Apple

19  points to the portion of the *Apple III* opinion where the Federal Circuit distinguished *Douglas*

20  *Dynamics* specifically on the grounds that damage to reputation was "a type of harm not asserted

21  by Apple" in *Apple III. Id.* Apple argues that because it *does* assert damage to reputation in the

22  instant case, *Apple III*'s distinction of *Douglas Dynamics* is inapposite.  Apple errs, however, in

23  presuming that this is the *only* basis on which *Apple III* distinguishes *Douglas Dynamics*. The

24  language on which Apple relies is from a portion of the Federal Circuit's opinion that distinguishes

25  *Douglas Dynamics* from the facts in *Apple III* "on other grounds *as well.*" *Id.* (emphasis added).

26  In *Apple III*, the Federal Circuit rejected Apple's reading of *Douglas Dynamics* for the same reason

27  that the instant Court rejects it today—in *Douglas Dynamics*, causal nexus was never in dispute.

28  Moreover, Apple argues that *Douglas Dynamics* implicitly abrogated the causal nexus requirement,

<div align="center">9</div>

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1   despite the court's express guidance that causal nexus and irreparable harm "are inextricably

2   related." It is highly unlikely that the Federal Circuit intended to eliminate an "inextricable"

3   requirement without comment, further analysis, or argument by the parties.

4   　　　　Apple's claim that "the mere fact of infringement" demonstrates irreparable reputational

5   harm also suggests the type of "categorical rule" that the U.S. Supreme Court rejected. *See eBay*,

6   547 U.S. at 393. For injury relating to either lost sales or reputation, Apple must demonstrate that

7   it will suffer irreparable harm if an injunction does not issue, *and* demonstrate that there is a causal

8   nexus between the alleged harm and Samsung's infringement of Apple's patents.

9   　　　　**2.   Harm to Apple's Reputation**

10   　　　　Apple argues that, absent an injunction, it will suffer the same type of irreparable harm to

11   "reputation and brand" that warranted an injunction in *Douglas Dynamics.* Mot. at 5. Specifically,

12   Apple argues that Samsung's infringement erodes Apple's reputation in multiple respects,

13   "including by tainting Apple's reputation as an innovator, by leading customers and competitors to

14   believe that Apple is not entitled to enforce its patent rights (even when it prevails on its

15   infringement claims), and by disrupting Apple's attempts to maintain exclusivity over its patented

16.   inventions." *Id.* at 11. Samsung disputes both irreparable harm and causal nexus, and further

17   argues that Apple's claim for damage to its reputation has been waived by Apple. *See* Opp'n at 8.

18   This Court finds that Apple did not waive its arguments regarding reputational harm, but

19   determines that Apple has not met its burden to show irreparable harm to its reputation or goodwill

20   without an injunction, and has not demonstrated a causal nexus between Samsung's infringement

21   and any alleged reputational injury.

22   　　　　**a.   Waiver**

23   　　　　In Apple's previous motion for a preliminary injunction in this matter, Apple argued that

24   Samsung's infringement of "key distinguishing features" diluted the "critical distinctiveness of

25   Apple's products and goodwill associated with those products." Apple Mot. for Preliminary

26   Injunction (ECF No. 10) at 24. In response to that motion, this Court observed that "[l]oss of

27   goodwill, as well as damage to reputation, can support a finding of irreparable harm." ECF No.

28   221 at 76 (citing *Celsis In Vitro, Inc. v. CellzDirect, Inc.,* 664 F.3d 922, 930 (Fed. Cir. 2012)).

<div style="text-align:center">10</div>

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

<div style="text-align:center">**A10**</div>

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

1   However, this Court found that even if Apple could establish a "reputation for innovativeness," a

2   likelihood of irreparable harm had not been shown at that time because "Apple has presented no

3   evidence explaining how the presence in the market of an infringing product . . . erodes that

4   goodwill." *Id.* at 77.

5        Despite Apple's arguments during the preliminary injunction phase, Samsung asserts that

6   Apple has since waived any claim for irreparable harm based on loss of goodwill or damage to

7   Apple's reputation as an "innovator." Opp'n at 8.  Samsung relies on Apple's alleged failure to

8   include reputational harm in Apple's response to Samsung's Interrogatory No. 10, which requested

9   "the complete factual and legal basis" for Apple's claim to injunctive relief, including "what

10  irreparable injury APPLE has suffered . . . ." Fazio Decl. Ex. 2 (ECF No. 1907-10) at 65.  Even

11  assuming that Apple needed to re-raise its preliminary injunction arguments regarding reputational

12  harm, Samsung's waiver argument fails because Apple referenced reputational harm in its response

13  to Samsung's Interrogatory No. 10.  Specifically, Apple's response to Interrogatory No. 10

14  incorporates "by reference as if fully set forth herein all facts and evidence contained or identified

15  in Apple's Motion for Preliminary Injunction. . . ." *Id.* at 66-67.  This incorporation notified

16  Samsung that Apple intended to continue asserting the same type of harm that was alleged during

17  the preliminary injunction phase, including reputational harm.

18       Even if this reference was not sufficient to preserve Apple's claim, Apple also served a

19  "Third Supplemental Response to Interrogatory No. 10," in which Apple provided "[a]dditional

20  evidence to show Apple's entitlement to injunctive relief, including the irreparable injury Apple

21  has suffered. . . ." *Id.* at 73.  Apple stated that such harm is the subject of various expert opinions,

22  listed in the Supplemental Response and "incorporated by reference." *Id.* at 74.  Apple

23  incorporated by reference the "Declaration of Christopher Vellturo, PH.D., dated February 8, 2012

24  and all exhibits, appendices, errata, and supplementations thereto." *Id.*  That Declaration, provided

25  initially in support of the motion for a preliminary injunction, discloses the "Irreparable Injury Due

26  to Harm to Apple's Goodwill Resulting from Samsung's Infringement." Vellturo 2012 Decl. (ECF

27  Nos. 12-14) ¶¶ 96-98 (discussing the "goodwill Apple has built with end users," relying on surveys

28  and reports in the popular press).  Samsung argues that these paragraphs are merely "conclusory"

<center>11</center>

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

<center>**A11**</center>

1    and are "insufficient to cure Apple's waiver by failing to raise this theory in response to Samsung's

2    Interrogatory." Opp'n at 8 n.10. While Samsung is correct that these paragraphs standing alone do

3    not suffice to prove that Apple will *in fact* suffer irreparable harm, these references were sufficient

4    to preserve the issue. The Court rejects Samsung's waiver argument.

b.    **Evidence of Reputational Harm**

6        To demonstrate irreparable reputation-based harm, Apple must first demonstrate that it has

7    goodwill or reputation that could be the subject of damage. Apple argues that it established a

8    reputation among consumers as an "innovator." Mot. at 6. Dr. Vellturo opined that the "distinctive

9    user experience Apple created and nurtured . . . is a critical determinant in the value of the Apple

10   brand," and cited survey evidence indicating that ██████████████████

11   ████████████████████████████████████████ Vellturo 2012 Decl. ¶ 96.

12   Dr. Vellturo further noted popular press articles ranking Apple first in a list of the world's most

13   innovative firms. *Id.* ¶ 97. Samsung leaves this contention largely unrebutted. Indeed, Samsung's

14   counsel acknowledged in his opening statement at trial that "Apple is an amazingly innovative

15   company." Tr. at 360:1-2. Accordingly, the Court finds that, like the plaintiff in *Douglas*

16   *Dynamics*, Apple has demonstrated an undisputed "reputation as an innovator." 717 F.3d at 1344.

17       However, Apple must still demonstrate that it will likely suffer irreparable reputational

18   harm absent an injunction, and that there is a causal nexus between that harm and Samsung's

19   infringement. Apple again relies extensively on *Douglas Dynamics*, arguing that all of the factors

20   discussed by the Federal Circuit in that case are present here as well. Specifically, Apple points to

21   the appearance of Apple's patented innovations in competing and allegedly inferior products;

22   Apple's reputation for enforcement of intellectual property rights; and Apple's general refusal to

23   license its patents. *See* Mot. at 5-11. In *Douglas Dynamics*, the Federal Circuit identified similar

24   facts and concluded the patentee's reputation would suffer irreparable harm from the infringing

25   behavior. 717 F.3d at 1345. Apple is incorrect, however, in arguing that *Douglas Dynamics*

26   demands a finding of irreparable harm whenever those factors are present.

27       In *Douglas Dynamics*, the district court concluded there was no injury to the patentee's

28   reputation because "there was no evidence that interested consumers confused the [patentee and

12

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   infringer]." *Id.* at 1344. The Federal Circuit rejected this finding, concluding that harm to a

2   company's reputation can occur "even absent consumer confusion." *Id.* The factors identified by

3   the *Douglas Dynamics* court are listed as *examples* of damage to reputation that can exist outside of

4   the customer confusion context. *Id.* at 1344-45 ("As just one example. . . ."). Apple's

5   interpretation of *Douglas Dynamics* would essentially create a *per se* rule in cases where the

6   patentee is an innovative company, forcing a finding of irreparable harm wherever the infringer is a

7   direct competitor.[2] This is at odds with the flexible and equitable nature of the irreparable harm

8   inquiry. *See eBay*, 547 U.S. at 391-92; *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142,

9   1149 (Fed. Cir. 2011). In *Douglas Dynamics*, the factors cited by the court were context-specific

10  examples, and the court's ultimate conclusion relied on "evidence submitted by [the patentee]."

11  717 F.3d at 1345. While the factors cited by Apple may form part of the analysis, *Douglas*

12  *Dynamics* does not alter the need to weigh all relevant evidence in conducting the irreparable harm

13  inquiry. The Court now turns to Apple's specific arguments regarding reputational harm.

14              **i.    Presence of Patented Features in Competing Products**

15       Apple argues that its reputation as an innovator is damaged when "customers [find] the

16  same 'innovations' appearing in competitors' [products]," including products considered less

17  prestigious and innovative. Mot. at 6 (quoting *Douglas Dynamics*, 717 F.3d at 1345), 9. Apple

18  argues that the harm to its reputation is "particularly acute" for the '647 and '721 patents because

19  Apple practices those patents in its own products.[3] *Id.* at 7. Furthermore, even if Apple does not

20  currently practice all of the patents at issue, Apple argues that it continues to sell products that

21  *compete* with infringing Samsung products. *See Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d

22  1159, 1171 (Fed. Cir. 2014) ("[A] party that does not practice the asserted patent may still receive

23  an injunction when it sells a competing product.").

24       To establish harm, Apple relies on trial testimony from various witnesses about Apple's

25  reputation and the competition between Apple and Samsung. Philip Schiller, Apple's Senior Vice

26  [2]       At times, Apple's argument goes even further, suggesting that "reputational harm flows
27  directly from the mere fact of infringement," Mot. at 5, and that "irreparable harm to the patentee's
    reputation *necessarily flows* from infringement," Reply at 2 (emphasis in original).
    [3]       Samsung disputes that Apple in fact practices the '647 and '721 patents. Opp'n at 13.
28

13

**A13**

United States District Court
For the Northern District of California

1   President of Worldwide Marketing, testified that he believes Apple values its reputation for

2   innovation: "I think it's really important to the very DNA of Apple that we're an innovator who

3   creates unique differentiations in our products that customers value." Tr. at 451:8-452:9.

4   Mr. Schiller further stated that Samsung's alleged infringement and copying of Apple's intellectual

5   property "diminishes the value that we're bringing to customers" and "confuses customers about

6   the source of those things, whether Apple is being [an] innovator and doing these things or whether

7   Samsung or someone else is innovating," and that "[Samsung's infringement] has caused people to

8   question some of the innovations that we've created and Apple's role as the innovator." *Id.* at

9   469:15-470:18, 473:25-474:21. Additionally, Apple highlights statements from Samsung's

10   corporate witnesses, including Dale Sohn, who noted the importance of "know[ing] who my

11   competitors are," *id.* at 1633:20-25, and Todd Pendleton, who admitted that Samsung has been

12   perceived as a "fast follower" and "not an innovator," *id.* at 1696:2-1698:11. Apple also points to

13   alleged admissions by Samsung's damages experts regarding competition. Dr. Judith Chevalier

14   acknowledged that "Apple and Samsung are fierce competitors in this market." *Id.* at 2433:9-17.

15   Dr. Tülin Erdem testified that certain unaccused features—such as video cameras and GPS—do not

16   differentiate smartphones in consumers' eyes. *See id.* at 2340:5-22. Finally, Apple cites internal

17   Samsung documents indicating that Samsung considered Apple a major rival. *See* PX216 at 3

18   (Samsung document: "Beating Apple is no longer merely an objective, it is our survival strategy.");

19   DX431 at 5 (Samsung document: "Overcome Fast Follower Status & Establish Samsung as

20   Challenger Brand to Apple").

21        Apple further argues that its reputation suffers because its patented innovations have

22   appeared in Samsung products that are perceived as "less prestigious and innovative." *See* Mot. at

23   9 (quoting *Douglas Dynamics*, 717 F.3d at 1345). As evidence, Apple points to the statements

24   above by Mr. Pendleton regarding perceptions of Samsung as a "fast follower" and "not an

25   innovator." *Id.* (quoting Tr. at 1696:2-1698:11). Apple asserts that consumers may begin to

26   "associate Apple's patented features with a company viewed by many as 'not an innovator.'" *Id.*

27        While Apple has presented significant evidence about the strength of its reputation and the

28   intensity of the parties' competition, the Court finds that Apple has not satisfied its burden of

14

**A14**

1   establishing irreparable reputational harm due to Samsung's infringing use of patented features. A

2   number of factors not present in *Douglas Dynamics* weigh against finding Apple suffered

3   irreparable harm to its reputation stemming from the appearance of Apple's patented features in

4   Samsung's products. First, Apple has provided only limited persuasive evidence of such actual

5   injury. The testimony above tends to show that Apple is recognized for innovation, and that

6   Samsung and Apple are "fierce" competitors. However, this evidence does not indicate that

7   Apple's reputation suffered as a result of Samsung's infringement. While Mr. Schiller testified that

8   Samsung's actions generally harm Apple's brand, this is true of competitors generally, and

9   Mr. Schiller did not link any harm to infringement of the three patented features in question. At

10  oral argument, Apple's counsel did not identify any other evidence of reputational harm. Apple

11  does not provide (for example) any surveys to establish that consumers have begun to question

12  Apple's role as an innovator or have difficulty differentiating Samsung and Apple products due to

13  the infringing features.

14        Second, Samsung argues persuasively that Apple's reputation has proved extremely robust,

15  *see* Opp'n at 11, weakening Apple's claim that it has suffered or will suffer irreparable harm to its

16  reputation from infringement of only three patents. Dr. Chevalier cites evidence that Apple's

17  reputation derives from products and features other than the three patents at issue. *See* Chevalier

18  Decl. (ECF No. 1907-5) ¶ 61 ("[T]here is no evidence that Apple's reputation as an innovator was

19  meaningfully connected to these patents prior to infringement."). Additionally, Apple executives

20  testified that highly publicized problems with its hardware and software have had little or no effect

21  on Apple's reputation. *See* Joswiak 7/9/13 Depo. Tr. (Fazio Decl. Ex. 3, ECF No. 1907-11) at

22  80:17-81:20 (stating that "AntennaGate" did not have "much of an impact on [Apple's] brand at

23  all"); Schiller 7/23/13 Depo. Tr. (Fazio Dec. Ex. 4, ECF No. 1907-12) at 87:24-88:7 (noting that

24  the "long-term effect of Antennagate was negligible"); Tr. at 514:7-20 (Schiller noting that the

25  iPhone did "extremely well" despite highly criticized "Maps" application in iOS 6). While not

26  dispositive, Apple's demonstrably robust reputation makes it less likely to be irreparably harmed

27  by the appearance of Apple's three patented features in Samsung's products.

28

15

**A15**

1    Third, Apple fails to demonstrate harm stemming from consumer association of Apple's

2  patented innovations with Samsung's allegedly "less prestigious" products. In *Douglas Dynamics*,

3  the Federal Circuit noted the risk that consumers would associate the patentee's innovations with

4  less innovative products, and the patentee's reputation as an innovator would suffer as a result. *See*

5  717 F.3d at 1344-45. Apple asserts that same harm here, disparaging Samsung's perception as a

6  "fast follower" as opposed to an innovator. *See* Mot. at 9. However, Samsung's expert

7  Dr. Chevalier argues that these statements are taken out of context because this testimony

8  concerned only Samsung's reputation in the past. *See* Chevalier Decl. ¶ 63. To establish

9  Samsung's reputation as it stands today, Dr. Chevalier points to recent innovations in "large-

10  screened products, [Samsung's] Note product line, products using a stylus, and with respect to near

11  field communication," and to a 2013 survey that "listed Samsung as the second most innovative

12  company (behind only Apple)." *Id.* ¶¶ 63-64. Thus, the record indicates that Samsung's products

13  are also reputable. Apple has not identified specific evidence that Samsung's infringing *products*

14  are perceived as "less prestigious," or that Samsung's products have been marketed as "[Apple's]

15  at half the price." *Douglas Dynamics*, 717 F.3d at 1344, 1345. By contrast, the infringing products

16  in *Douglas Dynamics* were of substantially inferior quality to those sold by the patentee. *See id.* at

17  1348 (Mayer, J., dissenting) ("[S]nowplow distributors viewed Douglas' plows as very high quality

18  products, but saw Buyers' plows as low quality products."); *see also In re: BRCA1- and BRCA2-*

19  *Based Hereditary Cancer Test Patent Litig.*, No. 2:14-MD-2510, 2014 U.S. Dist. LEXIS 31345, at

20  *112 (D. Utah Mar. 10, 2014) (distinguishing *Douglas Dynamics* and denying preliminary

21  injunction where "Plaintiffs here offer no clear evidence suggesting that the public would view

22  Defendant's testing products as less prestigious or innovative.").

23    Fourth, as discussed in greater detail below, Apple has licensed ████████████ to

24  competing companies in the smartphone market. Apple notes that it "has licensed the ██████

25  to IBM, Nokia, HTC, and Microsoft, and has licensed the ███████████ to IBM and HTC."

26  Mot. at 16. In *Douglas Dynamics*, the patentee had "never licensed the infringed patents," 717

27  F.3d at 1345, so it was reasonable to conclude that an injunction would prevent those features from

28  appearing in competitors' products and eroding the patentee's reputation for innovation. Here,

16

United States District Court
For the Northern District of California

1    Apple's claim for irreparable harm to its reputation as an innovator would be undermined by the

2    presence of the patented features in non-Apple products regardless of an injunction. Consumers

3    are unlikely to understand that certain features appear in competing products due to licenses as

4    opposed to unauthorized infringement.

5        Fifth, Apple has not met its burden to establish a causal nexus between the patents at issue

6    and any alleged harm. Apple must demonstrate that the features that infringe the '647, '721, and

7    '172 patents in Samsung's products are a significant factor causing any reputation-based harm. *See*

8    *Apple I*, 678 F.3d at 1324 (reasoning that if the patented feature does not drive the alleged harm, a

9    likelihood of irreparable harm cannot be shown). Here, the patents at issue cover three features in

10   complex smartphones that contain many different patented inventions. *See* Chevalier Decl. ¶ 20;

11   Tr. at 1372:5-19 (Velluro testimony: "Q. . . . You've seen estimates that there are as many as

12   250,000 patents in a smartphone? . . . A. I've seen some estimates like that, yes."). Apple argues

13   that *Douglas Dynamics* "enjoined entire snowplow assemblies" even though the patent covered

14   "'only some components of the accused snowplow assemblies.'" Reply at 3 (quoting 717 F.3d at

15   1343). This argument was answered in *Apple III*, where the Federal Circuit observed that where a

16   product is relatively simple, "the impact that the infringing features had on demand for the products

17   may never have been in doubt."[4] 735 F.3d at 1362. Here, in contrast to *Douglas Dynamics*, there

18   is considerable disagreement whether any harm to Apple's reputation as an innovator shares a

19   causal nexus with the infringing features of Samsung's products. Dr. Chevalier concluded that

20   "individual software features rarely impact consumer purchases, and some of the same evidence

21   suggests that individual software features would not drive Apple's reputation as an innovator."

22   Chevalier Decl. ¶ 62. As noted above, Samsung's infringement consists of infringing three

23   ──────────
[4]    *Apple III* did not specifically identify *Douglas Dynamics* as a "simple" case, but the thrust
24   of the court's holding was that "the causal nexus requirement applies regardless of the complexity
     of the products. It just may be more easily satisfied (indeed, perhaps even conceded) for relatively
25   'simple' products." 735 F.3d at 1362. *Douglas Dynamics* fits into this "simple" category of cases,
     in that causal nexus was not challenged. While it is true that the product at issue in *Douglas
26   Dynamics* (a detachable snowplow) is likely more complicated than the "simple" products cited by
     the Federal Circuit in *Apple III* (*e.g.*, windshield wiper blades in *Robert Bosch*, 659 F.3d at 1145,
27   and orthopedic nails in *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1326 (Fed. Cir. 2008)), even
     a relatively complicated snowplow assembly stands in stark contrast to the extraordinarily complex
28   and multi-featured smartphones at issue here.

United States District Court
For the Northern District of California

17

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1   patented features out of many unaccused hardware and software components in smartphones and

2   tablets. At trial, Mr. Schiller conceded that he did not know if the patent claims at issue were used

3   in Apple's products, or if any industry praise for Apple's products was related to the patented

4   features. *See* Tr. at 485:5-486:2. Moreover, Apple does not contend that it practices the '172

5   patent, and Apple has not tied its reputation to infringement of that invention. Accordingly, Apple

6   has not demonstrated that the inclusion of three infringing features in Samsung's products

7   irreparably damages Apple's reputation.

8                          **ii.     Reputation for Enforcing Intellectual Property**

9        Next, Apple argues that without an injunction, others might believe Apple "did not enforce

10   its intellectual property rights." Mot. at 9 (quoting *Douglas Dynamics*, 717 F.3d at 1345). Apple

11   relies again on *Douglas Dynamics* to assert that a patentee's reputation is *necessarily* harmed if

12   "customers and business partners" believe the patentee does not enforce its intellectual property

13   rights. *Id.* This misstates *Douglas Dynamics*. While Apple points to its reputation among

14   "customers and business partners," the *Douglas Dynamics* court focused only on the effect that

15   intellectual property enforcement might have on "dealers and distributors" of the patentee's

16   products. 717 F.3d at 1345. *Douglas Dynamics* did not rely on consumers' perceptions of

17   intellectual property enforcement. Apple provides no evidence that smartphone consumers make

18   purchasing decisions based on Apple's reputation for enforcing its intellectual property rights.

19       It is more plausible to suppose Apple's "business partners" are aware of Apple's reputation

20   for enforcement of intellectual property rights. However, Apple cannot demonstrate irreparable

21   harm merely by reciting *Douglas Dynamics* and asserting that the same harm will occur without

22   proof. The *Douglas Dynamics* court relied on evidence established at trial, specifically citing an

23   admission made by the defendant's expert. *Id.* ("Furthermore, as Buyers's expert agreed,

24   Douglas's reputation would be damaged if its dealers and distributors believed it did not enforce its

25   intellectual property rights."). Here, Apple's claims regarding a diminished reputation for patent

26   enforcement are unconvincing. Apple has engaged in vigorous patent litigation in this Court and

27   others throughout the country. *See Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK

28   (N.D. Cal.); *Apple Inc. v. Motorola, Inc.*, No. 2012-1548, 2014 WL 1646435 (Fed. Cir. Apr. 25,

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

**A18**

United States District Court
For the Northern District of California

1   2014) (asserting '647 patent); *Certain Personal Data and Mobile Communc'ns Devices and*

2   *Related Software*, Inv. No. 337-TA-710, (USITC July 15, 2011) (asserting '647 patent); *Apple Inc.*

3   *v. High Tech Computer Corp.*, No. CA 10-166-GMS, 2011 WL 124446 (D. Del. Jan. 14, 2011);

4   *Apple Inc. v. Motorola Mobility, Inc.*, No. 3:11-CV-00178 (W.D. Wis.).  Apple accuses Samsung

5   of "relentlessly criticiz[ing] Apple for attempting to enforce its patent rights," and provides

6   examples of statements to that effect made by Samsung's counsel to the press.  Mot. at 9-10.  The

7   Court finds there is little established risk that any customers or business partners will believe that

8   Apple does not enforce its patent rights.  Apple has not demonstrated any causal nexus between

9   infringement of the three patents at issue and any perception of Apple's failure to enforce its

10   intellectual property rights.

11                      **iii.    Apple's Licenses**

12          Apple argues that its general refusal to license patents favors finding irreparable

13   reputational harm.  *Id.* at 10.  In *Douglas Dynamics*, the court concluded that the patentee had

14   "never licensed the infringed patents . . . so that it could maintain market exclusivity."  717 F.3d at

15   1345.  That exclusivity "is an intangible asset that is part of a company's reputation," the loss of

16   which irreparably harmed the patentee.  *Id.*  As noted above, Apple "has licensed the ███████ to

17   IBM, Nokia, HTC, and Microsoft, and has licensed ██████████████ to IBM and HTC."

18   Mot. at 16.  Apple argues that the circumstances of these licenses diminish their relevance here,

19   because those licenses occurred in the context of cross-license agreements ███████████

20   ██████████████████████; were executed before the licensee entered the smartphone

21   market; or involved litigation settlements.  *Id.* at 16-17.

22          These circumstances are relevant in evaluating the evidentiary value of licenses as they

23   pertain to the sufficiency of money damages in a patent infringement case.  In addressing the

24   adequacy of legal remedies (*eBay* factor 2), this Court previously concluded in the first lawsuit

25   between the parties (Case No. 11-CV-1846) that "Apple's past licensing behavior demonstrates a

26   reluctance to license the utility patents-in-suit to Samsung, and several factors distinguish Apple's

27   licenses to IBM, HTC, and Nokia from the present circumstances."  1846 Injunction Order at 37;

28   *see also Apple III*, 735 F.3d at 1370 ("these factors are relevant to whether monetary damages will

<center>19</center>

<center>**A19**</center>

1    adequately compensate Apple for Samsung's infringement of the asserted patents"); *Acumed*, 551

2    F.3d at 1328 ("The fact of the grant of previous licenses, the identity of the past licensees, the

3    experience in the market since the licenses were granted, and the identity of the new infringer all

4    may affect the district court's discretionary decision concerning whether a reasonable royalty from

5    an infringer constitutes damages adequate to compensate for the infringement.").

6        In evaluating the harm to Apple's reputation as an innovator, however, these circumstances

7    are less relevant. Apple provides no reason why consumers would be likely to appreciate or care

8    about the licensing origins of the myriad patented features on their smartphones or tablets. *Cf.*

9    Chevalier Decl. ¶ 14 (describing features that drive consumer demand for smartphones). For

10    example, if the patented features appear in smartphones from several licensed companies, it is

11    unlikely that consumers will associate those features exclusively with Apple, regardless of the

12    reasons why Apple granted those licenses. Apple cannot argue that Samsung's use of patented

13    features will damage Apple's reputation for exclusivity if these features are not in fact exclusive to

14    Apple, due to licenses to competitors. *Cf. Douglas Dynamics*, 717 F.3d at 1345 (observing the

15    patentee had "never" licensed the patents at issue, whether for monetary or non-monetary

16    compensation). Therefore, after affording due consideration to the circumstances around Apple's

17    licenses, those licenses nevertheless suggest that Apple's reputation as an innovator among

18    consumers will not be irreparably harmed without an injunction.

19        **3.    Harm From Lost Sales**

20        In addition to reputational harm, Apple contends that it suffered sales-based losses that

21    independently establish irreparable harm and entitlement to a permanent injunction. Apple argues

22    that it has lost market share and downstream sales due to Samsung's infringement, as this Court

23    found in the first litigation between the parties. Relying on survey data from its expert Dr. John

24    Hauser, Apple then contends that Apple provided direct evidence that consumers value the features

25    claimed in the '647, '721, and '172 patents. Apple also argues that both parties greatly valued the

26    infringing features, and Samsung deliberately copied Apple's products. Samsung disputes Apple's

27    characterization of the record, and further claims that Apple suffered no sales-based losses because

28

United States District Court
For the Northern District of California

20

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

**A20**

1    the verdict shows that the jury awarded no lost profits. The Court addresses these arguments in

2    turn.

3        Initially, Apple argues that it lost market share and downstream sales to Samsung, citing as

4    support this Court's ruling in the first lawsuit and certain trial testimony in the instant case. *See*

5    Mot. at 11 (citing *Apple III*, 735 F.3d at 1360). Samsung does not address these arguments.

6    Indeed, as detailed above, it is undisputed that Apple and Samsung compete directly in the market

7    for smartphones and tablets. *See, e.g.*, Tr. at 557:22-558:9 (Schiller testimony); PX216 at 3

8    (Samsung document: "Beating Apple is no longer merely an objective, it is our survival strategy.").

9    It is also undisputed that this competition affects downstream sales because of so-called

10   "ecosystem" effects, where one company's customers will continue to buy that company's

11   products and recommend them to others. *See* Tr. at 448:12-449:4 (Schiller testimony); *see also*

12   1846 Injunction Order at 15 ("Apple has also been harmed by its loss of downstream sales, as

13   network compatibility and brand loyalty cause many consumers to be 'locked in' to either Apple or

14   Samsung after their initial purchase.").

15       The Federal Circuit observed that "[w]here two companies are in competition against one

16   another, the patentee suffers the harm—often irreparable—of being forced to compete against

17   products that incorporate and infringe its own patented inventions." *Douglas Dynamics*, 717 F.3d

18   at 1345.[5] Here, the record establishes that the competition between Apple and Samsung was

19   "fierce." Tr. at 2433:9-17 (Chevalier testimony). Indeed, evidence established that Apple was

20   Samsung's "largest smartphone competitor" in the U.S. market. PX3002 (DiCarlo deposition, ECF

21   No. 1920 at 3). The presence of direct competition between Apple and Samsung in the smartphone

22   market weighs in favor of finding irreparable harm. *See Presidio Components, Inc. v. Am.*

23   ───────────

[5]    Apple erroneously relies on this quote from *Douglas Dynamics* to support an argument for
24   harm to Apple's reputation for innovation. While the Federal Circuit concluded that the patentee
     had suffered reputation-based harm, that was not the only type of harm identified. Rather than
25   establishing any particular type of irreparable harm, the *Douglas Dynamics* opinion's "direct
     competition" analysis appears to bear on the question of irreparable harm more generally, or with
26   respect to sales-based losses. *See, e.g., Trebro*, 748 F.3d at 1171 ("Trebro and FireFly are direct
     competitors selling competing products in this market. Thus the record strongly shows a
27   probability for direct harm."); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703 (Fed. Cir.
     2008) ("Qualcomm has previously conceded. . . indirect competition. . . . Thus, Broadcom
28   provided evidence of irreparable harm.").

                                              21

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1    *Technical Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same

2    market is certainly one factor suggesting strongly the potential for irreparable harm . . . .").

3    However, Apple must still provide specific evidence of causal nexus between any such harm and

4    Samsung's infringement.

**a.    Evidence of Consumer Demand**

6        To show that consumers value the infringing features, Apple relies on a conjoint study from

7    Dr. Hauser and faults Samsung for not offering comparable survey data of its own. Samsung

8    responds that Apple's conjoint survey is flawed, based on rebuttal opinions from its experts

9    Dr. David Reibstein and Dr. Erdem. *See* Reibstein Decl. (ECF No. 1907-7); Erdem Decl. (ECF

10   No. 1907-6).

11       In the first lawsuit between these parties (Case No. 11-CV-1846), the Court analyzed a

12   similar conjoint survey from Dr. Hauser that purported to show demand for the patented features in

13   that case. *See* 1846 Injunction Order at 16. Following the Federal Circuit's guidance in *Apple III*,

14   this Court evaluated Dr. Hauser's survey in combination with Apple's additional evidence

15   regarding copying and ease of use, for purposes of determining whether to enter a permanent

16   injunction. The Court identified numerous potential flaws with that conjoint analysis, finding that

17   the survey could not account for actual market prices, provided little information about the

18   significance of any price increases supposedly attributable to the patented features, and inflated the

19   value of the patents by overemphasizing the relevant features while inadequately presenting

20   noninfringing alternatives. *See generally id.* at 16-29. As a result, the Court concluded that

21   "Dr. Hauser's survey results simply do not allow the Court to determine whether the patented

22   features meet [the] test" for causal nexus. *Id.* at 29.

23       In the instant case, the Court previously reviewed Dr. Hauser's current survey (as disclosed

24   in his expert report) in the context of a *Daubert* challenge by Samsung. *See* ECF No. 1326. The

25   Court summarized Dr. Hauser's methodology in the instant case and compared it to Dr. Hauser's

26   survey in the first lawsuit between the parties (Case No. 11-CV-1846). The Court noted that his

27   methods in the instant case were "identical" with respect to his analysis of "willingness to pay" in

28   the first lawsuit, but different in that Dr. Hauser added a second set of survey options in the instant

22

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

*United States District Court*
*For the Northern District of California*

case to measure the number of Samsung customers who would not have purchased Samsung
products without the patented features. *See id.* at 24-27. In the current litigation, the Court
declined to exclude Dr. Hauser's testimony under Federal Rule of Evidence 702, partly because
Samsung failed to brief the issue of the accuracy of the survey's descriptions of the asserted
patents. *See id.* at 36.

Against this background in both lawsuits regarding Dr. Hauser's conjoint survey
techniques, Apple's instant motion makes only cursory arguments about how the conjoint survey
evidence demonstrates causal nexus. Apple devotes only two paragraphs in its opening brief to
Dr. Hauser's conjoint study, one of which targets Samsung's lack of comparable survey evidence.
*See* Mot. at 12-13. On the other hand, Samsung points to extensive critiques of Apple's conjoint
study by two of its experts, both at trial and in declarations submitted for purposes of this motion.

At trial, Dr. Reibstein testified that Dr. Hauser's conjoint study was flawed because the
study "omitted the major factors and major drivers of sales." Tr. at 2071:15-2072:10. Dr.
Reibstein testified that none of the patented technologies appeared in an independent review of
online smartphone advertising. *See id.* at 2073:4-2074:11; *see also* Reibstein Decl. ¶¶ 53-55.
Dr. Reibstein also testified that he performed an independent "pretest" in which he screened
another set of participants "in the same way that Professor Hauser did," but also tested for
participant confusion as to Dr. Hauser's questions, and found that each participant expressed
confusion about at least one patented feature. Tr. at 2080:3-2086:19; *see also* Reibstein Decl.
¶¶ 34, 45-47 (describing pretest). Dr. Reibstein opined that the conjoint study produced
nonsensical results, such as the conclusion that the patented word correction feature (corresponding
to the '172 patent) was worth about $102 on a phone that cost $149. *Id.* at 2100:17-2101:16. Dr.
Reibstein acknowledges that these dollar figures corresponding to willingness to pay are "not
strictly additive" because the aggregate willingness to pay may be "either higher or lower than the
sum of the willingness to pay estimates for the individual features," but maintains that these results
are "unreasonably large." Reibstein Decl. ¶ 92 n.130. Additionally, Dr. Reibstein and Samsung's
technical experts testified that the descriptions of the patented features in Apple's conjoint study
overstated the scope of the claimed features and improperly included noninfringing alternatives.

United States District Court
For the Northern District of California

23

1   *See id.*. ¶¶ 13-24, 53 ("Professor Hauser's conjoint surveys here did not include numerous features

2   that Samsung prominently highlighted to consumers."); Tr. at 1798:9-1801:14 (Jeffay testimony on

3   survey description of the '647 patent), 1978:15-1982:1 (Greenberg testimony on survey description

4   of the '721 patent), 2029:8-2031:2 (Wigdor testimony on survey description of the '172 patent).

5       Apple insists that conjoint studies are generally reliable and widely used, and that Samsung

6   should have tested Dr. Hauser's results with Samsung's own conjoint studies. *See* Reply at 8.

7   Apple further notes that Dr. Reibstein admitted at trial that he could not explain why certain

8   participants in his pretest were "confused" about descriptions of patented features in Dr. Hauser's

9   survey. *See* Tr. at 2136:10-20; Reply at 8. Dr. Reibstein also admitted that he did not disclose

10  statistical validity tests for his pretest. *See* Tr. at 2142:10-2143:10. These admissions cast some

11  doubt on Dr. Reibstein's pretest and conclusions regarding confusion. Moreover, during the

12  preliminary injunction proceedings in the instant case, Samsung's expert Michael Wagner

13  criticized Apple for *not* putting forth "conjoint analyses" to quantify customer demand for the

14  infringing features. Wagner Decl. (ECF No. 131) ¶ 116 ("Apple has put forth no surveys, conjoint

15  analyses, or hedonic regressions to prove this critical link."); *see also* Tr. at 2488:14-2490:20

16  (Chevalier testimony: "Q. So just so the jury has the chronology down, we have Mr. Wagner on

17  behalf of Samsung suggesting that a conjoint analysis can be used, correct? A. Well, among other

18  things.").

19      Apple also argues that Samsung's alternative consumer studies were unreliable. *See* Reply

20  at 8. The Court agrees that Samsung's alternative studies were not convincing. Dr. Chevalier

21  conducted a "sentence-counting" exercise that involved taking online reviews of smartphones,

22  converting them to individual sentences, and counting the number of references to patented and

23  unpatented features. *See* Tr. at 2375:14-2380:3. From the results, she concluded that the "top

24  drivers of smartphone purchases" are unpatented features such as phone carrier, price, and battery

25  life. *Id.* at 2379:19-2380:3. Dr. Erdem performed an "eye-tracking" study where she "tracked the

26  movements of the eyes of consumers" as they viewed a mimicked shopping website for

27  smartphones. *Id.* at 2295:6-2298:13. Dr. Erdem concluded that "major attributes" affected

28  consumer choices, not "minor attributes." *Id.* at 2304:5-19.

24

United States District Court
For the Northern District of California

1      However, both of these Samsung studies had significant problems. Dr. Chevalier's study

2    tallied "mentions" of features without attempting to distinguish positive and negative statements.

3    *Id.* at 2479:11-14. Dr. Chevalier's study also counted spurious "reviews" that were unintelligible

4    (*e.g.*, *id.* at 2482:16-25: "This phone betrayed me. When I was sleeping, it slapped me and Seerei

5    said a bad werd.") or for fake products (*id.* at 2484:2-21: "I was sold a fake.").

6      Dr. Erdem's study did not include any of Apple's patented features, and attempted only to

7    estimate how consumers view "major" and "minor" attributes. *See id.* at 2301:7-2302:2, 2321:2-

8    11. Dr. Erdem concluded that Samsung's near-field communication capability was a minor phone

9    feature, yet Samsung views this feature as important. *See id.* at 2317:13-2318:15. Dr. Erdem's

10   study also identified 21 features that were supposedly unimportant, but Dr. Reibstein stated that 13

11   of those same features appeared often on consumer websites. *See id.* at 2343:8-17. Moreover, both

12   Drs. Chevalier and Erdem conceded that, to their knowledge, no court in the United States has

13   approved their respective study methodologies. *See id.* at 2477:11-15 (Chevalier), 2347:14-24

14   (Erdem). Overall, the Court does not find Samsung's competing consumer research persuasive.

15      However, the flaws in Samsung's studies do not relieve Apple of its burden to demonstrate

16   consumer demand for the patented features, or remedy the limitations of Apple's conjoint study.

17   Apple's criticisms of the analyses of Drs. Reibstein, Chevalier, and Erdem do not rebut Samsung's

18   critiques of Dr. Hauser's techniques or show that Apple's conjoint study in this case establishes a

19   causal nexus. The weight of the evidence shows that Apple's conjoint study fails to demonstrate

20   that the features claimed in the '647, '721, and '172 patents drive consumer demand for Samsung's

21   infringing products.

22           **b.**    **The Parties' Perceptions of the Patented Features**

23      Next, Apple claims that the evidence shows that both Samsung and Apple viewed the

24   patented features as important to customers. Apple argues that causal nexus exists because

25   "Samsung views the patented features as important to consumers" and "Samsung's own conduct

26   confirms that the patented features are important to consumers," citing evidence that Samsung

27   copied and praised the infringing features. Mot. at 13, 14. Similarly, Apple argues that it "views

28

<div align="center">25</div>

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

Case5:12-cv-00630-LHK   Document1954 *SEALED*   Filed08/27/14   Page26 of 42

1    its patented features claimed in the '647 and '721 patents as critical elements of an Apple user's

2    unique experience." *Id.* at 14.

3         The Federal Circuit has previously observed, in connection with Apple's allegations of

4    copying by Samsung, that: "While the evidence that Samsung's employees believed it to be

5    important to incorporate the patented feature into Samsung's products is certainly relevant to the

6    issue of nexus between the patent and market harm, it is not dispositive.  That is because the

7    relevant inquiry focuses on the objective reasons as to why the patentee lost sales, not on the

8    infringer's subjective beliefs as to why it gained them (or would be likely to gain them)." *Apple I*,

9    678 F.3d at 1327-28; *see also Apple III*, 735 F.3d at 1367 ("Apple's evidence of copying by

10   Samsung may be relevant, but it is insufficient by itself to establish the requisite causal nexus.").

11   Thus, the parties' subjective beliefs about what drives consumer demand are relevant to causal

12   nexus, but do not independently satisfy the inquiry.

13        Turning to Apple's specific allegations, Apple first claims that Samsung's internal pre-

14   litigation documents reveal Samsung's valuation of the infringing features.  For the '647 patent,

15   Apple cites an internal Samsung report that shows iPhone screens and notes the "[n]eed to improve

16   usability by providing Links for memo contents" (PX146 at 37); an internal Samsung document

17   that copied a figure from the publication of one of the '647 patent's inventors (PX107 at 52); and

18   Samsung's user manuals (PX233 at 362; PX237 at 823).  Regarding the '721 patent, Apple points

19   to other internal Samsung documents showing that Samsung tried to create unlocking designs

20   based on the iPhone (*e.g.*, PX119; PX121); testimony from Samsung engineer Youngmi Kim

21   regarding the value of designs for unlocking (Tr. at 1729:3-11); and Samsung e-mails noting that

22   certain carriers disapproved of the noninfringing "circle lock" alternative (PX181 at 5).  Moreover,

23   the jury found that Samsung willfully infringed the '721 patent.  ECF No. 1884 at 7.  As to the

24   '172 patent,[6] Apple refers to feedback documents indicating that some users criticized certain

25   Samsung keyboard and word-correction designs (PX168 at 4; PX169 at 4; PX219 at 104).

26

27   _____

[6]    For purposes of this litigation, Apple does not claim that it practices the '172 patent, and
28   does not claim that Samsung copied any features from the '172 patent.

United States District Court
For the Northern District of California

26

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

**A26**

United States District Court
For the Northern District of California

1    Apple's cited evidence indicates that Samsung paid close attention to, and tried to

2    incorporate, certain iPhone features. While indicative of copying by Samsung, this evidence alone

3    does not establish that the infringing features drove customer demand for Samsung's smartphones

4    and tablets. *See Apple III*, 735 F.3d at 1367. Some of the cited Samsung documents show that

5    Samsung valued numerous other noninfringing features. For example, Apple refers to one page

6    from a Samsung manual as an example of Samsung instructing customers on how to use a feature

7    that infringes the '647 patent. PX233. However, that manual is over 1300 pages and describes

8    dozens of unaccused features. Thus, the existence of instructions for an individual feature does not

9    necessarily show that the feature drives demand.

10    Next, Apple argues that Samsung continued to use the infringing features in Samsung

11    products, despite receiving notice of the '647, '721, and '172 patents and the filing of this lawsuit.

12    According to Apple, "Samsung's unwillingness to remove the infringing features from its products

13    only further reinforces the value of, and consumer demand for, Apple's patented inventions." Mot.

14    at 14. While Samsung has continued to sell infringing products following the start of this

15    litigation, Samsung might have had other reasons for doing so. Samsung has maintained that it did

16    not need to remove any features because it reasonably believed that it did not infringe any valid

17    patents. Before, during, and after trial, Samsung vigorously contested validity and infringement of

18    all three patents at issue here. Moreover, as explained above, Samsung's subjective beliefs are not

19    dispositive of causal nexus. As this Court found before, "though evidence that Samsung attempted

20    to copy certain Apple features may offer some limited support for Apple's theory, it does not

21    establish that those features actually drove consumer demand." *Apple, Inc. v. Samsung Elecs. Co.*,

22    909 F. Supp. 2d 1147, 1156 (N.D. Cal. 2012).

23    Apple also argues that its own use of the patented features in its products and

24    advertisements demonstrates that the features are important to consumers. *See* Mot. at 14-15.

25    Apple identifies only evidence relating to the '647 and '721 patents. For the '647 patent, Apple

26    cites a few lines of testimony from Apple engineer Thomas Deniau, who described his work on

27    "data detectors" and stated that "[m]ost of Apple's products use data detectors." Tr. at 791:15-18.

28    However, Mr. Deniau was not presented as an expert witness and did not directly equate asserted

27

**A27**

Case5:12-cv-00630-LHK   Document1954 *SEALED*   Filed08/27/14   Page28 of 42

1   claim 9 of the '647 patent with "data detectors." Moreover, his testimony that most Apple products

2   use this feature does not establish that data detectors drive consumer demand. For example, most

3   of Apple's products also use batteries, but that does not mean that batteries drive demand for those

4   products. *See Apple II*, 695 F.3d at 1376 (noting laptop battery as an example of a necessary

5   feature that does not drive demand). For the '721 patent, Apple cites testimony from Apple Vice

6   President Gregory Christie and Senior Vice President of Worldwide Marketing Philip Schiller, who

7   noted that Apple has featured "slide-to-unlock" in its marketing efforts. *See* Tr. at 600:23-601:15

8   (Christie, saying he personally considered slide-to-unlock "pretty important"), 432:20-433:18

9   (Schiller, describing decision to feature slide-to-unlock at beginning of advertisement). This

10  testimony is probative of the value of the slide-to-unlock feature, but as with Apple's other

11  evidence, it does not demonstrate demand by consumers for Samsung's infringing products.

12                    **c.    Lost Profits**

13          Samsung argues that Apple cannot show irreparable harm from lost sales because the jury's

14  damages verdict implicitly rejected Apple's claim for lost profits. Samsung's theory is that the jury

15  must have rejected Apple's demands for lost profits and chosen a lump sum royalty instead

16  because it awarded only a small percentage of what Apple requested. Samsung also makes the

17  related argument that Dr. Vellturo "effectively conceded" a lack of causal nexus for the '172 and

18  '721 patents because he did not seek diminished-demand lost profits. Opp'n at 7-8.

19          Samsung invites the Court to deconstruct the verdict to determine whether the jury awarded

20  lost profits to Apple, which may provide information about harm due to lost sales. The parties

21  dispute whether such an exercise is appropriate for purposes of this motion. "[W]hen equitable

22  claims are joined with legal claims and have factual questions in common, the judge's

23  determination of the equitable claims can not deprive the litigants of their right to a jury trial on

24  factual questions." *Therma-Tru Corp. v. Peachtree Doors Inc.*, 44 F.3d 988, 994-95 (Fed. Cir.

25  1995) (characterizing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510-11 (1959)). If the jury

26  in fact rejected Apple's claims for lost profits, the Court would be bound by that factual

27  determination for the purposes of determining equitable relief, such as a permanent injunction.

28

United States District Court
For the Northern District of California

28

**A28**

United States District Court
For the Northern District of California

1    Apple argues that the jury's verdict is not binding on the question of lost sales harm

2    because the verdict did not explicitly reject Apple's lost profits claims, and that the Court is not

3    permitted as a matter of law to "deconstruct" the jury's findings. Reply at 6. However, the jury's

4    factual findings need not be explicit in order to be binding. The *Therma-Tru* court overturned the

5    district court's judgment based on the need to avoid "conflict with the *implied* findings underlying

6    the jury verdicts[.]" 44 F.3d at 995 (emphasis added); *see also Miller v. Fairchild Indus., Inc.*, 885

7    F.2d 498, 507 (9th Cir. 1989) ("the Seventh Amendment requires the trial judge to follow the

8    jury's implicit or explicit factual determinations"). Apple cites to *Telcordia Technologies, Inc. v.*

9    *Cisco Systems, Inc.*, 612 F.3d 1365 (Fed. Cir. 2010), claiming that "parties cannot read findings

10   into [a] jury verdict 'in the absence of an express statement in the verdict.'" Reply at 6 (quoting

11   *Telcordia*, 612 F.3d at 1378). This twists the holding in *Telcordia*, where the Federal Circuit held:

12   "District courts have broad discretion to interpret an ambiguous verdict form, because district

13   courts witness and participate directly in the jury trial process. The district court was in a position

14   to assess whether the verdict figure represented past infringement as well as ongoing

15   infringement." 612 F.3d at 1378. The *Telcordia* trial court interpreted the jury's verdict, and the

16   language quoted by Apple merely reflects the Federal Circuit's unwillingness to overturn that

17   interpretation on appeal. *Id.* ("In the absence of an express statement in the verdict, this court

18   cannot determine whether the jury compensated Telcordia for all of Cisco's infringing activities . . .

19   the district court did not abuse its discretion in interpreting the verdict form."). Apple's two other

20   cases are inapposite because they addressed deconstruction or "reverse engineering" of a jury

21   verdict, but in the context of a motion for judgment as a matter of law, not the binding effect of a

22   jury verdict on a court's fact finding for the purposes of equitable relief. *See Yeti by Molly, Ltd. v.*

23   *Deckers Outdoor Corp.*, 259 F.3d 1101, 1107-08 (9th Cir. 2001); *DDR Holdings, LLC v.*

24   *Hotels.com, L.P.*, 954 F. Supp. 2d 509, 530 (E.D. Tex. 2013).

25   While it may be legally permissible to dissect the verdict under certain circumstances, the

26   Court declines Samsung's invitation to do so here for purposes of evaluating lost sales harm.

27   Samsung insists that the jury awarded a lump-sum royalty to compensate Apple for all future

28   infringement based on calculations by its expert Dr. Chevalier. Dr. Chevalier claims that the jury's

29

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1   allocation of damages between the '647, '721, and '172 patents and between the accused products

2   for each patent, and the fact that the jury did not grant a uniform per-unit royalty for all products,

3   demonstrates a lump-sum verdict. *See* Chevalier Decl. ¶ 67. She also claims that the fact that the

4   jury reallocated the total damages number when calculating damages for the Galaxy S II products

5   further indicates a lump sum. *See id.* ¶ 68. However, Dr. Chevalier's analysis is speculative at

6   best. The verdict form did not require the jury to denote which damages theories it applied. *See*

7   ECF No. 1884 at 9-10. Moreover, Dr. Chevalier's analysis assumes that the jury applied the same

8   theory to all products for all patents. Apple also notes that the jury could have chosen not to award

9   lost profits because it could not ascertain them with reasonable certainty, and not because Apple

10  did not actually lose sales to Samsung. Apple's expert Dr. Vellturo also submits a declaration

11  contesting Dr. Chevalier's conclusion that the jury awarded a lump sum. *See* Vellturo Decl. (ECF

12  No. 1919-4) ¶ 17 ("It is not possible to state definitively how the jury arrived at its damages award

13  of $119.625 million.").

14       Moreover, even if Samsung's hypothesis about a lump-sum royalty were correct, such a

15  finding does not dispose of the irreparable harm inquiry. Samsung asserts that "there can be no

16  irreparable harm due to lost sales because there are no lost sales." Opp'n at 4. This misstates the

17  law. As Apple notes, a jury finding of lost profits is not a prerequisite for finding irreparable harm.

18  *See Mytee Prods., Inc. v. Harris Research, Inc.*, 439 F. App'x 882, 887 (Fed. Cir. 2011) ("We have

19  never held, however, that in order to establish irreparable harm a patentee must demonstrate that it

20  is entitled to lost profits."); *see also Apple*, 909 F. Supp. 2d at 1159-60 ("The fact that the jury was

21  able to put a number on the harm Apple has suffered in terms of sales already lost directly to

22  Samsung does not necessarily mean that those damages captured the full extent of Apple's harm.

23  Indeed, if this were the case, no Court would ever award both damages and an injunction for the

24  same infringement, but Courts do so routinely."). Where lost sales did not form either an explicit

25  or implicit part of the jury's verdict, the Court would not be barred from finding lost sales for the

26  purposes of fashioning equitable relief. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861

27  (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011) (affirming permanent injunction based on lost

28  market share where the jury awarded royalty damages). Irrespective of a jury's factual finding

30

**A30**

with respect to lost sales, a court might still find irreparable harm that stems from sources other than lost sales. *See Mytee Prods.*, 439 F. App'x 882 at 888 (finding irreparable harm to patentee because "the market share enjoyed by [the patentee's] franchisees would be threatened by the presence of a competitor using the same technology."); *Douglas Dynamics*, 717 F.3d at 1344-45 (finding irreparable harm to patentee's reputation from infringement). Furthermore, a factual finding that Apple did not lose sales *in the past* does not necessarily mean that Apple will not lose sales *in the future.*

However, the Court need not deconstruct the verdict as Samsung proposes, for Apple has not shown the requisite irreparable harm, as discussed above. After considering all of Apple's evidence in combination, *see Apple III*, 735 F.3d at 1368, the Court concludes that Apple has failed to demonstrate irreparable harm due to lost sales, nor any causal nexus between Samsung's infringement and the alleged harm.

### 4.    Summary of Irreparable Harm

After careful examination of all the evidence, the Court concludes that Apple fails to prove that "the infringing feature[s] drive[] consumer demand for the accused product[s]." *Apple II*, 695 F.3d at 1375. Apple's argument that the causal nexus requirement does not apply to reputational harm overextends *Douglas Dynamics* and contravenes the Federal Circuit's guidance on irreparable harm. Apple has not demonstrated that it will suffer irreparable harm to its reputation or goodwill as an innovator without an injunction. Nor has Apple shown that it will suffer lost sales specifically due to Samsung's infringement of the three patents at issue. For these reasons, the irreparable harm factor favors Samsung and disfavors an injunction.

### B.    Adequacy of Legal Remedies

"This factor requires a patentee to demonstrate that 'remedies available at law, such as monetary damages, are inadequate to compensate' the patentee for the irreparable harm it has suffered." *Apple III*, 735 F.3d at 1368 (quoting *eBay*, 547 U.S. at 391).

### 1.    Whether Alleged Harms Can be Quantified

First, the parties disagree about whether it is possible to measure monetary damages for Apple's alleged lost sales and reputational injuries. As to reputational harm, Samsung accuses

31

United States District Court
For the Northern District of California

1    Apple of relying only on attorney argument, and cites Dr. Erdem's declaration, which states that

2    there are accepted industry techniques for assigning monetary values to "brand equity." *See* Erdem

3    Decl. ¶¶ 41-43. In response, Apple cites cases that have found money damages inadequate to

4    remedy reputation-related harms. *See* Reply at 10. In *Douglas Dynamics*, the court found damages

5    inadequate "for at least the reputation loss Douglas has suffered from Buyers's infringement," in

6    light of evidence regarding the parties' relative market share. 717 F.3d at 1345. In *Southern Snow*

7    *Manufacturing Co. v. SnoWizard Holdings, Inc.*, a district court followed *Douglas Dynamics* and

8    found legal remedies inadequate for "reputation loss" that the patentee had shown was the result of

9    the infringement in question. No. 06-9170, 2014 WL 1652436, at *7 (E.D. La. Apr. 24, 2014).

10    Similarly, in *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, another district court determined that

11    the patentee established irreparable harm to its reputation, and then found "the loss of customer

12    goodwill cannot be compensated by a reasonable royalty payment." No. 2:07-cv-00331, 2013 WL

13    3043668, at *7-8 (D. Nev. June 17, 2013). However, these cases share a common denominator: in

14    each case, the patentee provided evidence to support the court's conclusion. By contrast, in the

15    instant case, Apple offers no evidence that its alleged reputational harm cannot be remedied.

16       As to lost sales, Samsung notes that courts in other contexts have found that monetary

17    remedies can adequately compensate harm due to lost revenues. Samsung also claims that the fact

18    that Apple's damages expert Dr. Vellturo was able to estimate damages for downstream sales and

19    ecosystem effects shows that any such harm is quantifiable. *See* Opp'n at 16. Samsung's

20    arguments are unpersuasive. Samsung does not tie the facts of the cases it cites to the

21    circumstances here. Samsung's contention that Apple's request for damages precludes injunctive

22    relief suggests that damages and an injunction can never be awarded simultaneously—a

23    proposition that has been rejected. *See Apple*, 909 F. Supp. 2d at 1160. This also contradicts

24    Samsung's earlier argument that Apple cannot demonstrate irreparable harm due to lost sales

25    unless the jury awards lost profits, which requires the jury to place a number on such harm. *Cf.*

26    ECF No. 221 at 78 n.9 (noting inherent tension between showing likelihood, but also

27    incalculability, of lost market share). Here, Apple has cited evidence tending to show that lost

28    market share and downstream sales may be difficult to quantify. *See* Tr. at 448:8-449:4 (Schiller

32

1   testimony on ecosystem effects). Dr. Vellturo has explained that he was not able to completely

2   quantify ecosystem effects in his damages models. *See* Vellturo Decl. ¶ 22.  Additionally, this

3   Court has previously found that Apple's alleged lost sales would be hard to quantify and remedy

4   with damages. *See* ECF No. 221 at 70 (noting that loss of market share to Samsung "would be

5   difficult to quantify or recapture"); 1846 Injunction Order at 37 (finding Apple's alleged lost sales

6   "difficult to quantify").

7          Accordingly, the Court determines that Apple has not shown that its supposed reputational

8   injury cannot be compensated by damages, but Apple has shown that its alleged lost sales harm

9   would be difficult to calculate and remedy.

### 2.     Apple's Licenses

11          Samsung points out that Apple previously offered to license the asserted patents to

12  Samsung and other competitors, and argues that this activity demonstrates that money damages are

13  adequate. *See* Opp'n at 16-18.  A patentee's willingness to license its technology is relevant to the

14  adequacy of legal remedies. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d

15  1312, 1339 (Fed. Cir. 2012).  However, the Federal Circuit has cautioned that evaluation of a

16  patent owner's licensing efforts must account for "any relevant differences from the current

17  situation," such as whether the licensees were Apple's competitors in the smartphone market, and

18  whether the licenses involved agreements to settle litigation. *Apple III*, 735 F.3d at 1370.

19          As explained above, Apple granted rights to ▮▮▮▮▮▮▮▮▮▮ to competitors in the

20  smartphone market, licensing the ▮▮▮▮▮▮▮ to Nokia and HTC, and the ▮▮▮▮▮▮▮▮ to

21  HTC.[7] *See* ECF Nos. 1895-12 (HTC), 443-19 (Nokia).  In the prior litigation, Samsung used these

22  same licenses as evidence that Apple was willing to license the asserted patents in that case, and

23  was therefore willing to accept monetary compensation for those inventions.  This Court stated:

> Both the Nokia and HTC agreements resulted from litigation settlements.
> Moreover, the Nokia license "was a 'provisional license' for a limited 'standstill'
> period, and the HTC agreement excluded HTC products that were 'clones' of
> Apple's products."  Because of these special conditions, the Nokia-Apple and HTC-

[7] Apple preemptively addressed two additional licenses of ▮▮▮▮▮▮▮▮ to IBM and
Microsoft. *See* Mot. at 16.  Samsung does not rely on those licenses in its Opposition, so the Court
does not address them.

United States District Court
For the Northern District of California

33

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1   Apple licenses provide little insight into whether Apple would be willing to provide
Samsung unencumbered access to the patented features for money. Therefore, the
Court holds that Apple's other licenses do not support a finding that damages are an
2   adequate remedy.

3   1846 Injunction Order at 36 (citations omitted).  Samsung does not argue that any of this analysis

4   has changed for ███████████████, and acknowledges this Court's finding that the

5   litigation settlement context of those two licenses "diminishes their probative value." Opp'n at 18.

6   At oral argument, Samsung's counsel confirmed that this Court's prior analysis (with which

7   Samsung disagrees) would be the same in this case.  *See* July 10, 2014 Hearing Tr. (ECF No. 1949)

8   at 73-74.  Furthermore, Samsung's expert Dr. Chevalier acknowledged at trial that "Apple is, in

9   general, very reluctant to license their intellectual property." Tr. at 2433:9-17.  The Court finds no

10  reason to depart from its previous analysis of the same licenses.

11        Samsung also contends that Apple offered to license the '647 patent to Samsung in August

12  2010, prior to this litigation, when Apple presented a slideshow that listed the '647 patent and

13  stated: "Samsung needs a license to continue to use Apple patents in infringing smartphones."

14  PX132 at 15, 23.  In response, Apple notes that the same presentation stated that "Apple has not

15  authorized the use of any of these patents" (*id.* at 10), and there is no other evidence that Apple

16  presented licensing terms to Samsung, or that Apple would have included the '647 patent among

17  other patents identified.  In *Apple III*, the Federal Circuit noted that any offers by Apple to license

18  asserted patents to Samsung "may be quite relevant to the injunction analysis." 735 F.3d at 1370

19  n.7.  Here, the Court finds that Apple's presentation provides some indication that Apple might

20  have been willing to license Samsung, but did not amount to a formal licensing offer.  Apple's

21  references to a "license" and "Samsung's choice to use Android *without a license*" (PX132 at 2

22  (emphasis added)) suggest that Apple might have been willing to discuss licenses to at least some

23  of its intellectual property.  The presentation is also labeled "Provided for Information and

24  Business Settlement Purposes Only."  However, Apple did not identify license terms or specific

25  patents for licensing to Samsung.  The presentation is also consistent with a demand to cease and

26  desist from infringement.  Even to the extent that the August 2010 presentation reveals some

27  willingness by Apple to negotiate a license, this does not outweigh the additional evidence and this

28  Court's prior findings that Apple is reluctant to license its patents.

United States District Court
For the Northern District of California

34

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

### 3.    Summary of Adequacy of Monetary Remedies

The Court concludes that damages for Apple's alleged irreparable harm in connection with alleged lost sales are difficult to quantify. As the Court determined in the 1846 Injunction Order, Apple's past licensing behavior demonstrates a reluctance to license Apple's patents to Samsung, and several factors distinguish Apple's licenses to HTC and Nokia from the present circumstances. Moreover, Samsung has not established that Apple offered to license the '647 patent to Samsung in August 2010.

However, this determination does not overcome Apple's failure to demonstrate a causal nexus between its alleged harm and Samsung's infringement. As before, the Court will not issue a permanent injunction based on irreparable harm that Samsung's infringement did not cause, even if monetary remedies will not compensate Apple for that irreparable harm. *See* 1846 Injunction Order at 37. Apple bears the burden of showing that legal remedies are inadequate to compensate for the specific alleged irreparable harm. *See eBay*, 547 U.S. at 391 (listing as the first two factors a patentee must show for an injunction "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for *that injury*") (emphasis added); *Apple III*, 735 F.3d at 1371 ("Of course, if, on remand, Apple cannot demonstrate that demand for Samsung's products is driven by the infringing features, then Apple's reliance on lost market share and downstream sales to demonstrate the inadequacy of damages will be substantially undermined."). To award an injunction to Apple in these circumstances would ignore the Federal Circuit's warning that a patentee may not "leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Id.* at 1361 (quoting *Apple II*, 695 F.3d at 1375) (internal quotation mark omitted). The Court ultimately finds that—despite Apple's apparent unwillingness to license the patents-in-suit to Samsung—monetary remedies would more appropriately remedy Samsung's infringement than would an injunction. Accordingly, the second *eBay* factor favors Samsung.

### C.    Balance of Hardships

The balance of hardships factor "assesses the relative effect of granting or denying an injunction on the parties." *i4i*, 598 F.3d at 862. An injunction "may deter future harm, but it may

35

1    not punish." *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 969 (N.D. Cal. 2009).

2    Here, Samsung's admissions at trial about the ease of removing or designing around the infringing

3    features, combined with the relatively narrow scope of, and sunset provision in, Apple's requested

4    injunction, show that Samsung will not face any hardship from the injunction.  Accordingly, the

5    balance of hardships favors Apple and the entry of an injunction.

6           The parties focus their arguments on Samsung's likely hardships in light of the scope of

7    Apple's proposed injunction.  In the first lawsuit between these parties (Case No. 11-CV-1846),

8    Apple sought an "extremely broad" injunction that would "prevent the sale of 26 specific

9    products." *Apple*, 909 F. Supp. 2d at 1162.  Here, however, Apple seeks a narrower injunction

10   against only "Infringing Features," defined as:

11          (1) for the '647 patent, the data detection/linking feature accused at trial as
            implemented in Samsung's Admire, Galaxy Nexus, Galaxy Note, Galaxy Note II,
12          Galaxy S II, Galaxy S II Epic 4G Touch, Galaxy S II Skyrocket, Galaxy S III, and
            Stratosphere products;
13
            (2) for the '721 patent, the slide-to-unlock feature accused at trial as implemented in
14          Samsung's Admire, Galaxy Nexus, and Stratosphere products; and

15          (3) for the '172 patent, the autocorrect feature accused at trial as implemented in
            Samsung's Admire, Galaxy Nexus, Galaxy Note, Galaxy S II, Galaxy S II Epic 4G
16          Touch, Galaxy S II Skyrocket, and Stratosphere products.

17   Proposed Order at 1.  The injunction would apply only to activities involving the "software or code

18   capable of implementing any Infringing Feature," and not smartphone or tablet products in their

19   entirety.  *Id.* at 2.  Additionally, the injunction includes a 30-day "sunset provision" to delay its

20   effect: "the enforcement of this Permanent Injunction shall be stayed until thirty (30) days after

21   entry of this Order."  *Id.*  Apple claims that the injunction is narrowly tailored to avoid "seeking to

22   bar entire product lines from the marketplace."  Mot. at 17.

23          Given the scope of Apple's proposed order, Apple claims that Samsung faces no hardship

24   at all because Samsung said that it can easily remove or design around the infringing features.  *Id.*

25   at 17-18.  The Court agrees with Apple.  At trial, Samsung's witnesses repeatedly told the jury that

26   design-arounds would be simple or already exist.  For the '172 patent's "slide-to-unlock"

27   invention, Samsung explained that it already has alternatives such as the "puzzle" and "ripple"

28   unlock interfaces, and is "selling lots of these phones without using any Apple slide to unlock

36

United States District Court
For the Northern District of California

feature." Tr. at 399:22-400:18. As to the '721 patent's "autocorrect" feature, Samsung represented at trial that Samsung has already developed a "non-infringing keyboard" that has "since been installed on many Samsung phones" and has been "an option on five of the phones that Apple accuses in this case." *Id.* at 384:8-14. Regarding the '647 patent, Google engineer Dianne Hackborn said that "it shouldn't take more than a day" to remove the accused pop-up menu, *id.* at 1587:25-1588:11, and Samsung's expert Dr. Kevin Jeffay agreed that such a change would take "on the order of a day," *id.* at 1797:21-1798:8. Then, at closing argument, Samsung's counsel addressed the amount of time needed to design around the asserted patents for purposes of estimating damages, and told the jury: "And we wouldn't need four months. You know, we're talking about Samsung, one of the, you know, greatest, largest, most important technology companies in the world. They could do these changes, if they had to do it, in one month." *Id.* at 3336:2-5.

Additionally, Apple claims that the one-month sunset provision further limits any hardship to Samsung because the delay matches the time that Samsung told the jury it would need to implement design-arounds. *See* Mot. at 19; Tr. at 3336:2-8. The Federal Circuit has observed that "a delayed injunction may be more likely to prevent only infringing *features* rather than the sale of entire *products*, because the defendant would have time to implement a noninfringing alternative." *Apple III*, 735 F.3d at 1363; *see also Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1339 (Fed. Cir. 2013) (affirming injunction with 18-month sunset period); *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (same, for 20-month sunset period). Thus, the sunset period in Apple's proposed injunction further limits any possible hardship to Samsung.

Samsung does not attempt to rebut Apple's arguments regarding ease of design-arounds. Nor does Samsung dispute that it could accomplish all relevant design-arounds within the sunset period. In light of these repeated admissions, Samsung fails to demonstrate that it would suffer any hardship. *See, e.g., Douglas Dynamics*, 717 F.3d at 1345 ("If indeed Buyers had a non-infringing alternative which it could easily deliver to the market, then the balance of hardships would suggest that Buyers should halt infringement and pursue a lawful course of market conduct."); *Brocade*, 2013 WL 140039, at *5 ("A10's witnesses also stated at trial that A10 could easily design around

37

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Brocade's patented claims.  The hardship A10 would suffer, therefore, is minimal."); *Halo Elecs.*,

2    2013 WL 3043668, at *10 (finding little hardship to defendant that "testified at trial that it could

3    switch to a different, non-infringing design to meet its customers' needs").

4        Despite these admissions, Samsung asserts that the injunction "lacks specificity, is overly

5    broad and extends beyond the permissible scope of an injunction under Federal Circuit case law."

6    Opp'n at 19.  These arguments are unpersuasive.  Apple's proposed injunction targets only specific

7    features, not entire products.  Other courts have applied similar injunctions.  *See, e.g., i4i*, 598 F.3d

8    at 862 (affirming finding that infringer's hardship was minimal because the injunction affected

9    only "one of thousands of features"); *Brocade*, 2013 WL 140039, at *5 (holding that an injunction

10   against practice of features that "do not drive demand" was not overly burdensome).

11       Samsung also claims the injunction is "not limited to the specific adjudicated software at

12   trial such as, for [the] '647 patent, the Messenger and Browser applications."  Opp'n at 19.

13   Samsung is correct that Apple's proposed injunction lists only the features accused at trial "and/or

14   any feature not more than colorably different" without mention of specific applications.  However,

15   Samsung has failed to show why this omission renders Apple's proposed injunction overly broad.

16   Apple has limited the scope of the injunction to use of infringing features as accused at trial.

17   Moreover, focusing on specific features rather than existing applications may reasonably prevent

18   future infringement.  *See Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1293

19   (Fed. Cir. 2012) (holding that an injunction against "otherwise infringing the asserted claims" was

20   not overly broad); *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1359 (Fed. Cir. 1999) (holding

21   injunction against "any further infringement" was not overly broad).

22       Samsung also fears that Apple will initiate contempt proceedings and force Samsung to

23   demonstrate that future products are "colorably different."  Opp'n at 19.  However, the "not more

24   than colorably different" provision is standard in injunctions.  *See TiVo Inc. v. EchoStar Corp.*, 646

25   F.3d 869, 882 (Fed. Cir. 2011) ("Thus, the party seeking to enforce the injunction must prove both

26   that the newly accused product is not more than colorably different from the product found to

27   infringe and that the newly accused product actually infringes.").  Therefore, Samsung fails to

28

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1    identify any likely hardship specific to Apple's proposed order, only the general inconvenience and

2    uncertainty that results from any injunction.

3        Samsung additionally argues that beyond the use of specific features, the injunction

4    improperly prevents Samsung from "implementing," "advertising," or providing "assistance" for

5    its infringing features. Opp'n at 19. However, an injunction need not be limited only to the sale of

6    infringing products. *See NLRB v. Express Pub'g Co*, 312 U.S. 426, 435 (1941) ("A federal court

7    has broad power to restrain acts which are of the same type or class as unlawful acts which the

8    court has found to have been committed or whose commission in the future, unless enjoined, may

9    fairly be anticipated from the defendant's conduct in the past."); *Broadcom Corp. v. Emulex Corp.*,

10   2012 U.S. Dist. LEXIS 129524, at *30 (C.D. Cal. Mar. 16, 2012) ("The Court rejects the notion

11   that the injunction must be limited to the type of conduct which was found to infringe; namely,

12   selling infringing devices."). Samsung has admitted that it can easily remove or design around the

13   infringing features, and has not shown that it faces any hardship refraining from related advertising

14   or other activity. Samsung argues that Apple's proposed injunction would disrupt Samsung's

15   contractual relationship with carriers and consumers. Opp'n at 19. However, Apple represents that

16   its proposed injunction would not apply to end users or others not acting in concert with Samsung.

17   *See* Reply at 14. Moreover, this Court has previously held that third-party retailers "assumed the

18   risk of this type of disruption" and "should not be protected . . . when they have been benefitting

19   from Samsung's infringement." *See Apple*, 909 F. Supp. 2d at 1161-62; *see also Telebrands Direct*

20   *Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169, 1179 (D.N.J. 1992).

21       Finally, Samsung argues that Apple's proposed injunction "includes no carve-out for

22   repairs." Opp'n at 19. However, Apple represents that the proposed injunction does not enjoin

23   repairs for products already included in the jury's damages award, and that Apple would be

24   "willing to make clear that the injunction does not preclude Samsung from performing repairs on

25   those devices." Reply at 15. Based on these representations, Samsung's objection appears moot.

26       As to Apple's hardships, Apple contends that "Apple has been forced to compete against

27   products that contain its own patented technologies." Mot. at 17. The Federal Circuit has held that

28   requiring a patentee to "compete against its own patented invention . . . places a substantial

39

United States District Court
For the Northern District of California

**A39**

Case5:12-cv-00630-LHK   Document1954 *SEALED*   Filed08/27/14   Page40 of 42

1    hardship" on the patentee, for purposes of the balance of hardships factor. *Robert Bosch*, 659 F.3d

2    at 1156; *see also Sealant Sys. Int'l v. TEK Global S.R.L.*, No. 5:11-CV-00774-PSG, 2014 U.S. Dist.

3    LEXIS 31528, at *102 (N.D. Cal. Mar. 7, 2014) ("AMI faces substantial hardship because it must

4    compete with its own patented invention in the marketplace."). As noted above, it is undisputed

5    that Apple and Samsung have been "fierce" direct competitors in the smartphone market. While

6    Apple's likely hardship from Samsung's continued infringement does not rise to the level of

7    irreparable harm, *see Apple II*, 695 F.3d at 1375 (noting that causal nexus requires "that the

8    infringing feature drives consumer demand for the accused product"), Samsung faces no hardship,

9    as explained above.

10    Samsung repeatedly told the jury that designing around the asserted claims of the three

11    patents at issue would be easy and fast. In light of those admissions, and the narrow tailoring of,

12    and sunset provision in, the requested injunction, Samsung has failed to articulate any hardship. As

13    the Federal Circuit has held, if the infringer "had a non-infringing alternative which it could easily

14    deliver to the market, then the balance of hardships would suggest that [the infringer] should halt

15    infringement and pursue a lawful course of market conduct." *Douglas Dynamics*, 717 F.3d at

16    1345. For the above reasons, the balance of hardships favors Apple.

17    **D.    Public Interest**

18    "This factor requires a plaintiff to demonstrate that 'the public interest would not be

19    disserved by a permanent injunction.'" *Apple III*, 735 F.3d at 1371 (quoting *eBay*, 547 U.S. at

20    391). Courts have recognized that "the touchstone of the public interest factor is whether an

21    injunction, both in scope and effect, strikes a workable balance between protecting the patentee's

22    rights and protecting the public from the injunction's adverse effects." *i4i*, 598 F.3d at 863.

23    Apple repeats its argument from the parties' prior lawsuit that an injunction will promote

24    the public's interest in enforcing patents against a direct competitor, and will benefit the public by

25    "encouraging investment in innovation." Mot. at 19. As before, the Court agrees with Apple that

26    the public interest does favor the enforcement of patent rights to promote the "encouragement of

27    investment-based risk." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006);

28    *see also Apple*, 909 F. Supp. 2d at 1162 (quoting *id.*); *Douglas Dynamics*, 717 F.3d at 1346

United States District Court
For the Northern District of California

40

United States District Court
For the Northern District of California

1    (finding public interest disserved by an infringer "competing in the marketplace using a

2    competitor's patented technology"). However, as the Federal Circuit observed, "the public's

3    interest in enforcing patent rights must also be weighed with other aspects of the public interest."

4    *Apple III*, 735 F.3d at 1372 (citing *ActiveVideo*, 694 F.3d at 1341).

5         Samsung claims that an injunction will "depriv[e] the public of product choices created by a

6    thriving level of competition." Opp'n at 20. The Federal Circuit has stated that it is appropriate to

7    "consider the scope of Apple's requested injunction relative to the scope of the patented features

8    and the prospect that an injunction would have the effect of depriving the public of access to a

9    large number of non-infringing features." *Apple III*, 735 F.3d at 1372-73. In *Apple III*, Apple

10   sought broadly to enjoin sales of over two-dozen products. *Id.* at 1372. Here, as explained above,

11   Apple's proposed injunction is narrower and targets only "software and code" for the "Infringing

12   Features" accused at trial. Thus, there is substantially less risk that the injunction will deprive the

13   public of access to "a large number of non-infringing features," particularly given Samsung's

14   representations about the ease and speed of designing around the patents at issue.

15        Samsung claims that enjoining the accused features may at least temporarily restrict

16   consumers' choices of smartphones or smartphone features. However, any such effect would be

17   minimal because of Apple's proposed sunset provision and Samsung's repeated representations at

18   trial about the ease and speed with which Samsung could implement design-arounds. Moreover, as

19   this Court noted in connection with the much broader permanent injunction that Apple previously

20   requested, "[c]onsumers will have substantial choice of products, even if an injunction were to

21   issue. Apple and Samsung, despite being direct competitors, are not the only suppliers of mobile

22   phones in the market, nor are Samsung's infringing phones the only phones Samsung offers."

23   *Apple*, 909 F. Supp. 2d at 1162. Furthermore, Apple predicts that an injunction will promote

24   product diversity by forcing Samsung to design around the patents. *See* Mot. at 20. Samsung itself

25   stated repeatedly at trial that Samsung could offer multiple design-arounds in lieu of Apple's

26   patented features. *See* Tr. at 3336:2-5. Thus, an injunction may prompt introduction of new

27   alternatives to the patented features.

28

<div align="center">41</div>

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1    As before, Samsung argues that an injunction would create an administrative burden on the

2    Court, as it would require the Court's continuing supervision to enforce. *See* Opp'n at 20. This is

3    likely true, though on its own, it does not carry significant weight. *See Apple,* 909 F. Supp. 2d at

4    1163. Moreover, the relatively narrow scope of Apple's proposed injunction reduces the likelihood

5    of burdensome enforcement efforts. Balancing all of the considerations that the parties have

6    identified, the Court concludes that the public interest factor favors Apple.

7    **E.    Summary**

8    Weighing all of the factors, the Court concludes that the principles of equity do not support

9    a permanent injunction here. First and most importantly, Apple has not satisfied its burden of

10   demonstrating irreparable harm and linking that harm to Samsung's exploitation of any of Apple's

11   three infringed patents. Apple has not established that it suffered significant harm in the form of

12   either lost sales or reputational injury. Moreover, Apple has not shown that it suffered any of these

13   alleged harms *because* Samsung infringed Apple's patents. The Federal Circuit has cautioned that

14   the plaintiff must demonstrate a causal nexus between its supposed harm (including reputational

15   harm) and the specific infringement at issue. Apple has not demonstrated that the patented

16   inventions drive consumer demand for the infringing products.

17   Furthermore, the balance of the remaining *eBay* factors do not warrant an injunction here.

18   Apple has not demonstrated that money damages are inadequate compensation for the infringement

19   in this case. Although the public interest factor favors Apple and Apple's narrowly tailored

20   injunction request tilts the balance of hardships in Apple's favor, the Court determines that these

21   factors do not overcome the lack of irreparable harm. Apple's motion is DENIED.

22   **IT IS SO ORDERED.**

23   Dated: August 27, 2014

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

24

25

26

27

28

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

**A42**

# TAB 2

US005946647A

# United States Patent [19]

## Miller et al.

[11] **Patent Number:** **5,946,647**

[45] **Date of Patent:** **Aug. 31, 1999**

[54] **SYSTEM AND METHOD FOR PERFORMING AN ACTION ON A STRUCTURE IN COMPUTER-GENERATED DATA**

[75] Inventors: **James R. Miller**, Mountain View; **Thomas Bonura**, Capitola; **Bonnie Nardi**, Mountain View; **David Wright**, Santa Clara, all of Calif.

[73] Assignee: **Apple Computer, Inc.**, Cupertino, Calif.

[21] Appl. No.: **08/595,257**

[22] Filed: **Feb. 1, 1996**

[51] Int. Cl.[6] .................................................. **G06F 17/27**
[52] U.S. Cl. ................................ **704/9; 704/1**
[58] Field of Search ............................... 704/1, 7, 9–10, 704/243; 707/513, 101–104

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,115,390 | 5/1992 | Fukuda et al. | 364/146 |
| 5,130,924 | 7/1992 | Barker et al. | 704/1 |
| 5,164,899 | 11/1992 | Sobotka et al. | 704/9 |
| 5,202,828 | 4/1993 | Vertelney et al. | 364/419 |
| 5,247,437 | 9/1993 | Vale et al. | 704/1 |
| 5,369,575 | 11/1994 | Lamberti et al. | 704/1 |
| 5,574,843 | 11/1996 | Gerlach et al. | 395/118 |

### OTHER PUBLICATIONS

TerryMorse Software "What is Myrmidon" Downloaded from the Internet at URL http://www.terrymorse.com (Publication Date Unknown), 2 pages.

Shoens, K. et al. "Rufus System: Information Organization for Semi–Structured Data," Proceedings of the 19th VLDB Conference (Dublin, Ireland 1993), pp. 1–12.

Schwarz, Peter and Shoens, Kurt. "Managing Change in the Rufus System," Abstract from the IBM Almaden Research Center, pp. 1–16.

Myers, Brad A. "Tourmaline: Text Formatting by Demonstration," (Chapter 14) in *Watch What I Do: Programming by Demonstration*, edited by Allen Cypher, MIT Press, (Cambridge, MA 1993), pp. 309–321.

Maulsby, David. "Instructible Agents," Dissertation from the Department of Computer Science at The University of Calgary (Calgary, Alberta—Jun. 1994), pp. 178, 181–188, 193–196 (from Chapter 5).

Rus, Daniela and Subramanian, Devika. "Designing Structure–Based Information Agents," AAAI Symposium (Mar. 1994), pp. 79–86.

*Primary Examiner*—Forester W. Isen
*Assistant Examiner*—Patrick N. Edouard
*Attorney, Agent, or Firm*—Carr & Ferrell LLP

[57] **ABSTRACT**

A system and method causes a computer to detect and perform actions on structures identified in computer data. The system provides an analyzer server, an application program interface, a user interface and an action processor. The analyzer server receives from an application running concurrently data having recognizable structures, uses a pattern analysis unit, such as a parser or fast string search function, to detect structures in the data, and links relevant actions to the detected structures. The application program interface communicates with the application running concurrently, and transmits relevant information to the user interface. Thus, the user interface can present and enable selection of the detected structures, and upon selection of a detected structure, present the linked candidate actions. Upon selection of an action, the action processor performs the action on the detected structure.

**24 Claims, 10 Drawing Sheets**



**JOINT TRIAL EXHIBIT NO. 1**

United States District Court
Northern District of California
No. 12-CV-00630-LHK (PSG)

*Apple Inc. v. Samsung Elecs.*

Date Admitted:_____ By:_____

**A354**



FIG. 1



FIG. 2



FIG. 3



FIG. 4



510

Detect Structures

520

Bob:

This is my new

phone number: (415) 555-1234

address: 1 Hilly Street
San Francisco, CA 94105

E-mail address: Jdoe@work.com

Sincerely,

John Doe

**FIG. 5**



FIG. 6

**U.S. Patent**          Aug. 31, 1999          Sheet 7 of 10          5,946,647



FIG. 7



FIG. 8



FIG. 9



FIG. 10

5,946,647

| 1 | 2 |

# SYSTEM AND METHOD FOR PERFORMING AN ACTION ON A STRUCTURE IN COMPUTER-GENERATED DATA

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates generally to manipulation of structures in computer data. More particularly, the invention relates to a system and method for performing computer-based actions on structures identified in computer data.

### 2. Description of the Background Art

Much data that appears in a computer user's day-to-day activities contains recognizable structures that have semantic significance such as phone numbers, e-mail addresses, post-office addresses, zip codes and dates. In a typical day, for example, a user may receive extensive files from word-processing programs and e-mail that contain several of these structures. However, visually searching data files or documents to find these structures is laborious and cognitively disruptive, especially if the document is lengthy and hard to follow. Furthermore, missing a structure such as a date may lead to missing an important meeting or missing a deadline.

To help facilitate searching a document for these structures, programmers can create or employ pattern analysis units, such as parsers, to automatically identify the structures. For the purposes of the present description, the term "pattern" refers to data, such as a grammar, regular expression, string, etc., used by a pattern analysis unit to recognize information in a document, such as dates, addresses, phone numbers, names, etc. The term "structure" refers to an instantiation of a pattern in the document. That is, a "date" pattern will recognize the structure "Oct. 31, 1995." The application of a pattern to a document is termed "parsing."

Conventional systems that identify structures in computer data do not enable automatic performance of an action on an identified structure. For example, if a long e-mail message is sent to a user, the user may implement a pattern analysis unit to search for particular structures, such as telephone numbers. Upon identification of a structure, the user may want to perform an action on the structure, such as moving the number to an electronic telephone book. This usually involves cutting the structure from the e-mail message, locating and opening the electronic telephone book application program, pasting the structure into the appropriate field, and closing the application program. However, despite the fact that computer systems are getting faster and more efficient, this procedure is still tedious and cognitively disruptive.

One type of system that has addressed this problem involves detecting telephone numbers. Such systems enable a user to select a telephone number and request that the application automatically dial the number. However, these systems do not recognize the selected data as a telephone number, and they generally produce an error message if the user selects invalid characters as a phone number. Also, they do not enable the performance of other candidate actions, such as moving the number to an electronic telephone book. That is, if a user wishes to perform a different action on an identified telephone number, such as storing the number in an address book, the user cannot automatically perform the action but must select and transfer the number to the appropriate data base as described above.

Therefore, a system is needed that identifies structures, associates candidate actions to the structures, enables selec-tion of an action and automatically performs the selected action on the structure.

## SUMMARY OF THE INVENTION

The present invention overcomes the limitations and deficiencies of previous systems with a system that identifies structures in computer data, associates candidate actions with each detected structure, enables the selection of an action, and automatically performs the selected action on the identified structure. It will be appreciated that the system may operate on recognizable patterns for text, pictures, tables, graphs, voice, etc. So long as a pattern is recognizable, the system will operate on it. The present invention has significant advantages over previous systems, in that the present system may incorporate an open-ended number and type of recognizable patterns, an open-ended number and type of pattern analysis units, and further that the system may enable an open-ended number and type (i.e. scripts, macros, code fragments, etc.) of candidate actions to associate with, and thus perform, on each identified structure.

The present invention provides a computer system with a central processing unit (CPU), input/output (I/O) means, and a memory that includes a program to identify structures in a document and perform selected computer-based actions on the identified structures. The program includes program subroutines that include an analyzer server, an application program interface, a user interface and an action processor. The analyzer server receives data from a document having recognizable structures, and uses patterns to detect the structures. Upon detection of a structure, the analyzer server links actions to the detected structure. Each action is a computer subroutine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked. An action may specify opening another application, loading the identified structure into an appropriate field, and closing the application. An action may further include internal actions, such as storing phone numbers in an electronic phone book, addresses in an electronic address book, appointments on an electronic calendar, and external actions such as returning phone calls, drafting letters, sending facsimile copies and e-mail, and the like.

Since the program may be executed during the run-time of another program, i.e. the application which presents the document, such as Microsoft Word, an application program interface provides mechanisms for interprogram communications. The application program interface retrieves and transmits relevant information from the other program to the user interface for identifying, presenting and enabling selection of detected structures. Upon selection of a detected structure, the user interface presents and enables selection of candidate actions. When a candidate action is selected, the action processor performs the selected action on the selected structure.

In addition to the computer system, the present invention also provides methods for performing actions on identified structures in a document. In this method, the document is analyzed using a pattern to identify corresponding structures. Identified structures are stored in memory and presented to the user for selection. Upon selection of an identified structure, a menu of candidate actions is presented, each of which may be selected and performed on the selected structure.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a computer system having a program stored in RAM, in accordance with the present invention.

5,946,647

3

FIG. 2 is a block diagram of the program of FIG. 1.

FIG. 3 is a block diagram illustrating the analyzer server of FIG. 2.

FIG. 4 is a block diagram illustrating a particular example of the analyzer server of FIG. 2.

FIG. 5 illustrates a window presenting an example of a document having recognizable structures.

FIG. 6 illustrates a window with the identified structures in the example document of FIG. 5 highlighted based on the analyzer server of FIG. 4.

FIG. 7 illustrates a window showing the display of a pop-up menu for selecting an action.

FIGS. 8 and 9 together are a flowchart depicting the preferred method for selecting and performing an action on an identified structure.

FIG. 10 is a flowchart depicting the preferred method for identifying a structure in a data sample.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to FIG. 1, a block diagram is shown of a computer system **100** including a CPU **120**. Computer system **100** is preferably a microprocessor-based computer, such as a Power Macintosh manufactured by Apple Computer, Inc. of Cupertino, Calif. An input device **110**, such as a keyboard and mouse, and an output device **105**, such as a CRT or voice module, are coupled to CPU **120**. ROM **155**, RAM **170** and disk storage **175** are coupled to CPU **120** via signal bus **115**. Computer system **100** optionally further comprises a printer **180**, a communications interface **185**, and a floppy disk drive **190**, each coupled to CPU **120** via signal bus **115**.

Operating system **160** is a program that controls and facilitates the processing carried out by CPU **120**, and is typically stored in RAM **170**. Application **167** is a program, such as a word-processor or e-mail program, that presents data on output device **105** to a user. The program **165** of the present invention is stored in RAM **170** and causes CPU **120** to identify structures in the data presented by application **167**, to associate actions with the structures identified in the data, to enable the user to select a structure and an action, and to automatically perform the selected action on the identified structure. This program **165** may be stored in disk storage **175** and loaded into an allocated section of RAM **170** prior to execution by CPU **120**. Another section of RAM **170** is used for storing intermediate results and miscellaneous data **172**. Floppy disk drive **190** enables the storage of the present program **165** onto a removable storage medium which may be used to initially load program **165** into computer system **100**.

Referring now to FIG. 2, a schematic block diagram of program **165** is shown together with its interaction with a document **210**. Program **165** contains program subroutines including an analyzer server **220**, an application program interface **230**, a user interface **240** and an action processor **250**. Analyzer server **220** receives data having recognizable patterns from a document **210**, which may be retrieved from a storage medium such as RAM **170**, ROM **155**, disk storage **175**, or the like, and presented on output device **105** by application **167**. Analyzer server **220** comprises one or more pattern analysis units, such as a parser and grammars or a fast string search function and dictionaries, which uses patterns to parse document **210** for recognizable structures. Upon detection of a structure, analyzer server **220** links actions associated with the responsible pattern to the detected structure, using conventional pointers.

4

After identifying structures and linking actions, application program interface **230** communicates with application **167** to obtain information on the identified structures so that user interface **240** can successfully present and enable selection of the actions. In a display-type environment, application program interface **230** retrieves the locations in document **210** of the presentation regions for the detected structures from application **167**. Application program interface **230** then transmits this location information to user interface **240**, which highlights the detected structures, although other presentation mechanisms can be used. User interface **240** enables selection of an identified structure by making the presentation regions mouse-sensitive, i.e. aware when a mouse event such as a mouse-down operation is performed while the cursor is over the region. Alternative selection mechanisms can be used such as touch sensitive screens and dialog boxes. It will be appreciated that detected structures can be hierarchical, i.e. that a sub-structure can itself be selected and have actions associated with it. For example, a user may be able to select the year portion of an identified date, and select actions specific to the year rather than to the entire date.

User interface **240** communicates with application **167** through application program interface **230** to determine if a user has performed a mouse-down operation in a particular mouse-sensitive presentation region, thereby selecting the structure presented at those coordinates. Upon selection of this structure, user interface **240** presents and enables selection of the linked candidate actions using any selection mechanism, such as a conventional pull-down or pop-up menu.

The above description of the user interface is cast in terms of a purely visual environment. However, the invention is not limited to visual interface means. For example, in an audio environment, user interface **240** may present the structures and associated actions to the user using voice synthesis and may enable selection of a pattern and action using voice or sound activation. In this type of embodiment, analyzer server **220** may be used in conjunction with a text-to-speech synthesis application **167** that reads documents to users over a telephone. Analyzer server **220** scans document **210** to recognize patterns and link actions to the recognized patterns in the same manner as described above. In the audio environment, user interface **240** may provide a special sound after application **167** reads a recognized pattern, and enable selection of the pattern through the use of an audio interface action, such as a voice command or the pressing of a button on the touch-tone telephone keypad as before. Thus, user interface **240** may present the linked actions via voice synthesis. One can create various environments having a combination of sensory mechanisms.

Upon selection of a candidate action, user interface **240** transmits the selected structure and the selected action to action processor **250**. Action processor **250** retrieves the sequence of operations that constitute the selected action, and performs the sequence using the selected structure as the object of the selected action.

Referring now to FIG. 3, a block diagram illustrating an analyzer server **220** is shown. In this figure, analyzer server **220** is described as having a parser **310** and a grammar file **320**, although alternatively or additionally a fast string search function or other function can be used. Parser **310** retrieves a grammar from grammar file **320** and parses text using the retrieved grammar. Upon identification of a structure in the text, parser **310** links the actions associated with the grammar to the identified structure. More particularly, parser **310** retrieves from grammar file **320** pointers attached

5,946,647

to the grammar and attaches the same pointers to the identified structure. These pointers direct the system to the associated actions contained in associated actions file **330**. Thus, upon selection of the identified structure, user interface **240** can locate the linked actions.

FIG. 4 illustrates an example of an analyzer server **220**, which includes grammars **410** and a string library **420** such as a dictionary, each with associated actions. One of the grammars **410** is a telephone number grammar with associated actions for dialing a number identified by the telephone number grammar or placing the number in an electronic telephone book. Analyzer server **220** also includes grammars for post-office addresses, e-mail addresses and dates, and a string library **420** containing important names. When analyzer server **220** identifies an address using the "e-mail address" grammar, actions for sending e-mail to the identified address and putting the identified address in an e-mail address book are linked to the address.

FIG. 5 shows a window **510** presenting an exemplary document **210** having data containing recognizable structures, including a phone number, post-office address, e-mail address, and name. Window **510** includes a button **520** for initiating program **165**, although alternative mechanisms such as depressing the "option" key may be used. Upon initiation of program **165**, system **100** transmits the contents of document **210** to analyzer server **220**, which parses the contents based on grammars **410** and strings **420** (FIG. 4). This parsing process produces the window shown in FIG. 6. As illustrated in FIG. 6, analyzer server **220** identifies the phone number, post-office address, e-mail address and name. Although not shown in FIG. 6, analyzer server **220** links the actions associated with grammars **410** and strings **420** to these identified structures, and application program interface **230** retrieves information on the location of these structures from application **167**. User interface **240** then highlights the identified structures in document **210**, and makes the identified structures mouse-sensitive.

As shown in FIG. 7, upon recognition of a mouse-down operation over a structure, user interface **240** presents a pop-up menu **710**. In this example, pop-up menu **710** displays the candidate actions linked to the selected telephone number grammar **410**, including dialing the number and putting the number into an electronic telephone book. Upon selection of the action for putting the number in an electronic telephone book, user interface **240** transmits the corresponding telephone number and selected action to action processor **250**. Action processor **250** locates and opens the electronic telephone book, places the telephone number in the appropriate field and allows the user to input any additional information into the file.

FIGS. 8 and 9 display a flowchart illustrating preferred method **800** for recognizing patterns in documents and performing actions. This method is carried out during the run-time of application **167**. Referring first to FIG. 8, method **800** starts by receiving **810** the content, or a portion of the content, from document **210**. Assuming program **165** initiates with the receipt of any text, the received content or portion is scanned **820** for identifiable structures using the patterns in analyzer server **220**. Upon detection of a structure based on a particular pattern, actions associated with the particular pattern are linked **825** to the detected structure. Assuming a display-type environment, the presentation region location for a detected structure is retrieved **830** from application **167**. If the document content being displayed on output device **105** is changed **840**, for example by the user adding or modifying text, method **800** restarts. Otherwise, method **800** continues with block **850**. If the presentation

regions change **850**, for example by the a user scrolling document **210**, then new presentation regions from application **167** are again retrieved **830**. Otherwise, method **800** continues to block **860**. As illustrated by block **860**, method **800** loops between blocks **840** and **860** until a request for display of identified structures is received **860**. It will be appreciated that the steps of the loop (blocks **840**, **850** and **860**) can be performed by application **167**.

Referring also to FIG. 9, when a request for the display of detected structures is received **860**, the regions are displayed **910** using presentation mechanisms such as highlighting the presentation region around each detected structure, although alternative presentation mechanisms can be used. If a request for the display of candidate actions linked to a detected structure is not received **920**, method **800** returns to block **840**. However, if a request is received **920**, the actions linked in block **825** are displayed **930**. This request for display of candidate actions can be performed using a selection mechanism, such as a mouse-down operation over a detected structure, which causes the candidate actions linked to the structure to be displayed **930**. Display **930** of candidate actions may be implemented using a pop-up menu, although alternative presentation mechanisms can be used such as pull-down menus, dialog boxes and voice synthesizers.

As illustrated in block **940**, if an action from the displayed candidate actions is not selected **940**, method **800** returns to block **840**. However, if an action is selected **940**, the action is executed **950** on the structure selected in block **920**. After execution **950** of an action, method **800** returns to block **840**. Method **800** ends when the user exits application **167**, although other steps for ending method **800** can alternatively be used.

Referring now to FIG. 10, a flowchart illustrating the preferred method **820** for scanning and detecting patterns in a document is shown. Method **820** starts by retrieving **1010** data to be analyzed. After the data is retrieved, several pattern analysis processes may be performed on the data. As illustrated in block **1020**, a parsing process retrieves **1030** grammars, detects **1040** structures in the data based on the retrieved grammars, and links **1050** actions associated with each grammar to each structure detected by that grammar. As illustrated in block **1060**, a fast string search function retrieves **1070** the contents of string library **420**, detects **1080** the strings in the data identical to those in the string library **420**, and links **1090** actions associated with the library string to the detected string. As illustrated in block **1100**, additional pattern analysis processes, such as a neural net scan, can be performed **1100** to detect in the data other patterns, such as pictures, graphs, sound, etc. Method **820** then ends. Alternatively, the pattern analysis processes can be performed in parallel using a multiprocessor multitasking system, or using a uniprocessor multithreaded multitasking system where a thread is allocated to execute each pattern detection scheme.

These and other variations of the preferred and alternate embodiments and methods are provided by the present invention. For example, program **165** in FIG. 1 can be stored in ROM, disk, or in dedicated hardware. In fact, it may be realized as a separate electronic circuit. Other components of this invention may be implemented using a programmed general purpose digital computer, using application specific integrated circuits, or using a network of interconnected conventional components and circuits. The analyzer server **220** of FIG. 2 may use a neural net for searching a graphical document **210** for faces, or a musical library for searching a stored musical piece **210** for sounds. The user interface **240**

# A367

5,946,647

7

8

may present structures and actions via voice synthesis over a telephone line connection to system **100**. The embodiments described have been presented for purposes of illustration and are not intended to be exhaustive or limiting, and many variations and modifications are possible in light of the foregoing teaching. The system is limited only by the following claims.

What is claimed is:

1. A computer-based system for detecting structures in data and performing actions on detected structures, comprising:

an input device for receiving data;

an output device for presenting the data;

a memory storing information including program routines including

an analyzer server for detecting structures in the data, and for linking actions to the detected structures;

a user interface enabling the selection of a detected structure and a linked action; and

an action processor for performing the selected action linked to the selected structure; and

a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.

2. The system recited in claim 1, wherein the analyzer server stores detected structures in the memory.

3. The system recited in claim 1, wherein the input device receives the data from an application running concurrently, and wherein the program routines stored in memory further comprise an application program interface for communicating with the application.

4. The system recited in claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in the data.

5. The system recited in claim 4, wherein the analyzer server includes actions associated with each of the grammars, and wherein the analyzer server links to a detected structure the actions associated with the grammar which detects that structure.

6. The system recited in claim 1, wherein the analyzer server includes a string library and a fast string search function for detecting string structures in the data.

7. The system recited in claim 6, wherein the analyzer server includes actions associated with each of the strings, and wherein the analyzer server links to a detected structure the actions associated with the grammar which detects that string structure.

8. The system recited in claim 1, wherein the user interface highlights detected structures.

9. The system recited in claim 1, wherein the user interface enables selection of an action by causing the output device to display a pop-up menu of the linked actions.

10. The system recited in claim 1, wherein the programs stored in the memory further comprise an application running concurrently that causes the output device to present the data received by the input device, and an application program interface that provides interrupts and communicates with the application.

11. The system recited in claim 1, wherein the user interface enables the selection of a detected structure and a linked action using sound activation.

12. The system recited in claim 1, wherein a first one of the actions may invoke a second one of the actions.

13. A program storage medium storing a computer program for causing a computer to perform the steps of:

receiving computer data;

detecting a structure in the data;

linking at least one action to the detected structure;

enabling selection of the structure and a linked action; and

executing the selected action linked to the selected structure.

14. In a computer having a memory storing actions, a system for causing the computer to perform an action on a structure identified in computer data, comprising:

means for receiving computer data;

means for detecting a structure in the data;

means for linking at least one action to the detected structure;

means for selecting the structure and a linked action; and

means for executing the selected action linked to the selected structure.

15. In a computer having a memory storing actions, a method for causing the computer to perform an action on a structure identified in computer data, comprising the steps of:

receiving computer data;

detecting a structure in the data;

linking at least one action to the detected structure;

enabling selection of the structure and a linked action; and

executing the selected action linked to the selected structure.

16. The method recited in claim 15, wherein the computer data is received from the application running concurrently.

17. The method recited in claim 15, wherein the memory contains grammars, and wherein the step of detecting a structure further comprises the steps of retrieving a grammar and parsing the data based on the grammar.

18. The method recited in claim 17, wherein the grammar is associated with a particular action, and wherein the step of linking at least one action to the detected structure includes the step of linking the particular action to the detected structure.

19. The method recited in claim 15, wherein the memory contains strings, and wherein the step of detecting a structure further comprises the steps of retrieving a string from the memory and scanning the data to identify the string.

20. The method recited in claim 15, further comprising after the step of detecting a structure, the step of highlighting the detected structure.

21. The method recited in claim 15, further comprising, after the step of linking at least one action to the detected structure, the step of displaying and enabling selection of an action for performance on the detected structure.

22. A computer-based method for causing a computer to identify, select and perform an action on a structure in computer data received from a concurrently running application, said application presenting the computer data to the user, the method comprising the steps of:

receiving computer data from the application;

detecting a structure in the computer data;

linking at least one action to the detected structure;

5,946,647

9

communicating with the application to determine the location of the detected structure as presented by the application, to enable selection of the detected structure and a linked action, and to determine if the detected structure and a linked action have been selected; and

performing a selected action linked to the detected pattern.

10

**23**. The method recited in claim **15**, wherein the step of enabling uses sound activation.

**24**. The method recited in claim **15**, wherein a first one of the actions may invoke a second one of the actions.

\* \* \* \* \*

# TAB 3

(12) **United States Patent**       (10) **Patent No.:**    **US 8,046,721 B2**
    Chaudhri et al.                  (45) **Date of Patent:**    *Oct. 25, 2011

(54) **UNLOCKING A DEVICE BY PERFORMING GESTURES ON AN UNLOCK IMAGE**

(75) Inventors: **Imran Chaudhri**, San Francisco, CA (US); **Bas Ording**, San Francisco, CA (US); **Freddy Allen Anzures**, San Francisco, CA (US); **Marcel Van Os**, San Francisco, CA (US); **Stephen O. Lemay**, San Francisco, CA (US); **Scott Forstall**, Mountain View, CA (US); **Greg Christie**, San Jose, CA (US)

(73) Assignee: **Apple Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/477,075**

(22) Filed: **Jun. 2, 2009**

(65) **Prior Publication Data**

US 2009/0241072 A1    Sep. 24, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 11/322,549, filed on Dec. 23, 2005, now Pat. No. 7,657,849.

(51) **Int. Cl.**
    *G06F 3/033*    (2006.01)
(52) **U.S. Cl.** ........................ **715/863**; 345/173; 345/179
(58) **Field of Classification Search** .................. 715/154, 715/863; 345/156
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,465,084 A | 11/1995 | Cottrell .................. 340/825.31 |
| 5,559,961 A | 9/1996 | Blonder .................. 395/188.01 |
| 5,677,710 A | 10/1997 | Thompson-Rohrlich ..... 345/173 |
| 5,821,933 A | 10/1998 | Keller et al. ................. 345/348 |
| 5,907,327 A | 5/1999 | Ogura et al. .................. 345/339 |
| 6,151,208 A | 11/2000 | Bartlett ......................... 361/683 |
| 6,160,555 A | 12/2000 | Kang et al. .................. 345/358 |
| 6,192,478 B1 | 2/2001 | Elledge ........................ 713/202 |
| 6,249,606 B1 | 6/2001 | Kiraly et al. .................. 382/195 |

(Continued)

FOREIGN PATENT DOCUMENTS

EP          1 284 450  A2    2/2003

(Continued)

OTHER PUBLICATIONS

IBM, "Access/Control Icons (Icon Keys)," IBM Technical Disclosure Bulletin, Vo. 38, No. 4, Apr. 1995.

(Continued)

*Primary Examiner* — Boris Pesin
*Assistant Examiner* — Andres E Gutierrez
(74) *Attorney, Agent, or Firm* — Morgan, Lewis & Bockius LLP

(57)    **ABSTRACT**

A device with a touch-sensitive display may be unlocked via gestures performed on the touch-sensitive display. The device is unlocked if contact with the display corresponds to a predefined gesture for unlocking the device. The device displays one or more unlock images with respect to which the predefined gesture is to be performed in order to unlock the device. The performance of the predefined gesture with respect to the unlock image may include moving the unlock image to a predefined location and/or moving the unlock image along a predefined path. The device may also display visual cues of the predefined gesture on the touch screen to remind a user of the gesture.

**15 Claims, 15 Drawing Sheets**



Device 400

Touch Screen 408

404    402

502    Movement 504

Menu Button 410

JOINT TRIAL EXHIBIT NO. 10

United States District Court
Northern District of California
No. 12-CV-00630-LHK (PSG)

*Apple Inc. v. Samsung Elecs.*

Date Admitted:_____ By:_____

**A370**

US 8,046,721 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,323,846 B1 | 11/2001 | Westerman et al. | 345/173 |
| 6,347,290 B1 | 2/2002 | Bartlett | 702/150 |
| 6,421,453 B1 | 7/2002 | Kanevsky et al. | 382/115 |
| 6,570,557 B1 | 5/2003 | Westerman et al. | 345/173 |
| 6,573,883 B1 | 6/2003 | Bartlett | 345/156 |
| 6,633,310 B1 | 10/2003 | Andrew et al. | 345/728 |
| 6,677,932 B1 | 1/2004 | Westerman | 345/173 |
| 6,720,860 B1 | 4/2004 | Narayanaswami | 340/5.54 |
| 6,735,695 B1 | 5/2004 | Gopalakrishnan et al. | 713/186 |
| 7,124,433 B2 | 10/2006 | Little | 726/2 |
| 7,151,843 B2 | 12/2006 | Rui et al. | 382/103 |
| 7,174,462 B2 | 2/2007 | Pering et al. | 713/182 |
| 7,263,670 B2 | 8/2007 | Rekimoto | 715/837 |
| 7,286,063 B2 * | 10/2007 | Gauthey et al. | 341/34 |
| 7,395,506 B2 * | 7/2008 | Tan et al. | 715/741 |
| 7,627,904 B2 * | 12/2009 | Tokkonen | 726/27 |
| 2001/0012022 A1 | 8/2001 | Smith | 345/768 |
| 2002/0015024 A1 | 2/2002 | Westerman et al. | 345/173 |
| 2002/0191029 A1 | 12/2002 | Gillespie et al. | 345/810 |
| 2002/0196274 A1 | 12/2002 | Comfort et al. | 345/741 |
| 2003/0142138 A1 | 7/2003 | Brown et al. | 345/797 |
| 2004/0030934 A1 | 2/2004 | Mizoguchi et al. | 713/202 |
| 2004/0034801 A1 | 2/2004 | Jaeger | 713/202 |
| 2004/0085351 A1 | 5/2004 | Tokkonen | 345/741 |
| 2004/0088568 A1 | 5/2004 | Tokkonen | 713/200 |
| 2004/0230843 A1 | 11/2004 | Jansen | 713/202 |
| 2004/0250138 A1 | 12/2004 | Schneider | 713/202 |
| 2004/0260955 A1 | 12/2004 | Mantyla | 713/202 |
| 2004/0268267 A1 | 12/2004 | Moravcsik | 715/821 |
| 2005/0050477 A1 | 3/2005 | Robertson et al. | 715/853 |
| 2005/0060554 A1 | 3/2005 | O'Donoghue | 713/183 |
| 2005/0079896 A1 | 4/2005 | Kokko et al. | 455/566 |
| 2005/0212760 A1 | 9/2005 | Marvit et al. | 345/156 |
| 2005/0216862 A1 | 9/2005 | Shinohara et al. | 715/825 |
| 2005/0248542 A1 | 11/2005 | Sawanobori | 345/173 |
| 2005/0253817 A1 * | 11/2005 | Rytivaara et al. | 345/173 |
| 2005/0264833 A1 | 12/2005 | Hiraoka et al. | 358/1.9 |
| 2006/0031776 A1 | 2/2006 | Glein et al. | 715/779 |
| 2006/0161870 A1 | 7/2006 | Hotelling et al. | 715/863 |
| 2006/0174339 A1 | 8/2006 | Tao | 726/18 |
| 2006/0267955 A1 | 11/2006 | Hino | 345/173 |
| 2008/0034292 A1 | 2/2008 | Brunner et al. | 715/700 |
| 2008/0034307 A1 | 2/2008 | Cisler et al. | 715/764 |
| 2008/0055263 A1 | 3/2008 | Lemay et al. | 345/173 |
| 2008/0055269 A1 | 3/2008 | Lemay et al. | 345/173 |
| 2008/0072172 A1 | 3/2008 | Shinohara et al. | 715/772 |
| 2008/0082934 A1 | 4/2008 | Kocienda et al. | 715/773 |
| 2008/0094371 A1 | 4/2008 | Forstall et al. | 345/173 |
| 2008/0122796 A1 | 5/2008 | Jobs et al. | 345/173 |
| 2008/0134170 A1 * | 6/2008 | Astheimer | 717/175 |
| 2009/0128581 A1 | 5/2009 | Brid et al. | 345/646 |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2 313 460 A | 11/1997 |
| JP | 60 171560 | 9/1985 |
| JP | 2 249062 | 10/1990 |
| JP | 05 127819 | 5/1993 |
| JP | 6 214954 | 8/1994 |
| JP | 11 203045 | 7/1999 |
| JP | 2004 252720 | 9/2004 |
| JP | 2005 167455 A | 6/2005 |
| WO | WO 01/77792 A2 | 10/2001 |
| WO | WO 02/33882 A1 | 4/2002 |
| WO | WO 2004/001560 A1 | 12/2003 |
| WO | WO 2004/021108 A2 | 3/2004 |

## OTHER PUBLICATIONS

Neonode, Inc., "Welcome to the N1 Guide," neonode.com, Jul. 2004, 42 pages, http://www.ebookspdf.com/gadget/2818/neonode-n_1_m-manual/.

European Search Report dated Oct. 13, 2009, received in European Patent Application No. 09170574.9.

Office Action dated Jul. 24, 2009, received in U.S. Appl. No. 12/345,584.

Office Action dated Nov. 16, 2009, received in U.S. Appl. No. 12/345,584.

Bardram, J., "The trouble with login: on usability and computer security in ubiquitous computing," Centre for Pervasive Healthcare, Department of Computer Science, University of Aarhus, Denmark, Published online: Jul. 23, 2005, 11 pages.

Fitzpatrick et al., "Method for Access Control via Gestural Verification," IBM Technical Disclosure Bulletin, vol. 36, No. 09B, Sep. 1993, 2 pages.

GridLock (Palm OS), "Graphical Security System for Your Palm," Softonic, Oct. 8, 2003, 2 pages, http://gridlock.en.softonic.com/palm.

Horry et al., "A Passive-Style Buttonless Mobile Terminal," IEEE Transactions on Consumer Electronics, vol. 49, No. 3, Aug. 2003, 6 pages.

IBM, "Touch Pad Authentication," Sep. 21, 2004, 2 pages.

Jansen, W., "Authenticating Users on Handheld Devices," The National Institute of Standards and Technology, Gaithersburg, Maryland, USA, 2003, 13 pages.

Jermyn et al., "The Design and Analysis of Graphical Passwords," © 1999 by the USENIX Association, 15 pages.

JGUI Professional, "Touch Password Protection," printed Dec. 30, 2005, 4 pages, http://www.jgui.net/touch/index.html.

McLean et al., "Access/Control Icons (Icon Keys)," IBM Technical Disclosure Bulletin, vol. 38, No. 04, Apr. 1995, 3 pages.

Monrose, N., "Towards Stronger User Authentication," Ph.d dissertation, 1999, New York University, vol. 60/05-B of Dissertation Abstract International, Order No. AAD99-30229, 128 pages.

Najjar, L., "Graphical Passwords," International Technology Disclosures vol. 10, No. 1, Jan. 25, 1992, 1 page.

Renaud et al., "My password is here! An investigation into visuo-spatial authentication mechanisms," Interacting with Computers, vol. 16, © 2004 Elsevier B.V., 25 pages, www.sciencedirect.com.

Wiedenbeck et al. "PassPoints: Design and longitudinal evaluation of a graphical password system," International Journal of Human-Computer Studies, vol. 63, © 2005 Elsevier Ltd., 26 pages, www.sciencedirect.com.

International Search Report for International Application No. PCT/US2006/061370, mailed May 25, 2007.

International Search Report for International Application No. PCT/US2006/061380, mailed Apr. 23, 2007.

Office Action dated Feb. 7, 2008 for related U.S. Appl. No. 11/322,549.

Office Action dated Sep. 26, 2008, for related U.S. Appl. No. 11/322,549.

Office Action dated Feb. 4, 2009, received in the German patent application which corresponds to U.S. Appl. No. 11/322,549.

Final Office Action dated Mar. 23, 2009, for related U.S. Appl. No. 11/322,549.

Office Action dated Mar. 25, 2009, received in the European patent application which corresponds to U.S. Appl. No. 11/322,549.

Office Action dated Oct. 31, 2007 for related U.S. Appl. No. 11/322,550.

Office Action dated Apr. 21, 2008 for related U.S. Appl. No. 11/322,550.

Notice of Allowance dated Sep. 19, 2008, for related U.S. Appl. No. 11/322,550.

Office Action dated Feb. 5, 2010, received in Chinese Application for Invention No. 200680052770.4, which corresponds to U.S. Appl. No. 11/322,549.

Office Action dated Feb. 9, 2010, received in German Patent Application No. 11 2006 003 515.0-53, which corresponds to U.S. Appl. No. 11/322,549.

Office Action dated Mar. 5, 2010, received in Korean Patent Application No. 10-2008-7018109, which corresponds to U.S. Appl. No. 11/322,549.

Extended European Search Report dated Feb. 7, 2011, received in European Patent Application No. 10 194 359.5, which corresponds to U.S. Appl. No. 11/322,549.

Plaisant et al., "Touchscreen Toggle Design," Proceedings of the Conference on Human Factors in Computing Systems, Addison Wesley, US, May 3, 1992, 2 pages.

Notice of Allowance dated Aug. 10, 2009, received in U.S. Appl. No. 11/322,549.

**US 8,046,721 B2**

Page 3

Office Action dated Apr. 22, 2011, received in Japanese Patent Application No. 2008-547675, which corresponds to U.S. Appl. No. 11/322,549.

Baudisch, P., "Phosphor: Explaining Transitions in the User Interface Using Afterglow Effects," 2006, 10 pages.

Notice of Allowance dated Jun. 3, 2010, received in U.S. Appl. No. 12/345,584.

Translation of German Nullity Action Complaint against EP Patent 1 964 022 (DE No. 60 2006 012 876.2), filed Dec. 15, 2010, 37 pages.

* cited by examiner



**Figure 1**

Memory 102

Device 100

Operating System — 132
Communication Module — 134
Contact/Motion Module — 138
Graphics Module — 140
  Optical Intensity Module — 142
User Interface State Module — 144
  Lock Module — 150
  Unlock Module — 152
Application(s) — 146

Power System — 130

110
108
110    RF Circuitry 112
104
Memory Controller
111
110
106    CPU
Peripherals Interface
110    External Port 148
Speaker 116
110    Audio Circuitry 114
Microphone 118

110

I/O Subsystem 120
Touch-Screen Controller 122    Other Input Controller(s) 124

110    110

Touch Screen 126    Other Input / Control Devices 128

**JOINT TRIAL EXHIBIT NO. 10, Page 4 of 28**



Figure 2



User
300
Device
302
Device set to user interface lock state by any predefined manner, prevent device from performing predefined set of actions
304
Display unlock image and visual cue(s) of unlock action using the image (e.g., gesture, moving image to location, moving image along path)
306
Contact the touch sensitive display
308
Detect contact with touch sensitive display
310
Does contact correspond to unlock gesture using the image?
Yes
No
312
Maintain device in user interface lock state
314
Transition device to user interface unlock state

Figure 3



**Figure 4A**



**Figure 4B**



Device
400

**Figure 5A**



Device
400

**Figure 5B**

**A377**

**JOINT TRIAL EXHIBIT NO. 10, Page 8 of 28**



**Figure 5C**



**Figure 5D**



600

602 — While an electronic device is in a first user-interface state, detect progress towards satisfaction of a user input condition needed to transition to a second user-interface state

604 — While the device is in the first user-interface state, indicate progress towards satisfaction of the condition by transitioning an optical intensity of one or more user interface objects associated with the second user-interface state

606 — Transition the device to the second user-interface state if the condition is satisfied

**Figure 6**

**A379**
**JOINT TRIAL EXHIBIT NO. 10, Page 10 of 28**



**Figure 7A**



**Figure 7B**



**Figure 7C**



**Figure 7D**

**Figure 8A**



**Figure 8B**



**Figure 8C**



**JOINT TRIAL EXHIBIT NO. 10, Page 13 of 28**



User
900
Device
902
Device set to user interface lock state by any predefined manner, prevent device from performing predefined set of actions
904
Display 2 (or more) unlock images and visual cue(s) of manner of transitioning to active state using the images
906
Contact the touch sensitive display
908
Detect contact with touch sensitive display
910
Does contact correspond to unlock gesture using an image?
Yes
No
912
Maintain device in user interface lock state
914
Transition device to active state corresponding to the image used (e.g., first image -> first active state, second image -> second active state, ...)

Figure 9



**Figure 10**



**Figure 11A**



**Figure 11B**



**Figure 11C**



**Figure 11D**



Device
1000

**Figure 11E**



Device
1000

**Figure 11F**

**A387**
**JOINT TRIAL EXHIBIT NO. 10, Page 18 of 28**

US 8,046,721 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# UNLOCKING A DEVICE BY PERFORMING GESTURES ON AN UNLOCK IMAGE

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 11/322,549, filed Dec. 23, 2005, now U.S. Pat. No. 7,657,849 which application is incorporated by reference herein in its entirety.

This application is related to U.S. patent application Ser. No. 11/322,550, titled "Indication of Progress Towards Satisfaction of a User Input Condition," filed Dec. 23, 2005, which application is incorporated by reference herein in its entirety.

## TECHNICAL FIELD

The disclosed embodiments relate generally to user interfaces that employ touch-sensitive displays, and more particularly, to the unlocking of user interfaces on portable electronic devices.

## BACKGROUND

Touch-sensitive displays (also known as "touch screens" or "touchscreens") are well known in the art. Touch screens are used in many electronic devices to display graphics and text, and to provide a user interface through which a user may interact with the devices. A touch screen detects and responds to contact on the touch screen. A device may display one or more soft keys, menus, and other user-interface objects on the touch screen. A user may interact with the device by contacting the touch screen at locations corresponding to the user-interface objects with which she wishes to interact.

Touch screens are becoming more popular for use as displays and as user input devices on portable devices, such as mobile telephones and personal digital assistants (PDAs). One problem associated with using touch screens on portable devices is the unintentional activation or deactivation of functions due to unintentional contact with the touch screen. Thus, portable devices, touch screens on such devices, and/or applications running on such devices may be locked upon satisfaction of predefined lock conditions, such as upon entering an active call, after a predetermined time of idleness has elapsed, or upon manual locking by a user.

Devices with touch screens and/or applications running on such devices may be unlocked by any of several well-known unlocking procedures, such as pressing a predefined set of buttons (simultaneously or sequentially) or entering a code or password. These unlock procedures, however, have drawbacks. The button combinations may be hard to perform. Creating, memorizing, and recalling passwords, codes, and the like can be quite burdensome. These drawbacks may reduce the ease of use of the unlocking process and, as a consequence, the ease of use of the device in general.

Accordingly, there is a need for more efficient, user-friendly procedures for unlocking such devices, touch screens, and/or applications. More generally, there is a need for more efficient, user-friendly procedures for transitioning such devices, touch screens, and/or applications between user interface states (e.g., from a user interface state for a first application to a user interface state for a second application, between user interface states in the same application, or between locked and unlocked states). In addition, there is a need for sensory feedback to the user regarding progress towards satisfaction of a user input condition that is required for the transition to occur.

## SUMMARY

In some embodiments, a method of controlling an electronic device with a touch-sensitive display includes: detecting contact with the touch-sensitive display while the device is in a user-interface lock state; moving an image corresponding to a user-interface unlock state of the device in accordance with the contact; transitioning the device to the user-interface unlock state if the detected contact corresponds to a predefined gesture; and maintaining the device in the user-interface lock state if the detected contact does not correspond to the predefined gesture.

In some embodiments, a method of controlling a device with a touch-sensitive display includes: displaying an image on the touch-sensitive display while the device is in a user-interface lock state; detecting contact with the touch-sensitive display; transitioning the device to a user-interface unlock state if the detected contact corresponds to moving the image to a predefined location on the touch-sensitive display; and maintaining the device in the user-interface lock state if the detected contact does not correspond to moving the image to the predefined location.

In some embodiments, a method of controlling a device with a touch-sensitive display includes: displaying an image on the touch-sensitive display while the device is in a user-interface lock state; detecting contact with the touch-sensitive display; and transitioning the device to a user-interface unlock state if the detected contact corresponds to moving the image on the touch-sensitive display according to a predefined path on the touch-sensitive display; and maintaining the device in the user-interface lock state if the detected contact does not correspond to moving the image according to the predefined path.

In some embodiments, a method of controlling a device with a touch-sensitive display includes: displaying first and second images on the touch-sensitive display while the device is in a user-interface lock state; detecting contact with the touch-sensitive display; transitioning the device to a first active state corresponding to the first image if the detected contact corresponds to a predefined gesture with respect to the first image; and transitioning the device to a second active state distinct from the first active state if the detected contact corresponds to a predefined gesture with respect to the second image.

The aforementioned methods may be performed by a portable electronic device having a touch-sensitive display with a graphical user interface (GUI), one or more processors, memory and one or more modules, programs or sets of instructions stored in the memory for performing these methods. In some embodiments, the portable electronic device provides a plurality of functions, including wireless communication.

Instructions for performing the aforementioned methods may be included in a computer program product configured for execution by one or more processors. In some embodiments, the executable computer program product includes a computer readable storage medium (e.g., one or more magnetic disk storage devices, flash memory devices, or other non-volatile solid state memory devices) and an executable computer program mechanism embedded therein.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a better understanding of the aforementioned embodiments of the invention as well as additional embodiments thereof, reference should be made to the Description of

3

Embodiments below, in conjunction with the following drawings in which like reference numerals refer to corresponding parts throughout the figures.

FIG. **1** is a block diagram illustrating a portable electronic device, according to some embodiments of the invention.

FIG. **2** is a flow diagram illustrating a process for transitioning a device to a user-interface unlock state, according to some embodiments of the invention.

FIG. **3** is a flow diagram illustrating a process for transitioning a device to a user-interface unlock state, according to some embodiments of the invention.

FIGS. **4A-4B** illustrate the GUI display of a device in a user-interface lock state, according to some embodiments of the invention.

FIGS. **5A-5D** illustrate the GUI display of a device at various points of the performance of an unlock action gesture, according to some embodiments of the invention.

FIG. **6** is a flow diagram illustrating a process for indicating progress towards satisfaction of a user input condition according to some embodiments of the invention.

FIGS. **7A-7D** illustrate the GUI display of a device that is transitioning the optical intensity of user-interface objects, according to some embodiments of the invention.

FIGS. **8A-8C** are graphs illustrating optical intensity as a function of the completion of the user input condition, according to some embodiments of the invention.

FIG. **9** is a flow diagram illustrating a process for transitioning a device to a user interface active state, according to some embodiments of the invention.

FIG. **10** illustrates the GUI of a device in a user-interface lock state that displays a plurality of unlock images, according to some embodiments of the invention.

FIGS. **11A-11F** illustrate the GUI display of a device at various points in the performance of an unlock action gesture, according to some embodiments of the invention.

DESCRIPTION OF EMBODIMENTS

Reference will now be made in detail to embodiments, examples of which are illustrated in the accompanying drawings. In the following detailed description, numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will be apparent to one of ordinary skill in the art that the present invention may be practiced without these specific details. In other instances, well-known methods, procedures, components, and circuits have not been described in detail so as not to unnecessarily obscure aspects of the embodiments.

FIG. **1** illustrates a portable electronic device, according to some embodiments of the invention. The device **100** includes a memory **102**, a memory controller **104**, one or more processing units (CPU's) **106**, a peripherals interface **108**, RF circuitry **112**, audio circuitry **114**, a speaker **116**, a microphone **118**, an input/output (I/O) subsystem **120**, a touch screen **126**, other input or control devices **128**, and an external port **148**. These components communicate over the one or more communication buses or signal lines **110**. The device **100** can be any portable electronic device, including but not limited to a handheld computer, a tablet computer, a mobile phone, a media player, a personal digital assistant (PDA), or the like, including a combination of two or more of these items. It should be appreciated that the device **100** is only one example of a portable electronic device **100**, and that the device **100** may have more or fewer components than shown, or a different configuration of components. The various components shown in FIG. **1** may be implemented in hardware,

4

software or a combination of both hardware and software, including one or more signal processing and/or application specific integrated circuits.

The memory **102** may include high speed random access memory and may also include non-volatile memory, such as one or more magnetic disk storage devices, flash memory devices, or other non-volatile solid state memory devices. In some embodiments, the memory **102** may further include storage remotely located from the one or more processors **106**, for instance network attached storage accessed via the RF circuitry **112** or external port **148** and a communications network (not shown) such as the Internet, intranet(s), Local Area Networks (LANs), Wide Local Area Networks (WLANs), Storage Area Networks (SANs) and the like, or any suitable combination thereof. Access to the memory **102** by other components of the device **100**, such as the CPU **106** and the peripherals interface **108**, may be controlled by the memory controller **104**.

The peripherals interface **108** couples the input and output peripherals of the device to the CPU **106** and the memory **102**. The one or more processors **106** run various software programs and/or sets of instructions stored in the memory **102** to perform various functions for the device **100** and to process data.

In some embodiments, the peripherals interface **108**, the CPU **106**, and the memory controller **104** may be implemented on a single chip, such as a chip **111**. In some other embodiments, they may be implemented on separate chips.

The RF (radio frequency) circuitry **112** receives and sends electromagnetic waves. The RF circuitry **112** converts electrical signals to/from electromagnetic waves and communicates with communications networks and other communications devices via the electromagnetic waves. The RF circuitry **112** may include well-known circuitry for performing these functions, including but not limited to an antenna system, an RF transceiver, one or more amplifiers, a tuner, one or more oscillators, a digital signal processor, a CODEC chipset, a subscriber identity module (SIM) card, memory, and so forth. The RF circuitry **112** may communicate with the networks, such as the Internet, also referred to as the World Wide Web (WWW), an Intranet and/or a wireless network, such as a cellular telephone network, a wireless local area network (LAN) and/or a metropolitan area network (MAN), and other devices by wireless communication. The wireless communication may use any of a plurality of communications standards, protocols and technologies, including but not limited to Global System for Mobile Communications (GSM), Enhanced Data GSM Environment (EDGE), wideband code division multiple access (W-CDMA), code division multiple access (CDMA), time division multiple access (TDMA), Bluetooth, Wireless Fidelity (Wi-Fi) (e.g., IEEE 802.11a, IEEE 802.11b, IEEE 802.11g and/or IEEE 802.11n), voice over Internet Protocol (VoIP), Wi-MAX, a protocol for email, instant messaging, and/or Short Message Service (SMS)), or any other suitable communication protocol, including communication protocols not yet developed as of the filing date of this document.

The audio circuitry **114**, the speaker **116**, and the microphone **118** provide an audio interface between a user and the device **100**. The audio circuitry **114** receives audio data from the peripherals interface **108**, converts the audio data to an electrical signal, and transmits the electrical signal to the speaker **116**. The speaker converts the electrical signal to human-audible sound waves. The audio circuitry **114** also receives electrical signals converted by the microphone **116** from sound waves. The audio circuitry **114** converts the electrical signal to audio data and transmits the audio data to the

US 8,046,721 B2

5

peripherals interface **108** for processing. Audio data may be may be retrieved from and/or transmitted to the memory **102** and/or the RF circuitry **112** by the peripherals interface **108**. In some embodiments, the audio circuitry **114** also includes a headset jack (not shown). The headset jack provides an interface between the audio circuitry **114** and removable audio input/output peripherals, such as output-only headphones or a headset with both output (headphone for one or both ears) and input (microphone).

The I/O subsystem **120** provides the interface between input/output peripherals on the device **100**, such as the touch screen **126** and other input/control devices **128**, and the peripherals interface **108**. The I/O subsystem **120** includes a touch-screen controller **122** and one or more input controllers **124** for other input or control devices. The one or more input controllers **124** receive/send electrical signals from/to other input or control devices **128**. The other input/control devices **128** may include physical buttons (e.g., push buttons, rocker buttons, etc.), dials, slider switches, sticks, and so forth.

The touch screen **126** provides both an output interface and an input interface between the device and a user. The touch-screen controller **122** receives/sends electrical signals from/ to the touch screen **126**. The touch screen **126** displays visual output to the user. The visual output may include text, graphics, video, and any combination thereof. Some or all of the visual output may correspond to user-interface objects, further details of which are described below.

The touch screen **126** also accepts input from the user based on haptic and/or tactile contact. The touch screen **126** forms a touch-sensitive surface that accepts user input. The touch screen **126** and the touch screen controller **122** (along with any associated modules and/or sets of instructions in the memory **102**) detects contact (and any movement or break of the contact) on the touch screen **126** and converts the detected contact into interaction with user-interface objects, such as one or more soft keys, that are displayed on the touch screen. In an exemplary embodiment, a point of contact between the touch screen **126** and the user corresponds to one or more digits of the user. The touch screen **126** may use LCD (liquid crystal display) technology, or LPD (light emitting polymer display) technology, although other display technologies may be used in other embodiments. The touch screen **126** and touch screen controller **122** may detect contact and any movement or break thereof using any of a plurality of touch sensitivity technologies, including but not limited to capacitive, resistive, infrared, and surface acoustic wave technologies, as well as other proximity sensor arrays or other elements for determining one or more points of contact with the touch screen **126**. The touch-sensitive display may be analogous to the multi-touch sensitive tablets described in the following U.S. Pat. No. 6,323,846 (Westerman et al.), U.S. Pat. No. 6,570,557 (Westerman et al.), and/or U.S. Pat. No. 6,677,932 (Westerman), and/or U.S. Patent Publication 2002/ 0015024A1, each of which is hereby incorporated by reference. However, the touch screen **126** displays visual output from the portable device, whereas touch sensitive tablets do not provide visual output. The touch screen **126** may have a resolution in excess of 100 dpi. In an exemplary embodiment, the touch screen **126** may have a resolution of approximately 168 dpi. The user may make contact with the touch screen **126** using any suitable object or appendage, such as a stylus, finger, and so forth.

In some embodiments, in addition to the touch screen, the device **100** may include a touchpad (not shown) for activating or deactivating particular functions. In some embodiments, the touchpad is a touch-sensitive area of the device that, unlike the touch screen, does not display visual output. The

6

touchpad may be a touch-sensitive surface that is separate from the touch screen **126** or an extension of the touch-sensitive surface formed by the touch screen **126**.

The device **100** also includes a power system **130** for powering the various components. The power system **130** may include a power management system, one or more power sources (e.g., battery, alternating current (AC)), a recharging system, a power failure detection circuit, a power converter or inverter, a power status indicator (e.g., a light-emitting diode (LED)) and any other components associated with the generation, management and distribution of power in portable devices.

In some embodiments, the software components include an operating system **132**, a communication module (or set of instructions) **134**, a contact/motion module (or set of instructions) **138**, a graphics module (or set of instructions) **140**, a user interface state module (or set of instructions) **144**, and one or more applications (or set of instructions) **146**.

The operating system **132** (e.g., Darwin, RTXC, LINUX, UNIX, OS X, WINDOWS, or an embedded operating system such as VxWorks) includes various software components and/or drivers for controlling and managing general system tasks (e.g., memory management, storage device control, power management, etc.) and facilitates communication between various hardware and software components.

The communication module **134** facilitates communication with other devices over one or more external ports **148** and also includes various software components for handling data received by the RF circuitry **112** and/or the external port **148**. The external port **148** (e.g., Universal Serial Bus (USB), FIREWIRE, etc.) is adapted for coupling directly to other devices or indirectly over a network (e.g., the Internet, wireless LAN, etc.).

The contact/motion module **138** detects contact with the touch screen **126**, in conjunction with the touch-screen controller **122**. The contact/motion module **138** includes various software components for performing various operations related to detection of contact with the touch screen **122**, such as determining if contact has occurred, determining if there is movement of the contact and tracking the movement across the touch screen, and determining if the contact has been broken (i.e., if the contact has ceased). Determining movement of the point of contact may include determining speed (magnitude), velocity (magnitude and direction), and/or an acceleration (including magnitude and/or direction) of the point of contact. In some embodiments, the contact/motion module **126** and the touch screen controller **122** also detects contact on the touchpad.

The graphics module **140** includes various known software components for rendering and displaying graphics on the touch screen **126**. Note that the term "graphics" includes any object that can be displayed to a user, including without limitation text, web pages, icons (such as user-interface objects including soft keys), digital images, videos, animations and the like.

In some embodiments, the graphics module **140** includes an optical intensity module **142**. The optical intensity module **142** controls the optical intensity of graphical objects, such as user-interface objects, displayed on the touch screen **126**. Controlling the optical intensity may include increasing or decreasing the optical intensity of a graphical object. In some embodiments, the increase or decrease may follow predefined functions.

The user interface state module **144** controls the user interface state of the device **100**. The user interface state module **144** may include a lock module **150** and an unlock module **152**. The lock module detects satisfaction of any of one or

US 8,046,721 B2

7                                                                8

more conditions to transition the device **100** to a user-interface lock state and to transition the device **100** to the lock state. The unlock module detects satisfaction of any of one or more conditions to transition the device to a user-interface unlock state and to transition the device **100** to the unlock state. Further details regarding the user interface states are described below.

The one or more applications **130** can include any applications installed on the device **100**, including without limitation, a browser, address book, contact list, email, instant messaging, word processing, keyboard emulation, widgets, JAVA-enabled applications, encryption, digital rights management, voice recognition, voice replication, location determination capability (such as that provided by the global positioning system (GPS)), a music player (which plays back recorded music stored in one or more files, such as MP3 or AAC files), etc.

In some embodiments, the device **100** may include the functionality of an MP3 player, such as an iPod (trademark of Apple Computer, Inc.). The device **100** may, therefore, include a 36-pin connector that is compatible with the iPod. In some embodiments, the device **100** may include one or more optional optical sensors (not shown), such as CMOS or CCD image sensors, for use in imaging applications.

In some embodiments, the device **100** is a device where operation of a predefined set of functions on the device is performed exclusively through the touch screen **126** and, if included on the device **100**, the touchpad. By using the touch screen and touchpad as the primary input/control device for operation of the device **100**, the number of physical input/control devices (such as push buttons, dials, and the like) on the device **100** may be reduced. In one embodiment, the device **100** includes the touch screen **126**, the touchpad, a push button for powering the device on/off and locking the device, a volume adjustment rocker button and a slider switch for toggling ringer profiles. The push button may be used to turn the power on/off on the device by depressing the button and holding the button in the depressed state for a predefined time interval, or may be used to lock the device by depressing the button and releasing the button before the predefined time interval has elapsed. In an alternative embodiment, the device **100** also may accept verbal input for activation or deactivation of some functions through the microphone **118**.

The predefined set of functions that are performed exclusively through the touch screen and the touchpad include navigation between user interfaces. In some embodiments, the touchpad, when touched by the user, navigates the device **100** to a main, home, or root menu from any user interface that may be displayed on the device **100**. In such embodiments, the touchpad may be referred to as a "menu button." In some other embodiments, the menu button may be a physical push button or other physical input/control device instead of a touchpad.

### User Interface States

The device **100** may have a plurality of user interface states. A user interface state is a state in which the device **100** responds in a predefined manner to user input. In some embodiments, the plurality of user interface states includes a user-interface lock state and a user-interface unlock state. In some embodiments, the plurality of user interface states includes states for a plurality of applications.

In the user-interface lock state (hereinafter the "lock state"), the device **100** is powered on and operational but ignores most, if not all, user input. That is, the device **100** takes no action in response to user input and/or the device **100** is prevented from performing a predefined set of operations in response to the user input. The predefined set of operations may include navigation between user interfaces and activation or deactivation of a predefined set of functions. The lock state may be used to prevent unintentional or unauthorized use of the device **100** or activation or deactivation of functions on the device **100**. When the device **100** is in the lock state, the device **100** may be said to be locked. In some embodiments, the device **100** in the lock state may respond to a limited set of user inputs, including input that corresponds to an attempt to transition the device **100** to the user-interface unlock state or input that corresponds to powering the device **100** off. In other words, the locked device **100** responds to user input corresponding to attempts to transition the device **100** to the user-interface unlock state or powering the device **100** off, but does not respond to user input corresponding to attempts to navigate between user interfaces. It should be appreciated that even if the device **100** ignores a user input, the device **100** may still provide sensory feedback (such as visual, audio, or vibration feedback) to the user upon detection of the input to indicate that the input will be ignored.

In embodiments where the device **100** includes the touch screen **126**, while the device **100** is locked, a predefined set of operations, such as navigation between user interfaces, is prevented from being performed in response to contact on the touch screen **126** when the device **100** is locked. In other words, when the contact is being ignored by the locked device **100**, the touch screen may be said to be locked. A locked device **100**, however, may still respond to a limited class of contact on the touch screen **126**. The limited class includes contact that is determined by the device **100** to correspond to an attempt to transition the device **100** to the user-interface unlock state.

In the user-interface unlock state (hereinafter the "unlock state"), the device **100** is in its normal operating state, detecting and responding to user input corresponding to interaction with the user interface. A device **100** that is in the unlock state may be described as an unlocked device **100**. An unlocked device **100** detects and responds to user input for navigating between user interfaces, entry of data and activation or deactivation of functions. In embodiments where the device **100** includes the touch screen **126**, the unlocked device **100** detects and responds to contact corresponding to navigation between user interfaces, entry of data and activation or deactivation of functions through the touch screen **126**.

### Unlocking a Device via Gestures

FIG. **2** is a flow diagram illustrating a process **200** for transitioning a device to a user-interface unlock state, according to some embodiments of the invention. As used herein, transitioning from one state to another refers to the process of going from one state to another. The process may be, as perceived by the user, instantaneous, near-instantaneous, gradual or at any suitable rate. The progression of the process may be controlled automatically by the device, such as the device **100** (FIG. **1**), independent of the user, once the process is activated; or it may be controlled by the user. While the process flow **200** described below includes a number of operations that appear to occur in a specific order, it should be apparent that these processes may include more or fewer operations, which may be executed serially or in parallel (e.g., using parallel processors or a multi-threading environment).

A device is set to the lock state (**202**). The device may be set (that is, transition completely to the lock state from any other state) to the locked state upon satisfaction of any of one or more lock conditions. The lock conditions may include events

9

10

such as the elapsing of a predefined time of inactivity, entry into an active call, or powering on the device. The lock conditions may also include user intervention, namely the user locking the device by a predefined user input. In some embodiments, the user may be allowed to specify the events that serve as lock conditions. For example, the user may configure the device to transition to the lock state upon the elapsing of a predefined time of inactivity but not upon powering on the device.

In some embodiments, the locked device displays on the touch screen one or more visual cues of an unlock action that the user may perform to unlock the device (204). The visual cue(s) provide hints or reminders of the unlock action to the user. The visual cues may be textual, graphical or any combination thereof. In some embodiments, the visual cues are displayed upon particular events occurring while the device is locked. The particular events that trigger display of the visual cues may include an incoming call, incoming message, or some other event that may require the user's attention. In some embodiments, the visual cues may also be displayed upon particular user inputs, such as the user interacting with the menu button, the user making contact with the locked touch screen and/or the user interacting with any other input/control device. The locked device, when not displaying the visual cues, may power down the touch screen (which helps to conserve power) or display other objects on the touch screen, such as a screen saver or information that may be of interest to the user (e.g., battery charge remaining, date and time, network strength, etc.).

The unlock action includes contact with the touch screen. In some embodiments, the unlock action is a predefined gesture performed on the touch screen. As used herein, a gesture is a motion of the object/appendage making contact with the touch screen. For example, the predefined gesture may include a contact of the touch screen on the left edge (to initialize the gesture), a horizontal movement of the point of contact to the opposite edge while maintaining continuous contact with the touch screen, and a breaking of the contact at the opposite edge (to complete the gesture).

While the touch screen is locked, the user may initiate contact with the touch screen, i.e., touch the touch screen (206). For convenience of explanation, contact on the touch screen in the process 200 and in other embodiments described below will be described as performed by the user using at least one hand using one or more fingers. However, it should be appreciated that the contact may be made using any suitable object or appendage, such as a stylus, finger, etc. The contact may include one or more taps on the touch screen, maintaining continuous contact with the touch screen, movement of the point of contact while maintaining continuous contact, a breaking of the contact, or any combination thereof.

The device detects the contact on the touch screen (208). If the contact does not correspond to an attempt to perform the unlock action, or if the contact corresponds to a failed or aborted attempt by the user to perform the unlock action (210—no), then the device remains locked (212). For example, if the unlock action is a horizontal movement of the point of contact across the touch screen while maintaining continuous contact with the touch screen, and the detected contact is a series of random taps on the touch screen, then the device will remain locked because the contact does not correspond to the unlock action.

If the contact corresponds to a successful performance of the unlock action, i.e., the user performed the unlock action successfully (210—yes), the device transitions to the unlock state (214). For example, if the unlock action is a horizontal movement of the point of contact across the touch screen while maintaining continuous contact with the touch screen, and the detected contact is the horizontal movement with the continuous contact, then the device transitions to the unlock state.

In some embodiments, the device begins the process of transitioning to the unlock state upon detection of any contact on the touch screen and aborts the transition as soon as the device determines that the contact does not correspond to an unlock action or is a failed/aborted unlock action. For example, if the unlock action is a predefined gesture, the device may begin the process of transitioning to the unlock state as soon as it detects the initial contact of the gesture and continues the progression of the transition as the gesture is performed. If the user aborts the gesture before it is completed, the device aborts the transition and remains in the lock state. If the gesture is completed, the device completes the transition to the unlock state and becomes unlocked. As another example, if the unlock action is a horizontal movement of the point of contact across the touch screen while maintaining continuous contact with the touch screen, and the user taps the touch screen once, the device begins the process of the state transition as soon as it detects the tap but also aborts the process soon after because it realizes that the tap is just a tap and does not correspond to the unlock action.

While the device is unlocked, the device may display on the touch screen user-interface objects corresponding to one or more functions of the device and/or information that may be of interest to the user. The user-interface objects are objects that make up the user interface of the device and may include, without limitation, text, images, icons, soft keys (or "virtual buttons"), pull-down menus, radio buttons, check boxes, selectable lists, and so forth. The displayed user-interface objects may include non-interactive objects that convey information or contribute to the look and feel of the user interface, interactive objects with which the user may interact, or any combination thereof. The user may interact with the user-interface objects by making contact with the touch screen at one or more touch screen locations corresponding to the interactive objects with which he wishes to interact. The device detects the contact and responds to the detected contact by performing the operation(s) corresponding to the interaction with the interactive object(s).

While the device is locked, the user may still make contact on the touch screen. However, the locked device is prevented from performing a predefined set of actions in response to any detected contact until the device is unlocked. The prevented predefined set of action may include navigating between user interfaces and entry of data by the user.

While the device is locked, the device may display one or more visual cues of the unlock action, as described above. In some embodiments, the device may also display, along with the visual cues, an unlock image. The unlock image is a graphical, interactive user-interface object with which the user interacts in order to unlock the device. In other words, the unlock action is performed with respect to the unlock image. In some embodiments, performing the unlock action with respect to the image includes dragging the unlock image in a predefined manner, which moves the unlock image across the touch screen. In some embodiments, if the unlock action is not completed, the GUI display can show reverse progress towards the locked state by gradually returning the unlock image to its position in the locked state

In some embodiments, in addition to visual feedback, the electronic device supplies non-visual feedback to indicate progress towards completion of the unlock action. In some embodiments, in addition to visual feedback, the electronic device supplies non-visual feedback to indicate completion

US 8,046,721 B2

11
12

of the unlock action. The additional feedback may include audible feedback (e.g., sound(s)) or physical feedback (e.g., vibration(s)).

FIG. **3** is a flow diagram illustrating a process **300** for transitioning a device to a user-interface unlock state using an unlock image, according to some embodiments of the invention. The process **300** is similar to the process **200** (FIG. **2**) with the addition of an unlock image that is displayed with the visual cues. The unlock action in the process **300** is performed with respect to the unlock image, i.e., the unlock action includes interaction with the unlock image. While the process flow **300** described below includes a number of operations that appear to occur in a specific order, it should be apparent that these processes can include more or fewer operations, which can be executed serially or in parallel (e.g., using parallel processors or a multi-threading environment).

The device is locked upon satisfaction of a lock condition (**302**), similar to the operation **202** (FIG. **2**). An unlock image and visual cues of the unlock action using the unlock image are displayed (**304**). The operation **304** is the same as the operation **204** (FIG. **2**), except that in the operation **304** an unlock image is displayed in addition to the visual cues.

As described above, the unlock action includes interaction with the unlock image. In some embodiments, the unlock action includes the user performing a predefined gesture with respect to the unlock image. In some embodiments, the gesture includes dragging the unlock image to a location on the touch screen that meets one or more predefined unlock criteria. In other words, the user makes contact with the touch screen at a location corresponding to the unlock image and then performs the predefined gesture while maintaining continuous contact with the touch screen, dragging the image to the location that meets the predefined unlock criteria. In some embodiments, the unlock action is completed by breaking the contact with the touch screen (thus releasing the unlock image) upon completion of the predefined gesture.

A location meeting one or more predefined unlock criteria is simply a location on the touch screen that is predefined as a location to which the unlock image is to be dragged in order to unlock the device. The location(s) may be defined narrowly or broadly and may be one or more particular locations on the touch screen, one or more regions on the touch screen, or any combination thereof. For example, the location may be defined as a particular marked location, areas at each of the four corners of the touch screen, or a quadrant of the touch screen, etc.

In some embodiments, the interaction includes dragging the unlock image to a predefined location on the touch screen. For example, the unlock action may include dragging the unlock image from one corner of the touch screen to another corner of the touch screen. As another example, the unlock action may include dragging the unlock image from one edge of the touch screen to the opposite edge. The emphasis here is on the final destination of the unlock image (and of the finger). Thus, the user can drag the unlock image from its initial location along any desired path. As long as the unlock image reaches the predefined location and is released at that location, the device is unlocked. It should be appreciated that the predefined location may be, as described above, defined narrowly or broadly and may be one or more particular locations on the touch screen, one or more regions on the touch screen, or any combination thereof.

In some other embodiments, the unlock action includes dragging the unlock image along a predefined path. For example, the unlock action may include dragging the unlock image clockwise along the perimeter of the touch screen (the path being the perimeter of the touch screen), from one of the corners and back. As another example, the unlock action may include dragging the unlock image from one edge of the touch screen to the opposite edge in a linear path. The emphasis here is on the path along which the unlock image (and the finger) moves. Because of the emphasis on the path, the final location to which the unlock image is to be moved may be defined broadly. For example, the unlock action may be to drag the unlock image from its initial location, along the predefined path, to any spot within a predefined region on the touch screen. The predefined path may include one or more straight lines or lines with twists and turns.

The user makes contact with the touch screen (**306**), similar to the operation **206** (FIG. **2**). The device detects the contact with the touch screen (**308**), similar to the operation **208** (FIG. **2**). If the contact does not correspond to successful performance of the unlock action with respect to the image (**310**—no), the device remains locked. If the contact does correspond to successful performance of the unlock action with respect to the image (**310**—yes), the device is unlocked (**314**).

FIGS. **4A**-**4B** illustrate the GUI display of a device in a user-interface lock state, according to some embodiments of the invention. In FIG. **4A**, device **400** includes a touch screen **408** and a menu button **410**. The device **400** is locked and the touch screen **408** is displaying an unlock image **402** and visual cues. The visual cues shown include a channel **404** indicating the path of the gesture/movement along which the unlock image **402** is to be dragged, similar to a groove along which a slider switch moves; and one or more arrows **406** indicating the direction of the gesture/movement. The end of the channel **404** (in FIGS. **4A**-**4B** and **5A**-**5D**, the "end" of the channel is the right end) also serves as a predefined location to which the unlock image **402** is to be dragged. The unlock image **402** may also include an arrow to further remind the user the direction of the gesture/movement. As described above, the visual cues and the unlock image may be displayed by the device **400** upon an event that may require the user's attention (e.g., incoming call or message) or upon user intervention (e.g., the user pressing the menu button **410** while the device is locked).

In some embodiments, the arrows **406** and the arrow on the unlock image **402** may be animated. For example, the arrow on the unlock image **402** may appear and disappear in a pulse-like manner and the arrows **406** may emanate from one end of the channel **406** in sync with the pulsing of the arrow on the unlock image **402**. As shown in FIG. **4B**, the arrow **406** may move along the channel **404** and disappear when it moves to the end of the channel **404**.

The visual cues illustrated in FIGS. **4A** and **4B** remind the user that the unlock action is a predefined gesture that includes a horizontal movement of the finger (and thus moving the point of contact) along the channel **404**, from the beginning of the channel **404**, where the unlock image is initially located, to the end of the channel **404**. It should be appreciated, however, that the visual cues shown in FIGS. **4A**-**4B** are merely exemplary and that more or fewer visual cues, or alternative visual cues may be used. The content of the visual cues may be based on the particulars of the unlock action.

FIGS. **5A**-**5D** illustrate the GUI display of a device at various points of the performance of an unlock action gesture, according to some embodiments of the invention. In FIG. **5A**, the user, represented by the hand and finger **502** (not drawn to scale), begins the unlock action by touching the touch screen **408** of device **400** with her finger **502**. In some embodiments, the touch screen **408** is initially in sleep mode and/or dark, and the screen **408** displays the unlock image **402** when touched. The user touches the touch screen **408** at the location

US 8,046,721 B2

13

corresponding to the unlock image **402**, which is located initially at the left end of the channel **404**. The contact, either overlapping with the unlock image **402** or in proximity to the unlock image **402**, is detected by the device **400** and is determined to be an attempt to unlock the touch screen, based on the fact that the user **502** is interacting with the unlock image **402**.

In FIG. **5**B, the user is in the process of performing the gesture by moving her finger, which is in continuous contact with the touch screen **408**, in the direction of movement **504**. The unlock image **402** is dragged along the channel **404** as a result of the gesture. The channel **404** reminds the user that the unlock gesture is a horizontal motion. In some embodiments, the channel **404** indicates the predefined location (in FIGS. **5**A-**5**D, the right end of the channel) to which the user drags the unlock image **402** to complete the unlock action and/or the predefined path along which the user drags the unlock image **402** to complete the unlock action.

In FIG. **5**C, the user has dragged the unlock image **402** to the right end of the channel **404**. Once the user releases the unlock image **402** at the right end of the channel **404**, the unlock action is complete. Upon completion of the unlock gesture, the device unlocks and displays on the touch screen **408** user-interface objects associated with normal operation of the device **400**. FIG. **5**D illustrates an example of user-interface objects that may be displayed when the device **400** is unlocked. In FIG. **5**D, the device **400** displays a menu **506**. The menu **506** includes interactive user-interface objects corresponding to various applications or operations. A user may interact with the user-interface objects to activate an application or perform an operation. It should be appreciated, however, that the device **400**, upon being unlocked, may display additional or alternative user-interface objects.

In some embodiments, the unlock image **402** may also be used to indicate failure of performance of the unlock action. For example, if the user breaks the contact with the touch screen before the unlock image reaches the right end of the channel **404**, the unlock action has failed. The device **400** may display the unlock image **402** returning to its initial position on the left end of the channel **404**, allowing the user to attempt the unlock action again, if she so chooses. In some embodiments, the device goes back to sleep if no gesture is applied in a predetermined period of time.

In some embodiments, the user may unlock the device **400** by contacting the touch screen **408** and moving the point of contact horizontally along a fraction of the channel **404**, i.e., the user need not move all the way to the right end of the channel. In some embodiments, the user may unlock the device **400** by making contact anywhere on the touch screen **408** and moving the point of contact horizontally as if he or she were following the channel **404**.

In some embodiments, the lock/unlock feature may apply to specific applications that are executing on the device **400** as opposed to the device **400** as a whole. In some embodiments, an unlock gesture transitions from one application to another, for example, from a telephone application to a music player or vice versa. The lock/unlock feature may include a hold or pause feature. In some embodiments, as the user transitions from a first application and to a second application, a user interface for the second application may fade in (i.e., increase in intensity) and a user interface for the first application may fade out (i.e., decrease in intensity). The fade in and fade out may occur smoothly over a pre-determined time interval, such as 0.2 s, 1 s or 2 s. The pre-determined time interval may

14

be in accordance with the unlock gesture, such as the time it takes the user to perform the gesture.

Indication of Progress Towards Satisfaction of a User Input Condition

FIG. **6** is a flow diagram illustrating a process **600** for indicating progress towards satisfaction of a user input condition according to some embodiments of the invention. While the process flow **600** described below includes a number of operations that appear to occur in a specific order, it should be apparent that these processes can include more or fewer operations, which can be performed serially or in parallel (e.g., using parallel processors or a multi-threading environment).

While an electronic device is in a first user-interface state, progress is detected (**602**) towards satisfaction of a user input condition needed to transition to a second user-interface state. In some embodiments, the first user-interface state is for a first application and the second user-interface state is for a second application. In some embodiments, the first user-interface state is a lock state and the second user-interface state is an unlock state.

While the device is in the first user-interface state, progress is indicated (**604**) towards satisfaction of the condition by transitioning an optical intensity of one or more user interface objects associated with the second user-interface state. The change in optical intensity of the user-interface objects provides a user with sensory feedback of the progress in transitioning between user interface states.

In some embodiments, in addition to visual feedback, the device supplies non-visual feedback to indicate progress towards satisfaction of the user input condition. The additional feedback may include audible feedback (e.g., sound(s)) or physical feedback (e.g., vibration(s)).

The device transitions (**606**) to the second user-interface state if the condition is satisfied. In some embodiments, in addition to visual feedback, the device supplies non-visual feedback to indicate satisfaction of the user input condition. The additional feedback may include audible feedback (e.g., sound(s)) or physical feedback (e.g., vibration(s)).

The optical intensity of a user-interface object, as used herein, is the object's degree of visual materialization. The optical intensity may be measured along a scale between a predefined minimum and a predefined maximum. In some embodiments, the optical intensity may be measured along a logarithmic scale. In some embodiments, the optical intensity may be perceived by users as a transparency effect (or lack thereof) applied to the user-interface object. In some embodiments, the minimum optical intensity means that the object is not displayed at all (i.e., the object is not perceptible to the user), and the maximum optical intensity means that the object is displayed without any transparency effect (i.e., the object has completely materialized visually and is perceptible to the user). In some other embodiments, the optical intensity may be the visual differentiation between the user-interface object and the background, based on color, hue, color saturation, brightness, contrast, transparency, and any combination thereof.

In some embodiments, the optical intensity of the user-interface objects to be displayed in the second user-interface state is increased smoothly. Smoothly may include a transition time that is greater than a pre-defined threshold, for example, 0.2 s, 1 s or 2 s. The rate of the transition of optical intensity may be any predefined rate.

In some embodiments, the indication of progress towards completion of the user input condition is a function of the

15

user's satisfaction of the condition. For example, for a transition to an unlock state, the indication of progress towards completion is a function of the user's performance of an unlock action. For a linear function, the indication of progress is 10% complete when the unlock action is 10% complete; the indication of progress is 50% complete when the unlock action is 50% complete, and so forth, up to 100% completion of the unlock action, at which point the transition to the unlock state occurs. Correspondingly, for a linear function, the transition of the optical intensity from an initial value to a final value is 10% complete when the unlock action is 10% complete; the transition is 50% complete when the unlock action is 50% complete, and so forth, up to 100% completion of the unlock action, at which point the optical intensity is at its final value. In some embodiments, the user may perceive the optical intensity transition as a fading in of the user-interface objects as the unlock action is performed. It should be appreciated that the function need not be linear and alternative functions may be used, further details of which are described below, in relation to FIGS. **8A-8C**.

If the user input condition includes a predefined gesture then the indication of progress of the gesture may be defined in terms of how much of the gesture is completed and how much of the gesture is remaining. For example, if the gesture includes moving the finger from one edge of the screen to the opposite edge horizontally, then the indication of progress may be defined in terms of the distance between the two edges because the distance remaining objectively measures how much further the user has to move her finger to complete the gesture.

If the user input condition includes dragging an image to a predefined location, then the indication of progress may be defined in terms of the distance between the initial location of the image and the predefined location to which the image is to be dragged in order to complete the input condition.

If the user input condition includes dragging an image along a predefined path, then the indication of progress may be defined in terms of the length of the predefined path.

FIGS. **7A-7D** illustrate the GUI display of a device that is transitioning the optical intensity of user-interface objects concurrent with a transition from a first user interface state to a second user interface state, according to some embodiments of the invention. In FIG. **7A**, the device **700** is locked and has received an incoming call. The device **700** is displaying a prompt **706** to the user, informing the user of the incoming call, on the touch screen **714**. The device is also displaying the unlock image **702** and channel **704** so that the user can unlock the device **700** in order to accept or decline the incoming call. The user begins the unlock action by making contact on the touch screen with her finger **710** on the unlock image **702**.

In FIG. **7B**, the user is in the process of dragging the unlock image **702** along the channel **704** in the direction of movement **712**. As the user drags the unlock image, a set of virtual buttons **708** appears and increases in optical intensity. The virtual buttons **708** are shown with dotted outlines to indicate that they are not yet at their final optical intensity levels. The virtual buttons **708** are associated with the prompt **706**; the virtual buttons shown in FIG. **7B-7D** allow the user to decline or accept the incoming call. However, the user cannot interact with the virtual buttons **708** until the device is unlocked and the virtual buttons have reached their final optical intensity. In FIG. **7C**, the user drags the unlock image **702** further along the channel **704** in the direction of movement **712**. The virtual buttons **708** have increased further in optical intensity relative to their optical intensity in FIG. **7B**, as illustrated by their

16

different style of dotted outlines. The increases in optical intensity indicate to the user progress towards completion of the unlock action.

In FIG. **7D**, the user completes the unlock action by dragging the unlock image to the right end of the channel **704** and releasing the unlock image **702**. The device **700** transitions to the unlock state. The unlock image **702** and the channel **704** disappear from the display and the virtual buttons **708** are at their final optical intensity levels, as illustrated by their solid outlines. At this point the user may interact with the virtual buttons **708** and accept or decline the incoming call.

As described above in relation to FIGS. **5A-5D**, if the unlock action fails because the user releases the unlock image prematurely, the unlock image may return to its initial location. In some embodiments, the optical intensity of the virtual buttons **708** or other user-interface objects that were increasing in optical intensity as the unlock action was performed may, concurrent with the return of the unlock image to its initial location, have their optical intensity decreased smoothly, back to their initial levels.

FIGS. **8A-8C** are graphs illustrating optical intensity as a function of the completion of the user input condition, according to some embodiments of the invention. In FIG. **8A**, the optical intensity is a linear function of the completion of the user input condition. At 0% completion, the optical intensity is at an initial value (in this case, the initial value is 0). As the completion percentage increases, the optical intensity increases linearly with the completion percentage, until it reaches the final value at 100% completion.

In FIG. **8B**, the optical intensity is a nonlinear function of the completion of the user input condition. At 0% completion, the optical intensity is at an initial value (in this case, the initial value is 0). As the completion percentage increases, the optical intensity increases gradually at first, but the increase becomes steeper as the completion percentage increases, until it reaches the final value at 100% completion.

In FIG. **8C**, the optical intensity is another nonlinear function of the completion of the user input condition. At 0% completion, the optical intensity is at an initial value (in this case, the initial value is 0). As the completion percentage increases, the optical intensity increases steeply at first, but the increase becomes more gradual as the completion percentage increases, until it reaches the final value at 100% completion. In some embodiments, the optical intensity may increase according to a logarithmic scale.

In some embodiments, the optical intensity may reach its final value prior to 100% completion of the user input condition (e.g., at 90% completion).

### User Interface Active States Corresponding to Events or Applications

FIG. **9** is a flow diagram illustrating a process **900** for transitioning a device to a user interface active state corresponding to one of a plurality of unlock images, according to some embodiments of the invention. In some embodiments, the device may have one or more active applications running when the device becomes locked. Additionally, while locked, the device may continue to receive events, such as incoming calls, messages, voicemail notifications, and so forth. The device may display multiple unlock images on the touch screen, each unlock image corresponding to an active application or incoming event. Performing the unlock action using one of the multiple unlock images unlocks the device and displays the application and/or event corresponding to the unlock image. The user interface active state, as used herein, means that the device is unlocked and a corresponding application or event is displayed on the touch screen to the user.

US 8,046,721 B2

17

While the process flow **900** described below includes a number of operations that appear to occur in a specific order, it should be apparent that these processes can include more or fewer operations, which can be executed serially or in parallel (e.g., using parallel processors or a multi-threading environment).

The device is locked upon satisfaction of a predefined lock condition (**902**). The device may have active applications running when it is locked and the active applications may continue running while the device is locked. Additionally, while the device is locked, the device may receive events, such as incoming calls, messages, and voicemail notifications.

The device displays a plurality of unlock images, each displayed unlock image corresponding to an active application running or an event received while the device is locked (**904**). In some embodiments, the device also displays visual cues of the unlock action with respect to each unlock image. The device may display additional unlock images and visual cues as additional events are received. The user makes contact with the touch screen (**906**). The device detects the contact gesture (**908**). If the detected contact gesture does not correspond to successful performance of the unlock action with respect to any one of the displayed unlock images (e.g., because the contact is not an attempt to perform the unlock action or the unlock action failed/was aborted) (**910**—no), the device remains locked (**912**). If the detected contact gesture does correspond to successful performance of the unlock action with respect to one of the displayed unlock images (**910**—yes), the touch screen is unlocked and the running application or event corresponding to the one of the unlock images is displayed on the touch screen (**914**). In other words, the device transitions to a first active state corresponding to the first image if the detected contact corresponds to a predefined gesture with respect to the first image; the device transitions to a second active state distinct from the first active state and corresponding to the second image if the detected contact corresponds to a predefined gesture with respect to the second image; and so on.

The device becomes unlocked and makes the corresponding event or application visible to the user, active, or running in the foreground, as opposed to running in the background, upon performance of the unlock action with respect to the particular unlock image. The user-interface active state includes the running application or incoming event corresponding to the particular unlock image with which the user interacted being displayed prominently on the touch screen, in addition to the device being unlocked. Thus, unlocking using a first unlock image (if multiple unlock images are displayed) transitions the device to a first user-interface active state, in which the device is unlocked and the application/event corresponding to the first unlock image is displayed prominently. Unlocking using a second image transitions the device to a second user-interface active state, in which the device is unlocked and the application/event corresponding to the second unlock image is displayed prominently.

In some embodiments, the device may prioritize which unlock images to display. The device may display a subset of the corresponding unlock images on the touch screen at one time. The device may decide which subset to display based on one or more predefined criteria. For example, the device may display only unlock images corresponding to the most recent events and/or running applications. As another example, the device may display only unlock images corresponding to incoming events.

18

FIG. **10** illustrates the GUI of a device **1000** in a user-interface lock state that displays a plurality of unlock images, according to some embodiments of the invention. In FIG. **10**, the touch screen **1014** of the device **1000** is locked. A first unlock image **1002** is displayed with corresponding visual cues, such as the first channel **1004** and arrow **1006**. A second unlock image **1008** is displayed with corresponding visual cues, such as the second channel **1010** and arrow **1012**. The touch screen **1014** may display additional unlock images and visual cues. The first unlock image **1002** corresponds to a first running application or received event. The second unlock image **1008** corresponds to a second running application or received event. The first and second unlock images and visual cues are similar to the unlock image and visual cues described above, in relation to FIGS. **4**A and **4**B. The arrows **1006** and **1012** may be animated to move from one end of the channels **1004** and/or **1010** to the other end, in order to indicate the proper direction of the predefined gesture or movement of the unlock image.

FIGS. **11**A-**11**F illustrate the GUI display of a device at various points in the performance of an unlock action gesture corresponding to one of a plurality of unlock images, according to some embodiments of the invention. In FIG. **11**A, the user makes contact with the touch screen **1014** using her finger **1102** (not shown to scale), at the location corresponding to the second unlock image **1008**. The user performs the unlock action gesture by moving the point of contact, dragging the second unlock image **1008**. FIG. **11**B shows a snapshot of the device **1000** during the tendency of the unlock action. The second unlock image **1008** is moved along in the channel **1010** in the direction of movement **1104**.

FIG. **11**C shows the second unlock image **1008** moved to the end of the channel **1010**, where the unlock action with respect to the second unlock image **1008** will be completed once the user breaks the contact (and releases the second unlock image **1008**). In some embodiments, the unlock action is completed when the unlock image **1008** is moved to the end of the channel **1010**, with or without the user breaking contact, and the second unlock image **1008** disappears. As shown in FIG. **11**D, upon completion of the unlock action with respect to the second unlock image **1008**, the device displays on the touch screen the user-interface objects **1106** associated with the application or event corresponding to the second unlock image **1008**. In FIG. **11**D, the event corresponding to the second unlock image is an incoming text message event and a prompt for the user to read it.

The user, instead of performing the unlock action with respect to the second unlock image **1108**, may instead perform the unlock action gesture with respect to the first unlock image **1002**. In FIG. **11**E, the user does so and performs the unlock action with respect to the first unlock image **1002** by dragging the first unlock image, in the direction **1104**, to the right end of the channel **1004**. Upon completion of the unlock action, the device **1000** displays the user-interface objects **1108** associated with the application or event corresponding to the first unlock image **1002**. In FIG. **11**F, the application corresponding to the first unlock image is a music player application.

In some embodiments, the transition to a user interface active state, as described in FIGS. **9** and **11**A-**11**E, may also include a concurrent transition in the optical intensity of user-interface objects, similar to that described above in relation to FIGS. **6**, **7**A-**7**D, and **8**A-**8**C. Concurrent with the transition to a user interface active state, the user-interface objects associated with the application or event corresponding to the unlock image with which the user interacted to unlock the device increase in intensity. For example, the

US 8,046,721 B2

19

optical intensity of the user-interface objects **1106** associated with the text message prompt in FIG. **11**D may be increased smoothly, as a function of the progress towards completion of the unlock action with respect to the second unlock image **1008**. As another example, the optical intensity of the user-interface objects **1108** associated with music player application in FIG. **11**F may be increased smoothly, as a function of the progress towards completion of the unlock action with respect to the first unlock image **1002**.

The foregoing description, for purpose of explanation, has been described with reference to specific embodiments. However, the illustrative discussions above are not intended to be exhaustive or to limit the invention to the precise forms disclosed. Many modifications and variations are possible in view of the above teachings. The embodiments were chosen and described in order to best explain the principles of the invention and its practical applications, to thereby enable others skilled in the art to best utilize the invention and various embodiments with various modifications as are suited to the particular use contemplated.

What is claimed is:

**1**. A method of unlocking a hand-held electronic device, the device including a touch-sensitive display, the method comprising:

detecting a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image;

continuously moving the unlock image on the touch-sensitive display in accordance with movement of the contact while continuous contact with the touch screen is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device; and

unlocking the hand-held electronic device if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch-sensitive display.

**2**. The method of claim **1**, wherein the moving comprises movement along any desired path.

**3**. The method of claim **1**, wherein the moving comprises movement along a predefined channel from the first predefined location to the predefined unlock region.

**4**. The method of claim **1**, further comprising displaying visual cues to communicate a direction of movement of the unlock image required to unlock the device.

**5**. The method of claim **4**, wherein the visual cues comprise text.

**6**. The method of claim **4**, wherein said visual cues comprise an arrow indicating a general direction of movement.

**7**. A portable electronic device, comprising:

a touch-sensitive display;

memory;

one or more processors; and

one or more modules stored in the memory and configured for execution by the one or more processors, the one or more modules including instructions:

to detect a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image;

to continuously move the unlock image on the touch-sensitive display in accordance with movement of the

20

detected contact while continuous contact with the touch-sensitive display is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device; and

to unlock the hand-held electronic device if the unlock image is moved from the first predefined location on the touch screen to a predefined unlock region on the touch-sensitive display.

**8**. The device of claim **7**, further comprising instructions to display visual cues to communicate a direction of movement of the unlock image required to unlock the device.

**9**. The device of claim **8**, wherein the visual cues comprise text.

**10**. The device of claim **8**, wherein said visual cues comprise an arrow indicating a general direction of movement.

**11**. A portable electronic device, comprising:

a touch-sensitive display;

means for displaying an unlock image at a first predefined location on the touch-sensitive display while the device is in a user-interface lock state;

means for detecting contact with the touch-sensitive display; and

means for continuously moving the unlock image on the touch-sensitive display in response to detecting the contact in accordance with movement of the contact while continuous contact with the touch screen is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device; and

means for transitioning the device to a user-interface unlock state if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch-sensitive display.

**12**. A computer readable storage medium storing one or more programs, the one or more programs comprising instructions, which when executed by a portable electronic device with a touch-sensitive display, cause the portable electronic device to perform a method comprising:

detecting a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image;

continuously moving the unlock image on the touch-sensitive display in accordance with movement of the contact while continuous contact with the touch screen is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device; and

unlocking the hand-held electronic device if the moving the unlock image on the touch-sensitive display results in movement of the unlock image from the first predefined location to a predefined unlock region on the touch-sensitive display.

**13**. The method of claim **1**, wherein the unlock image is a single image.

**14**. The device of claim **7**, wherein the unlock image is a single image.

**15**. The computer readable storage medium of claim **12**, wherein the unlock image is a single image.

\* \* \* \* \*

# TAB 4



US008074172B2

(12) **United States Patent**     (10) **Patent No.:**    **US 8,074,172 B2**

Kocienda et al.     (45) **Date of Patent:**      **Dec. 6, 2011**

(54) **METHOD, SYSTEM, AND GRAPHICAL USER INTERFACE FOR PROVIDING WORD RECOMMENDATIONS**

(75) Inventors: **Kenneth Kocienda**, Sunnyvale, CA (US); **Bas Ording**, San Francisco, CA (US)

(73) Assignee: **Apple Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1249 days.

(21) Appl. No.: **11/620,642**

(22) Filed: **Jan. 5, 2007**

(65) **Prior Publication Data**

US 2008/0168366 A1    Jul. 10, 2008

(51) **Int. Cl.**
*G06F 17/21*     (2006.01)

(52) **U.S. Cl.** ........ **715/263**; 715/255; 715/261; 715/268; 715/271

(58) **Field of Classification Search** ................. 715/200, 715/230, 231, 255, 261, 263, 268, 271
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,305,205 A | 4/1994 | Weber et al. | 364/419.1 |
| 5,736,974 A | 4/1998 | Selker | 345/146 |
| 5,748,512 A | 5/1998 | Vargas | 364/709.12 |
| 5,818,451 A | 10/1998 | Bertram et al. | 345/354 |
| 5,896,321 A | 4/1999 | Miller et al. | 365/189.01 |
| 6,040,824 A | 3/2000 | Maekawa et al. | 345/173 |
| 6,073,036 A | 6/2000 | Heikkinen et al. | 455/575 |
| 6,169,538 B1 | 1/2001 | Nowlan et al. | 345/168 |
| 6,259,436 B1 | 7/2001 | Moon et al. | 345/173 |
| 6,271,835 B1 | 8/2001 | Hoeksma | 345/168 |
| 6,307,548 B1 | 10/2001 | Flinchem et al. | 345/352 |
| 6,469,722 B1 | 10/2002 | Kinoe et al. | 345/837 |
| 6,597,345 B2 | 7/2003 | Hirshberg | 345/168 |
| 6,714,221 B1 | 3/2004 | Christie et al. | 345/784 |
| 6,795,059 B2 | 9/2004 | Endo | 345/173 |
| 6,803,905 B1 | 10/2004 | Capps et al. | 345/173 |
| 6,857,800 B2 | 2/2005 | Zhang et al. | 400/473 |
| 7,038,659 B2 | 5/2006 | Rajkowski | 345/156 |

(Continued)

FOREIGN PATENT DOCUMENTS

WO    WO 98/33111    7/1998

(Continued)

OTHER PUBLICATIONS

Office Action dated Nov. 20, 2009, received in U.S. Appl. No. 11/620,641 (related).

(Continued)

*Primary Examiner* — Stephen Hong
*Assistant Examiner* — Gregory J Vaughn
(74) *Attorney, Agent, or Firm* — Morgan, Lewis & Bockius LLP

(57) **ABSTRACT**

One aspect of the invention involves a method that includes: in a first area of the touch screen, displaying a current character string being input by a user with the keyboard; in a second area of the touch screen, displaying the current character string or a portion thereof and a suggested replacement for the current character string; replacing the current character string in the first area with the suggested replacement if the user activates a delimiter key on the keyboard; replacing the current character string in the first area with the suggested replacement if the user performs a first gesture on the suggested replacement displayed in the second area; and keeping the current character string in the first area if the user performs a second gesture on the current character string or the portion thereof displayed in the second area.

**38 Claims, 14 Drawing Sheets**



**JOINT TRIAL EXHIBIT NO. 13**

United States District Court
Northern District of California
No. 12-CV-00630-LHK (PSG)

*Apple Inc. v. Samsung Elecs.*

Date Admitted:_____ By:_____

US 8,074,172 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,057,607 | B2 | 6/2006 | Mayoraz et al. | 345/173 |
| 7,194,699 | B2 | 3/2007 | Thomson et al. | 715/823 |
| 7,443,316 | B2 | 10/2008 | Lim | 341/22 |
| 7,477,240 | B2 | 1/2009 | Yanagisawa | 345/173 |
| 7,508,324 | B2 | 3/2009 | Suraqui | 341/22 |
| 7,526,738 | B2 | 4/2009 | Ording et al. | 715/862 |
| 7,679,534 | B2 | 3/2010 | Kay et al. | 341/22 |
| 7,683,886 | B2 | 3/2010 | Willey | 345/169 |
| 7,712,053 | B2 | 5/2010 | Bradford et al. | 715/864 |
| 7,725,838 | B2 | 5/2010 | Williams | 715/816 |
| 2002/0085037 | A1* | 7/2002 | Leavitt et al. | 345/765 |
| 2002/0140679 | A1 | 10/2002 | Wen | 345/168 |
| 2002/0191029 | A1* | 12/2002 | Gillespie et al. | 345/810 |
| 2003/0090467 | A1* | 5/2003 | Hohl et al. | 345/168 |
| 2003/0149978 | A1 | 8/2003 | Plotnick | 725/39 |
| 2003/0193481 | A1 | 10/2003 | Sokolsky | 345/173 |
| 2003/0197736 | A1 | 10/2003 | Murphy | 345/780 |
| 2004/0070567 | A1 | 4/2004 | Longe et al. | 345/156 |
| 2004/0135774 | A1 | 7/2004 | La Monica | 345/174 |
| 2004/0160419 | A1 | 8/2004 | Padgitt | 345/173 |
| 2004/0178994 | A1 | 9/2004 | Kairls, Jr. | 345/173 |
| 2004/0183833 | A1 | 9/2004 | Chua | 345/773 |
| 2004/0196256 | A1* | 10/2004 | Wobbrock et al. | 345/156 |
| 2005/0024341 | A1* | 2/2005 | Gillespie et al. | 345/173 |
| 2005/0190970 | A1 | 9/2005 | Griffin | 382/209 |
| 2005/0216331 | A1 | 9/2005 | Ahrens et al. | 705/11 |
| 2005/0278647 | A1* | 12/2005 | Leavitt et al. | 715/765 |
| 2006/0152496 | A1* | 7/2006 | Knaven | 345/172 |
| 2006/0206454 | A1 | 9/2006 | Forstall et al. | 707/3 |
| 2006/0246955 | A1* | 11/2006 | Nirhamo et al. | 455/566 |
| 2006/0265648 | A1 | 11/2006 | Rainisto et al. | 715/534 |
| 2006/0274051 | A1* | 12/2006 | Longe et al. | 345/173 |
| 2007/0040813 | A1 | 2/2007 | Kushler et al. | 345/173 |
| 2007/0061754 | A1 | 3/2007 | Ardhanari et al. | 715/816 |
| 2007/0067272 | A1* | 3/2007 | Flynt et al. | 707/3 |
| 2007/0130128 | A1 | 6/2007 | Garg et al. | 707/3 |
| 2007/0152978 | A1 | 7/2007 | Kocienda et al. | 345/173 |
| 2008/0059876 | A1 | 3/2008 | Hantler et al. | 715/257 |
| 2009/0327977 | A1* | 12/2009 | Bachfischer et al. | 715/863 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 00/38041 | 6/2000 |

### OTHER PUBLICATIONS

Call Centre 1999, "Word Prediction," Copyright (c) The CALL Centre & Scottish Executive Education Dept., pp. 63-73.

Dyslexic.com, "AlphaSmart 3000 with CoWriter SmartApplet: Don Johnston Special Needs," http://www.dyslexic.com/procuts.php?catid=2&pid=465&PHPSESSID=2511b800000f7da..., downloaded Dec. 6, 2005, 13 pages.

Glossary of Adaptive Technologies: Word Prediction, http://www.utoronto.ca/atrc/reference/techwordpred.html, printed Dec. 6, 2005, 5 pages.

MacTech, "KeyStrokes 3.5 for Mac OS X Boosts Word Prediction," http://www.mactech.com/news/?p=1007129, printed Jan. 7, 2008, 3 pages.

Mobile Tech News, "T9 Text Input Software Updated," htpp://www.mobiletechnews.com/info/2004/11/23/122155.html, Nov. 23, 2004, 4 pages.

NCIP: Word Prediction Collection, "What is Word Prediction?" http://www2.edc.org/NCIP/library/wp/What_is.htm, printed Jan. 7, 2008, 2 pages.

NCIP: Word Prediction Collection, NCIP Library: Word Prediction Collection, http://www2.edc.org/NCIP/library/wp/toc.htm, printed Jan. 7, 2008, 4 pages.

International Search Report and Written Opinion for International Application PCT/US2007/088872, mailed May 8, 2008.

International Search Report and Written Opinion for International Application PCT/US2007/088873, mailed May 8, 2008.

Office Action dated Apr. 10, 2009, for U.S. Appl. No. 11/549,624.

Office Action dated May 22, 2009, for U.S. Appl. No. 11/459,615.

Office Action dated May 28, 2009, for U.S. Appl. No. 11/459,606.

Office Action dated Jul. 22, 2009, for U.S. Appl. No. 11/549,624.

Final Office Action dated Jun. 25, 2010, received in U.S. Appl. No. 11/620,641.

Office Action dated May 26, 2010, received in European Application No. 07 869 922.0, which corresponds to U.S. Appl. No. 11/620,641.

Office Action dated May 26, 2010, received in European Application No. 07 869 923.8, which corresponds to U.S. Appl. No. 11/620,642.

Notice of Allowance dated Jun. 3, 2010, received in U.S. Appl. No. 11/549,624.

Final Office Action dated Feb. 1, 2010, received in U.S. Appl. No. 11/549,624.

Office Action dated Apr. 1, 2010, received in Australian Patent Application No. 2007342164, which corresponds to U.S. Appl. No. 11/620,641.

Office Action dated Nov. 25, 2010, received in Chinese Patent Application No. 200780052020.1, which corresponds to U.S. Appl. No. 11/620,641.

Office Action dated Dec. 7, 2010, received in European Patent Application No. 07 869 922.0, which corresponds to U.S. Appl. No. 11/620,641.

* cited by examiner

APLNDC630-0001914274

JOINT TRIAL EXHIBIT NO. 13, Page 2 of 24



Memory 102
Operating System
Communication Module
Display Module
Contact/Motion Module
Graphics Module
Applications
Keyboard Module
Word Recommendations Module
Dictionary
122
124
125
126
128
130
131
133
136
Power System
137
Optical Sensor
148
External Port
135
103
104
120
118
Controller
Processor
Peripherals Interface
116
RF Circuitry
108
146
110
Speaker 142
Audio Circuitry
Microphone 144
I/O Subsystem
106
132
Touch Screen Controller
Other Input Controller(s)
134
Touch Sensitive Display System
Other Input Control Devices
112
114

FIG. 1



**FIG. 2**

APLNDC630-0001914276



300
Display a current character string in a first area
302
Display in a second area: the current character string or a portion thereof, and a suggested replacement for the current character string
304
Activate a key associated with a delimiter (e.g., space, certain punctuation marks)
User action?
306
Perform gesture on the current character string or portion thereof in the second area
Perform gesture on the suggested replacement in the second area
Replace the current character string in the first area with the suggested replacement
308
Keep the current character string in the first area
310

FIG. 3



**FIG. 4A**

A403                    APLNDC630-0001914278
JOINT TRIAL EXHIBIT NO. 13, Page 6 of 24



**FIG. 4B**

**A404**                                          APLNDC630-0001914279

**JOINT TRIAL EXHIBIT NO. 13, Page 7 of 24**



**FIG. 4C**



**FIG. 4D**

APLNDC630-0001914281
JOINT TRIAL EXHIBIT NO. 13, Page 9 of 24



**FIG. 4E**

APLNDC630-0001914282
JOINT TRIAL EXHIBIT NO. 13, Page 10 of 24



**FIG. 4F**



**FIG. 4G**

APLNDC630-0001914284
**JOINT TRIAL EXHIBIT NO. 13, Page 12 of 24**



**FIG. 4H**



FIG. 4I

APLNDC630-0001914286

JOINT TRIAL EXHIBIT NO. 13, Page 14 of 24



**FIG. 5A**



FIG. 5B

US 8,074,172 B2

**1**
# METHOD, SYSTEM, AND GRAPHICAL USER INTERFACE FOR PROVIDING WORD RECOMMENDATIONS

## RELATED APPLICATIONS

This application is related to U.S. patent application Ser. No. 11/620,641, filed Jan. 5, 2007, entitled "Method and System for Providing Word Recommendations for Text Input," the disclosure of which is hereby incorporated by reference herein.

## TECHNICAL FIELD

The disclosed embodiments relate generally to text input on portable electronic devices, and more particularly, to a method, system, and graphical user interface for providing word recommendations on a portable electronic device.

## BACKGROUND

In recent years, the functional capabilities of portable electronic devices have increased dramatically. Current devices enable communication by voice, text, and still or moving images. Communication by text, such as by email or short message service (SMS), has proven to be quite popular.

However, the size of these portable communication devices also restricts the size of the text input device, such as a physical or virtual keyboard, in the portable device. With a size-restricted keyboard, designers are often forced to make the keys smaller or overload the keys. Both may lead to typing mistakes and thus more backtracking to correct the mistakes. This makes the process of inputting text on the devices inefficient and reduces user satisfaction with such portable devices.

Accordingly, there is a need for more efficient ways of entering text into portable devices.

## SUMMARY

The above deficiencies and other problems associated with user interfaces for portable devices are reduced or eliminated by the disclosed device that includes a text input interface that provides word recommendations.

According to some embodiments, a computer-implemented method may be performed at a portable electronic device with a keyboard and a touch screen display. The method includes: in a first area of the touch screen display, displaying a current character string being input by a user with the keyboard; in a second area of the touch screen display, displaying the current character string or a portion thereof and a suggested replacement character string for the current character string; replacing the current character string in the first area with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter; replacing the current character string in the first area with the suggested replacement character string if the user performs a first gesture on the suggested replacement character string displayed in the second area; and keeping the current character string in the first area if the user performs a second gesture on the current character string or the portion thereof displayed in the second area.

According to some embodiments, a graphical user interface on a portable electronic device with a keyboard and a touch screen display includes a first area of the touch screen display that displays a current character string being input by a user with the keyboard, and a second area of the touch screen display that displays the current character string or a portion thereof and a suggested replacement character string for the current character string. The current character string in the first area is replaced with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter. The current character string in the first area is replaced with the suggested replacement character string if the user performs a gesture on the suggested replacement character string in the second area. The current character string in the first area is kept if the user performs a gesture on the current character string or the portion thereof displayed in the second area.

According to some embodiments, a portable electronic device includes a touch screen display, one or more processors, memory, and a program. The program is stored in the memory and configured to be executed by the one or more processors. The program includes: instructions for displaying, in a first area of the touch screen display, a current character string being input by a user with the keyboard; instructions for displaying, in a second area of the touch screen display, the current character string and a suggested replacement character string for the current character string; instructions for replacing the current character string in the first area with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter; instructions for replacing the current character string in the first area with the suggested replacement character string if the user performs a first gesture on the suggested replacement character string displayed in the second area; and instructions for keeping the current character string in the first area if the user performs a second gesture on the current character string or the portion thereof displayed in the second area.

According to some embodiments, a computer-program product includes a computer readable storage medium and a computer program mechanism embedded therein. The computer program mechanism includes instructions, which when executed by a portable electronic device with a touch screen display, cause the device to: in a first area of the touch screen display, display a current character string being input by a user with the keyboard; in a second area of the touch screen display, display the current character string or a portion thereof and a suggested replacement character string for the current character string; replace the current character string in the first area with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter; replace the current character string in the first area with the suggested replacement character string if the user performs a first gesture on the suggested replacement character string displayed in the second area; and keep the current character string in the first area if the user performs a second gesture on the current character string or the portion thereof displayed in the second area.

According to some embodiments, a portable electronic device with a touch screen display includes: means for displaying a current character string being input by a user with the keyboard in a first area of the touch screen display; means for displaying the current character string or a portion thereof and a suggested replacement character string for the current character string in a second area of the touch screen display; means for replacing the current character string in the first area with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter; means for replacing the current character string in the first area with the suggested replacement character string if the user performs a first gesture on the suggested replacement character string displayed in the second area; and means for

3

keeping the current character string in the first area if the user performs a second gesture on the current character string or the portion thereof displayed in the second area.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a better understanding of the aforementioned embodiments of the invention as well as additional embodiments thereof, reference should be made to the Description of Embodiments below, in conjunction with the following drawings in which like reference numerals refer to corresponding parts throughout the figures.

FIG. **1** is a block diagram illustrating a portable electronic device in accordance with some embodiments.

FIG. **2** illustrates a portable electronic device having a touch screen and a soft keyboard in accordance with some embodiments.

FIG. **3** is a flow diagram illustrating a process for providing word recommendations in accordance with some embodiments.

FIGS. **4A-4I** illustrate a user interface for providing word recommendations in accordance with some embodiments.

FIGS. **5A-5B** illustrate a user interface for showing originally entered text in accordance with some embodiments.

## DESCRIPTION OF EMBODIMENTS

Reference will now be made in detail to embodiments, examples of which are illustrated in the accompanying drawings. In the following detailed description, numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will be apparent to one of ordinary skill in the art that the present invention may be practiced without these specific details. In other instances, well-known methods, procedures, components, circuits, and networks have not been described in detail so as not to unnecessarily obscure aspects of the embodiments.

Embodiments of user interfaces and associated processes for using a portable electronic device are described. In some embodiments, the device is a portable communications device such as a mobile telephone. The user interface may include a click wheel in addition to a touch screen. A click wheel is a physical user-interface device that may provide navigation commands based on an angular displacement of the wheel or a point of contact with the wheel by a user of the device. A click wheel may also be used to provide a user command corresponding to selection of one or more items, for example, when the user of the device presses down on at least a portion of the wheel or the center of the wheel. For simplicity, in the discussion that follows, a portable electronic device (e.g., a cellular telephone that may also contain other functions, such as text messaging, PDA and/or music player functions) that includes a touch screen is used as an exemplary embodiment. It should be understood, however, that the user interfaces and associated processes may be applied to other devices, such as personal digital assistants (PDA's), personal computers and laptops, which may include one or more other physical user-interface devices, such as a click wheel, a keyboard, a mouse and/or a joystick.

The device may support a variety of applications, such as one or more telephone applications, a text messaging application, a word processing application, an email application, a web browsing application, and a music player. The music player may be compatible with one or more file formats, such as MP3 and/or AAC. In an exemplary embodiment, the device includes an iPod music player (iPod trademark of Apple Computer, Inc.).

4

The various applications that may be executed on the device may use at least one common physical user-interface device, such as the touch screen. In embodiments that include a touch screen, one or more functions of the touch screen as well as corresponding information displayed on the device may be adjusted and/or varied from one application to the next and/or within a respective application. In this way, a common physical architecture (such as the touch screen) of the device may support the variety of applications with user interfaces that are intuitive and transparent to a user.

The user interfaces may include one or more keyboard embodiments displayed on a touch screen. The keyboard embodiments may include standard (QWERTY) and/or non-standard configurations of symbols on the displayed icons of the keyboard. The keyboard embodiments may include a reduced number of icons (or soft keys) relative to the number of keys in existing physical keyboards, such as that for a typewriter. This may make it easier for users to select one or more icons in the keyboard, and thus, one or more corresponding symbols. The keyboard embodiments may be adaptive. For example, displayed icons may be modified in accordance with user actions, such as selecting one or more icons and/or one or more corresponding symbols. One or more applications on the portable device may utilize common and/or different keyboard embodiments. Thus, the keyboard embodiment used may be tailored to at least some of the applications. In some embodiments, one or more keyboard embodiments may be tailored to a respective user. For example, based on a word usage history (lexicography, slang, individual usage) of the respective user. Some of the keyboard embodiments may be adjusted to reduce a probability of a user error when selecting one or more icons, and thus one or more symbols, when using the keyboard embodiments.

Attention is now directed to an embodiment of a portable communications device. FIG. **1** is a block diagram illustrating an embodiment of a device **100**, such as a portable electronic device having a touch-sensitive display **112**. The touch-sensitive display **112** is sometimes called a "touch screen" for convenience. The device **100** may include a memory controller **120**, one or more data processors, image processors and/or central processing units **118** and a peripherals interface **116**. The memory controller **120**, the one or more processors **118** and/or the peripherals interface **116** may be separate components or may be integrated, such as in one or more integrated circuits **104**. The various components in the device **100** may be coupled by one or more communication buses or signal lines **103**.

If the device **110** includes picture taking capabilities, the peripherals interface **116** may be coupled to an optical sensor **148**, such as a CMOS or CCD image sensor. The peripherals interface **116** is also coupled to RF circuitry **108**; audio circuitry **110**; and/or an input/output (I/O) subsystem **106**. The audio circuitry **110** may be coupled to a speaker **142** and a micro-phone **144**. The device **100** may support voice recognition and/or voice replication. The RF circuitry **108** may be coupled to one or more antennas **146** and may allow communication with one or more additional devices, computers and/or servers using a wireless network. The device **100** may support a variety of communications protocols, including code division multiple access (CDMA), Global System for Mobile Communications (GSM), Enhanced Data GSM Environment (EDGE), Wi-Fi (such as IEEE 802.11a, IEEE 802.11b, IEEE 802.11g and/or IEEE 802.11n), Bluetooth, Wi-MAX, a protocol for email, instant messaging, and/or a short message service (SMS), or any other suitable communication protocol, including communication protocols not yet developed as of the filing date of this document. In an exem-

APLNDC630-0001914290

**JOINT TRIAL EXHIBIT NO. 13, Page 18 of 24**

US 8,074,172 B2

5

plary embodiment, the device **100** may be, at least in part, a mobile phone (e.g., a cellular telephone).

The I/O subsystem **106** may include a touch screen controller **132** and/or other input controller(s) **134**. The touch-screen controller **132** is coupled to a touch-sensitive screen or touch sensitive display system **112**. The touch screen **112** and touch screen controller **132** may detect contact and any movement or break thereof using any of a plurality of touch sensitivity technologies now known or later developed, including but not limited to capacitive, resistive, infrared, and surface acoustic wave technologies, as well as other proximity sensor arrays or other elements for determining one or more points of contact with the touch-sensitive screen **112**. A touch-sensitive display in some embodiments of the display system **112** may be analogous to the multi-touch sensitive tablets described in the following U.S. Pat. Nos. 6,323,846 (Westerman et al.), 6,570,557 (Westerman et al.), and/or 6,677,932 (Westerman), and/or U.S. Patent Publication 2002/0015024A1, each of which is hereby incorporated by reference. However, a touch screen in the display system **112** displays visual output from the portable device **100**, whereas touch sensitive tablets do not provide visual output. The touch-sensitive screen **112** may have a resolution in excess of 100 dpi. In an exemplary embodiment, the touch-sensitive screen **112** has a resolution of approximately 168 dpi. The other input controller(s) **134** may be coupled to other input/control devices **114**, such as one or more buttons. In some alternate embodiments, input controller(s) **134** may be coupled to any (or none) of the following: a keyboard, infrared port, USB port, and/or a pointer device such as a mouse. The one or more buttons (not shown) may include an up/down button for volume control of the speaker **142** and/or the microphone **144**. The one or more buttons (not shown) may include a push button. A quick press of the push button (not shown) may disengage a lock of the touch screen **112**. A longer press of the push button (not shown) may turn power to the device **100** on or off. The user may be able to customize a functionality of one or more of the buttons. The touch screen **112** may be used to implement virtual or soft buttons and/or one or more keyboards.

A touch-sensitive display in some embodiments of the display system **112** may be as described in the following applications: (1) U.S. patent application Ser. No. 11/381,313, "Multipoint Touch Surface Controller," filed on May 2, 2006; (2) U.S. patent application Ser. No. 10/840,862, "Multipoint Touchscreen," filed on May 6, 2004; (3) U.S. patent application Ser. No. 10/903,964, "Gestures For Touch Sensitive Input Devices," filed on Jul. 30, 2004; (4) U.S. patent application Ser. No. 11/048,264, "Gestures For Touch Sensitive Input Devices," filed on Jan. 31, 2005; (5) U.S. patent application Ser. No. 11/038,590, "Mode-Based Graphical User Interfaces For Touch Sensitive Input Devices," filed on Jan. 18, 2005; (6) U.S. patent application Ser. No. 11/228,758, "Virtual Input Device Placement On A Touch Screen User Interface," filed on Sep. 16, 2005; (7) U.S. patent application Ser. No. 11/228,700, "Operation Of A Computer With A Touch Screen Interface," filed on Sep. 16, 2005; (8) U.S. patent application Ser. No. 11/228,737, "Activating Virtual Keys Of A Touch-Screen Virtual Keyboard," filed on Sep. 16, 2005; and (9) U.S. patent application Ser. No. 11/367,749, "Multi-Functional Hand-Held Device," filed on Mar. 3, 2006. All of these applications are incorporated by reference herein.

In some embodiments, the device **100** may include circuitry for supporting a location determining capability, such as that provided by the Global Positioning System (GPS). In some embodiments, the device **100** may be used to play back recorded music, such as one or more files, such as MP3 files or AAC files. In some embodiments, the device **100** may

6

include the functionality of an MP3 player, such as an iPod (trademark of Apple Computer, Inc.). In some embodiments, the device **100** may include a multi-pin (e.g., 30-pin) connector that is compatible with the iPod.

The device **100** also includes a power system **137** for powering the various components. The power system **137** may include a power management system, one or more power sources (e.g., battery, alternating current (AC)), a recharging system, a power failure detection circuit, a power converter or inverter, a power status indicator (e.g., a light-emitting diode (LED)) and any other components associated with the generation, management and distribution of power in portable devices. The device **100** may also include one or more external ports **135** for connecting the device **100** to other devices.

The memory controller **120** may be coupled to memory **102**, which may include one or more types of computer readable medium. Memory **102** may include high-speed random access memory and/or non-volatile memory, such as one or more magnetic disk storage devices, one or more optical storage devices, and/or flash memory. Memory **102** may store an operating system **122**, such as Darwin, RTXC, LINUX, UNIX, OS X, WINDOWS, or an embedded operating system such as VxWorks. The operating system **122** may include procedures (or sets of instructions) for handling basic system services and for performing hardware dependent tasks. Memory **102** may also store communication procedures (or sets of instructions) in a communication module **124**. The communication procedures may be used for communicating with one or more additional devices, one or more computers and/or one or more servers. The memory **102** may include a display module (or a set of instructions) **125**, a contact/motion module (or a set of instructions) **126** to determine one or more points of contact and/or their movement, and a graphics module (or a set of instructions) **128**. The graphics module **128** may support widgets, that is, modules or applications with embedded graphics. The widgets may be implemented using JavaScript, HTML, Adobe Flash, or other suitable computer program languages and technologies.

The memory **102** may also include one or more applications **130**. Examples of applications that may be stored in memory **102** include telephone applications, email applications, text messaging or instant messaging applications, memo pad applications, address books or contact lists, calendars, picture taking and management applications, and music playing and management applications. The applications **130** may include a web browser (not shown) for rendering pages written in the Hypertext Markup Language (HTML), Wireless Markup Language (WML), or other languages suitable for composing web pages or other online content.

Also included in the memory **102** are a keyboard module (or a set of instructions) **131**, a word recommendations module (or a set of instructions) **133**, and a dictionary **136**. The keyboard module **131** operates one or more soft keyboards. The word recommendations module **133** determines word completion or replacement recommendations for text entered by the user. The dictionary **136** includes a list of words in a language, from which word recommendations are drawn. In some embodiments, the dictionary also includes usage frequency rankings associated with the words in the dictionary.

Each of the above identified modules and applications correspond to a set of instructions for performing one or more functions described above. These modules (i.e., sets of instructions) need not be implemented as separate software programs, procedures or modules. The various modules and sub-modules may be rearranged and/or combined. Memory **102** may include additional modules and/or sub-modules, or fewer modules and/or sub-modules. Memory **102**, therefore,

US 8,074,172 B2

7

8

may include a subset or a superset of the above identified modules and/or sub-modules. Various functions of the device **100** may be implemented in hardware and/or in software, including in one or more signal processing and/or application specific integrated circuits.

Attention is now directed towards embodiments of user interfaces and associated processes that may be implemented on the device **100**. FIG. **2** is a schematic diagram illustrating an embodiment of a user interface for a portable electronic device **200**. The device **200** includes a touch screen **208**. In some embodiments, the touch screen may display one or more trays. A tray is a defined region or area within a graphical user interface. One tray may include a user entry interface, such as a virtual or soft keyboard **210** that includes a plurality of icons. The icons may include one or more symbols. In this embodiment, as well as others described below, a user may select one or more of the icons, and thus, one or more of the corresponding symbols, by making contact or touching the keyboard **210**, for example, with one or more fingers **212** (not drawn to scale in the figure). The contact may correspond to the one or more icons. In some embodiments, selection of one or more icons occurs when the user breaks contact with the one or more icons. In some embodiments, the contact may include a gesture, such as one or more taps, one or more swipes (e.g., from left to right, right to left, upward and/or downward) and/or a rolling of a finger (e.g., from right to left, left to right, upward and/or downward) that has made contact with the device **200**. In some embodiments, inadvertent contact with an icon may not select a corresponding symbol. For example, a swipe gesture that sweeps over an icon may not select a corresponding symbol if the gesture corresponding to selection is a tap gesture.

Alternatively, in some other embodiments, the keyboard may be a physical keyboard that includes a set of push-buttons, a keypad, or the like. The physical keyboard is not a part of the touch screen display. The physical keyboard includes keys that correspond to the plurality of icons described above. A user may select one or more of the icons by pushing the corresponding keys on the physical keyboard.

The device **200** may include a display tray **214**, which is displayed on the touch screen **208**. The display tray **214** may display one or more of the characters and/or symbols that are selected by the user. The device **200** may also include one or more physical buttons, such as the clear, hold and menu buttons shown in FIG. **2**. The menu button may be used to navigate to any application in a set of applications that may be executed on the device **200**. Alternatively, in some embodiments, the clear, hold, and/or menu buttons are implemented as soft keys in a GUI in touch screen **208**.

Attention is now directed to FIG. **3**, which illustrates a flow diagram of a process flow **300** for providing word recommendations in accordance with some embodiments. As text is entered by a user on a device, one or more candidate character sequences (suggested replacements) may be provided in response to the entered text. The user may select a candidate character sequence to further extend or to complete the entered text.

A current character string is displayed in a first area of a touch screen of a portable device (**302**). In some embodiments, the current character string (which is a word, number, symbol, or a combination thereof) is at least a portion of a sequence of characters entered into the device by a user. The user inputs a sequence of characters into the portable device via an input device, such as a keyboard **210**, and the device receives and displays the input on the touch screen. In some embodiments, the current character string is the endmost sequence of non-whitespace characters input by the user via the input device and delimited from the rest of the sequence of characters entered by the user by delimiters, such as whitespaces, line breaks, and punctuation.

The current character string (or a portion thereof) and one or more suggested replacements for the current character string is displayed in a second area (for example, a word selection area **216**) of the touch screen (**304**). The second area may be located between the first area and the keyboard. The one or more suggested replacements, which may be words, numbers, or combinations thereof, are selected from a dictionary **136** for display by the device in accordance with predefined procedures. An example of a procedure for selecting suggested replacements for display is described in U.S. patent application Ser. No. 11/620,641, which is hereby incorporated by reference as background information. The user may take one of a plurality of actions with respect to the current character string and the suggested replacement displayed in the second area. If the user action is activation of a key on the keyboard associated with a delimiter (**306**—Activate a key . . . ), the current character string in the first area of the touch screen is replaced with the suggested replacement (**308**). The delimiter associated with the activated key may be appended to the end of the suggested replacement in the first area. For example, if the activated key is associated with a comma, a comma is appended to the suggested replacement (which replaces the current character string) in the first area. In some embodiments, delimiters include spaces, line breaks (sometimes called line returns), and terminal punctuation (for example, commas, periods, exclamation points, question marks, and semicolons). In other embodiment, delimiters may include a subset of the delimiters listed above, and may optionally include additional delimiters as well.

If the user action is performance of a first gesture on the suggested replacement in the second area of the touch screen (**306**—Perform gesture on the suggested replacement . . . ), the current character string in the first area of the touch screen is replaced with the suggested replacement (**308**). In some embodiments, a whitespace is appended to the end of the suggested replacement in the first area. In some embodiments, the first gesture includes one or more taps on the suggested replacement in the second area.

If the user action is performance of a second gesture on the current character string in the second area (**306**—Perform gesture on the current character string . . . ), the current character string is maintained in the first area (**310**). In some embodiments, a whitespace is appended to the end of the current character string in the first area. In some embodiments, the second gesture includes one or more taps on the current character string in the second area.

In some embodiments, the device displays a plurality of suggested replacements in the word selection area. In these embodiments, the user may select the desired replacement by performing a gesture on the desired replacement. However, if the user activates a key associated with the delimiter, a replacement is selected from amongst the plurality in accordance with one or more default rules. For example, a default rule may be that the highest ranked suggested replacement is selected.

In some embodiments, if the current character string in the first area was replaced with the suggested replacement, the user may review the current character string that was replaced. The user may perform a third gesture on the suggested replacement in the first area. After the third gesture is performed, the (original) current character string is displayed in the first area for a predetermined amount of time. In some embodiments, the third gesture includes one or more taps on the suggested replacement in the first area. Further details

# A417

APLNDC630-0001914292

**JOINT TRIAL EXHIBIT NO. 13, Page 20 of 24**

US 8,074,172 B2

9

10

regarding reviewing the replaced current character string is described below in relation to FIGS. 5A-5B.

Attention is now directed to FIGS. 4A-4I, which illustrate a user interface for providing word recommendations in accordance with some embodiments. In a portable electronic device 200, text 218 entered by the user via a keyboard 210 or other input may be displayed in a first area, e.g. display tray 214. A cursor or insertion marker 220 may be displayed in the display tray 214 to indicate the insertion position of the next entered character.

The text 218 may include one or more strings separated by one or more delimiters, such as spaces and punctuation. The end-most string in the text 218 may be highlighted as the current character string 222 (FIG. 4B). The current character string 222 may be a complete or incomplete word. The device 200 may display one or more suggested replacements 224 (for example, "car" in FIG. 4D; "car," "cat," "cabinet," and "candle" in FIG. 4F) in a second area, e.g. word selection area 216. A duplicate 226 of the current character string 222 may also be displayed in the word selection area 216. In some embodiments, the suggested replacement(s) and the current character string duplicate 226 are displayed on opposite sides of the word selection area 216. For example, the suggested replacement(s) may be displayed in the left side of the word selection area 216 and the current character string duplicate 226 may be displayed in the right side of the word selection area 216.

The user may perform a gesture (such as a tap on the touch screen) on either the duplicate 226 of the current character string 222 or the suggested replacement 224. If the user taps on the duplicate 226 of the current character string 222 in the word selection area 216 with a finger 212, as indicated by the finger contact area 228 in FIG. 4B, the current character string 222 is left as is in the display tray 214. If the user taps on the suggested replacement 224 in the word selection area 216 with a finger 212, as indicated by the finger contact area 228 in FIG. 4D, the current character string 222 is replaced in the display tray 214 by the suggested replacement 224 (FIG. 4E).

As an example, the current character string 222 "cae" is highlighted, as shown in FIG. 4B. If the user taps the duplicate 226 of the current character string 222 in the word selection area 216, the current character string "cae" is completed and becomes part of the text 218 for which the device 200 is not providing suggested replacements, as shown in FIG. 4C. In some embodiments, a space is added to the end of the completed current character string, as shown in FIG. 4C. In some embodiments, the completed current character string ("cae" in FIG. 4C) is added to the dictionary 136. If the user taps instead the suggested replacement 224 "car" in the word selection area 216 (FIG. 4D), the current character string "cae" is replaced in the display tray 214 with the suggested replacement "car," as shown in FIG. 4E. In some embodiments, a space is added to the end of the replaced current character string in the display tray 214, as shown in FIG. 4E.

Returning to FIG. 4D, if the user hits (as indicated by the finger contact area 228 on the space bar 227) a key on the keyboard 210 that is associated with a delimiter, such as a space bar 227, the current character string 222 in the display tray 214 is replaced by the suggested replacement 224, and the delimiter associated with the key that was hit by the user is appended to the end of the suggested replacement in the display tray 214.

In some embodiments, the device 200 may display a plurality of suggested replacements 224 for a current character sequence 222 in the word selection area 216, as shown in FIG. 4F. A user may perform a gesture (e.g., a tap) on one of the plurality of suggested replacements to select that suggested replacement. The current character sequence 222 is replaced with the selected suggested replacement. As an example, in FIG. 4F, suggested replacements for the current character string "cae" include "car," "cat," "cabinet," and "candle." If the user taps on the suggested replacement "cabinet," as indicated by the contact area 228 in the word selection area 216, the current character string "cae" is replaced in the display tray 214 with the selected replacement "cabinet," as shown in FIG. 4G. If the user hits a key on the keyboard 210 that is associated with a delimiter, the current character string 222 in the display tray 214 may be replaced by the suggested replacement 224 in the word selection area 216 that is highest ranked (e.g., "car" in FIG. 4F). In some embodiments, the suggested replacements 224 are displayed in ranking order (ascending or descending, depending on the particular embodiment and/or user preferences) in the word selection area 216, so that the user may identify which suggested replacement is the highest ranked.

In some embodiments, if the current character string 222 is longer than a predefined length (based on the number of characters), the duplicate 226 of the current character string 222 in the word selection area 216 may show a subset of the characters in the current character string 222. For example, the duplicate 226 may show the first six characters of the current character string 222, as shown in FIG. 4H. As another example, the duplicate 226 may show the first three and the last three characters of the current character string 222.

As shown in FIG. 4I, in some embodiments, the highest ranked suggested replacement 240 is displayed within the space bar 227. If the user performs a predefined gesture on or near the touch screen display (e.g., taps or touches the space bar 227), the current character string 222 is replaced by the replacement string 240 shown in the space bar 227, and the display of the space bar 227 is then returned to its normal or default status (e.g., blank, or with the word "space" displaced in the space bar (see FIG. 4H)). It is noted that the space bar 227 corresponds to a delimiter (i.e., a space). In some of these embodiments, only the highest ranked suggested replacement is presented to the user, and thus any other corrections must be made manually by the user. If the user performs a second gesture with respect to the touch screen display, such as tapping any key of the keyboard other than the space bar 227, the current character string 222 is retained.

The embodiments of the invention, as described above, provides an intuitive way to integrate explicit word selection (via suggested word replacements in the second area), implicit word selection (e.g., via the space bar or other delimiter keys), and explicit non-selection of suggested word replacements (via keeping the current word, e.g., for words with unusual spellings).

In some embodiments, the device 200 may allow the user to review strings replaced by user-selected suggested replacements. Attention is now directed to FIGS. 5A-5B, which illustrate a user interface for reviewing the originally entered strings that were replaced by suggested replacements. A user may perform a gesture over a word 229 in the entered text 218. For example, the user may tap the word 229 on the touch screen with a finger 212, as indicated by the contact area 228 in the display tray 214. If the word 229 (FIG. 5A) has a replacement for some originally entered text, the originally entered text 230 may be displayed (FIG. 5B). Alternately, the originally entered text may be displayed if the user's finger hovers over the word 229 for at least a threshold period of time (e.g., 0.5 seconds, 1.0 second, or a value between 0.35 and 1.25 seconds). In some embodiments, the originally entered text 230 is displayed in place of the word 229 for a predetermined amount of time, such as 2 seconds. After the time has

**A418**

APLNDC630-0001914293

**JOINT TRIAL EXHIBIT NO. 13, Page 21 of 24**

US 8,074,172 B2

| 11 | 12 |

elapsed, the word **229** is displayed back in its place unless an undo gesture (e.g., a tap on the original text) is performed, in which case the originally entered text **230** is durably restored. In some other embodiments, the originally entered text **230** is displayed in a balloon graphic or the like extending from the word **229**.

The foregoing description, for purpose of explanation, has been described with reference to specific embodiments. However, the illustrative discussions above are not intended to be exhaustive or to limit the invention to the precise forms disclosed. Many modifications and variations are possible in view of the above teachings. The embodiments were chosen and described in order to best explain the principles of the invention and its practical applications, to thereby enable others skilled in the art to best utilize the invention and various embodiments with various modifications as are suited to the particular use contemplated.

What is claimed is:

**1**. A method, comprising:

at a portable electronic device with a touch screen display:
  in a first area of the touch screen display, displaying a current character string being input by a user with the keyboard;
  in a second area of the touch screen display that is between the first area and the keyboard, displaying the current character string or a portion thereof and a suggested replacement character string for the current character string on opposite sides of the second area;
  replacing the current character string in the first area with the suggested replacement character string if the user activates a space bar key on the keyboard;
  replacing the current character string in the first area with the suggested replacement character string if the user performs a first gesture on the suggested replacement character string displayed in the second area; and
  keeping the current character string in the first area and adding a space if the user performs a second gesture in the second area on the current character string or the portion thereof displayed in the second area.

**2**. A method, comprising:

at a portable electronic device with a touch screen display:
  in a first area of the touch screen display, displaying a current character string being input by a user with the keyboard;
  in a second area of the touch screen display separate from the first area, displaying the current character string or a portion thereof and a suggested replacement character string for the current character string;
  replacing the current character string in the first area with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter;
  replacing the current character string in the first area with the suggested replacement character string if the user performs a first gesture on the suggested replacement character string displayed in the second area; and
  keeping the current character string in the first area if the user performs a second gesture in the second area on the current character string or the portion thereof displayed in the second area.

**3**. The method of claim **2**, including adding a space after the current character string if the user performs the second gesture on the current character string or the portion thereof displayed in the second area.

**4**. The method of claim **2**, wherein the key on the keyboard associated with a delimiter is a space bar key.

**5**. The method of claim **2**, wherein the delimiter is any of a plurality of predefined delimiters symbols.

**6**. The method of claim **2**, wherein the keyboard is a soft keyboard that is part of the touch screen display.

**7**. The method of claim **2**, wherein the keyboard is a physical keyboard that is not a part of the touch screen display.

**8**. The method of claim **2**, wherein the character strings are words, numbers, or a combination thereof.

**9**. The method of claim **2**, further comprising:
  in the second area of the touch screen display, displaying an alternative suggested replacement character string for the current character string; and
  replacing the current character string in the first area with the alternative suggested replacement character string if the user performs a predefined gesture on the alternative suggested replacement character string in the second area.

**10**. The method of claim **2**, further comprising adding the current character string to a dictionary in the device if the user performs the second gesture on the current character string displayed in the second area.

**11**. The method of claim **2**, wherein the first gesture includes one or more taps on the suggested replacement character string displayed in the second area.

**12**. The method of claim **2**, wherein the second gesture includes one or more taps on the current character string displayed in the second area.

**13**. The method of claim **2**, further comprising, after replacing the current character string in the first area with the suggested replacement character string, displaying the current character string in place of the suggested replacement character string in the first area if the user performs a third gesture on the suggested replacement character string in the first area.

**14**. The method of claim **13**, wherein the third gesture comprises a tap gesture or a hover gesture.

**15**. The method of claim **2**, wherein, in the second area of the touch screen display, the suggested replacement character string and the current character string are on opposite sides of the second area.

**16**. The method of claim **2**, wherein, in the second area of the touch screen display, the suggested replacement character string is on the left side of the second area and the current character string is on the right side of the second area.

**17**. The method of claim **2**, wherein the second area is between the first area and the keyboard.

**18**. A graphical user interface on a portable electronic device with a keyboard and a touch screen display, comprising:
  a first area of the touch screen display that displays a current character string being input by a user with the keyboard; and
  a second area of the touch screen display separate from the first area that displays the current character string or a portion thereof and a suggested replacement character string for the current character string;
  wherein;
  the current character string in the first area is replaced with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter;
  the current character string in the first area is replaced with the suggested replacement character string if the user performs a gesture on the suggested replacement character string in the second area; and

US 8,074,172 B2

13

the current character string in the first area is kept if the user performs a gesture in the second area on the current character string or the portion thereof displayed in the second area.

**19**. A portable electronic device, comprising:

a touch screen display;

one or more processors;

memory; and

one or more programs, wherein the one or more programs are stored in the memory and configured to be executed by the one or more processors, one or more programs including:

instructions for displaying, in a first area of the touch screen display, a current character string being input by a user with the keyboard;

instructions for displaying, in a second area of the touch screen display separate from the first area, the current character string and a suggested replacement character string for the current character string;

instructions for replacing the current character string in the first area with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter;

instructions for replacing the current character string in the first area with the suggested replacement character string if the user performs a first gesture on the suggested replacement character string displayed in the second area; and

instructions for keeping the current character string in the first area if the user performs a second gesture in the second area on the current character string or the portion thereof displayed in the second area.

**20**. A computer readable storage medium storing one or more programs, the one or more programs comprising instructions, which when executed by a portable electronic device with a touch screen display cause the portable electronic device to:

in a first area of the touch screen display, display a current character string being input by a user with the keyboard;

in a second area of the touch screen display separate from the first area, display the current character string or a portion thereof and a suggested replacement character string for the current character string;

replace the current character string in the first area with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter;

replace the current character string in the first area with the suggested replacement character string if the user performs a first gesture on the suggested replacement character string displayed in the second area; and

keep the current character string in the first area if the user performs a second gesture in the second area on the current character string or the portion thereof displayed in the second area.

**21**. A computer readable storage medium storing one or more programs, the one or more programs comprising instructions, which when executed by a portable electronic device with a display and a keyboard, cause the portable electronic device to perform a method comprising:

receiving a plurality of user inputs of characters through the keyboard, and displaying on the display a current character string as input by the user;

displaying a suggested replacement character string for the current character string;

14

while both the current character string and the suggested replacement string are displayed, receiving a further user input through a punctuation mark key of the keyboard; and

in response to the further user input, replacing the current character string with the suggested replacement character string, and appending a punctuation mark at the end of the replacement character string, the punctuation mark corresponding to the punctuation mark key through which the further user input was received.

**22**. The computer readable storage medium of claim **21**, wherein the punctuation mark key corresponds to a punctuation mark selected from the group consisting essentially of a comma, a period, an exclamation point, a question mark, and a semicolon.

**23**. The computer readable storage medium of claim **21**, wherein the display is a touch screen display, and wherein the keyboard is a virtual keyboard displayed on the touch screen display.

**24**. The computer readable storage medium of claim **23**, wherein the virtual keyboard comprises a display that simultaneously displays a first plurality of virtual keys each associated with a respective letter of the alphabet, and a second plurality of virtual punctuation mark keys each corresponding to a respective punctuation mark.

**25**. The computer readable storage medium of claim **24**, wherein the plurality of virtual punctuation mark keys comprises a first virtual punctuation mark key corresponding to a comma and a second virtual punctuation mark key corresponding to a period.

**26**. The computer readable storage medium of claim **21**, wherein displaying a suggested replacement character string for the current character string comprises displaying a single suggested replacement character string.

**27**. A portable electronic device, comprising:

one or more processors;

a touch screen display; and

computer readable memory comprising instructions that, when executed by the one or more processors, perform operations comprising:

receiving a plurality of user inputs of characters through the keyboard, and displaying a current character string as input by the user,

displaying a suggested replacement character string for the current character string;

while both the current character string and the suggested replacement string are displayed, receiving a further user input through a punctuation mark key of the keyboard, and

in response to the further user input, replacing the current character string with the suggested replacement character string, and appending a punctuation mark at the end of the replacement character string, the punctuation mark corresponding to the punctuation mark key through which the further user input was received.

**28**. A portable electronic device, comprising:

one or more processors;

a display;

a keyboard; and

computer readable memory comprising instructions that, when executed by the one or more processors, perform operations comprising:

receiving a plurality of user inputs of characters through the keyboard, and displaying on the display a current character string as input by the user,

displaying on the display a suggested replacement character string for the current character string, and

US 8,074,172 B2

15

receiving a further user input of a single touch, wherein the portable electronic device is configured to receive the further single user input to perform a selected character string function of a plurality of possible character string functions depending on where the further single user input is received, the plurality of possible character string functions comprising,

replacing the current character string with the suggested replacement character string in response to a single user input at a first location,

replacing the current character string with the suggested replacement character string in combination with a first punctuation mark in response to a single user input at a second location, the second location being a first punctuation mark key on the keyboard corresponding to the first punctuation mark,

replacing the current character string with the suggested replacement character string in combination with a second punctuation mark in response to a single user input at a third location, the third location being a second punctuation mark key on the keyboard corresponding to the second punctuation mark, and

accepting the current character string in response to a single user input at a fourth location.

29. The portable electronic device of claim 28, wherein the display is a touch screen display, and wherein the keyboard is a virtual keyboard displayed on the touch screen display.

30. The portable electronic device of claim 29, wherein the virtual keyboard comprises a display that simultaneously displays a first plurality of virtual keys each associated with a respective letter of the alphabet, and a second plurality of virtual punctuation mark keys each corresponding to a respective punctuation mark.

31. The portable electronic device of claim 30, wherein the first punctuation mark key is a virtual punctuation mark key corresponding to the first punctuation mark, and the second punctuation mark key is a virtual punctuation mark key corresponding to the second punctuation mark.

32. A portable electronic device, comprising:

one or more processors;

a touch screen display; and

computer readable memory comprising instructions that, when executed by the one or more processors, perform operations comprising,

receiving a plurality of user inputs of characters through a virtual keyboard that simultaneously displays a first plurality of virtual keys each associated with a respective single letter of the alphabet, and a second plurality of virtual punctuation mark keys each corresponding to a respective punctuation mark,

displaying on the touch screen display a current character string as input by the user,

displaying on the display a suggested replacement character string for the current character string,

in response to a first user input at a first location, replacing the current character string with the suggested replacement character string,

in response to a second user input at a virtual punctuation mark key corresponding to a first punctuation mark, replacing the current character string with the suggested replacement character string in combination with the first punctuation mark, and

16

in response to a third user input at a third location, accepting the current character string.

33. A computer readable storage medium storing one or more programs comprising instructions, which when executed by a portable electronic device with a touch screen display, cause the portable electronic device to perform a method comprising:

receiving a plurality of user character inputs through the touch screen display of the portable electronic device, wherein the user character inputs are received through a virtual keyboard displayed on the touch screen, wherein the virtual keyboard simultaneously displays a first plurality of virtual keys each associated with a respective single letter of the alphabet, and a second plurality of virtual punctuation mark keys;

displaying on the touch display a current character string as input by a user;

while displaying the current character string, also displaying a suggested replacement character string for the current character string, wherein at the time a suggested replacement character string is displayed, the portable electronic device is able to receive a plurality of possible user single touch inputs that will result in selection of the suggested replacement character string, and wherein said plurality of possible user single touch inputs includes actuation of one of the plurality of virtual punctuation mark keys;

receiving a single touch user selection input through one of the plurality of the virtual punctuation mark key; and

in response to the single touch user selection input, replacing the current character set with the suggested replacement character set and adding at the end of said character set a punctuation mark corresponding to the virtual punctuation mark key through which the input was received.

34. The computer readable storage medium of claim 33, wherein the plurality of possible single touch user inputs that will result in selection of the suggested replacement character string includes inputs that are not associated with a virtual punctuation mark key.

35. The computer readable storage medium of claim 34, wherein the plurality of possible single touch user inputs that are not associated with a virtual punctuation mark key and that will result in selection of the suggested replacement character string comprises a single touch input through the space bar of the virtual keyboard.

36. The computer readable storage medium of claim 34, wherein the plurality of possible single touch user inputs that are not associated with a virtual punctuation mark key and that will result in selection of the suggested replacement character string comprises a single touch input at the location of the displayed suggested replacement character set.

37. The computer readable storage medium of claim 33, wherein the plurality of virtual punctuation mark keys comprises virtual punctuation mark keys respectively associated with a comma and a period.

38. The computer readable storage medium of claim 37, wherein the plurality of virtual punctuation mark keys further comprises virtual punctuation mark keys respectively associated with an exclamation point and a semicolon.

\* \* \* \* \*

APLNDC630-0001914296